**WEISSLAW LLP**
Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
Telephone: (310) 208-2800
Facsimile:  (310) 209-2348

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN BUSHANSKY, derivatively on behalf of PINTEREST, INC., <br><br> Plaintiff, <br><br> v. <br><br> BENJAMIN SILBERMANN, JEFFREY JORDAN, LESLIE J. KILGORE, JEREMY S. LEVINE, GOKUL RAJARAM, FREDERIC G. REYNOLDS, EVAN SHARP, and MICHELLE WILSON, <br><br> Defendants, <br><br> and <br><br> PINTEREST, INC., a Delaware Corporation <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS, BREACH OF FIDUCIARY DUTIES, AND WASTE OF CORPORATE ASSETS** <br><br> **JURY TRIAL DEMANDED** |

1    Plaintiff Stephen Bushansky, derivatively on behalf of Pinterest, Inc. ("Pinterest" or the
2  "Company"), brings the following Verified Stockholder Derivative Complaint against members of
3  the Board of Directors of Pinterest (the "Board") for breaches of fiduciary duties owed to the
4  Company and its shareholders and for issuing a materially false and misleading Proxy Statement.
5  Except for allegations specifically pertaining to Plaintiff's own acts, the allegations in the Complaint
6  are based upon information and belief, which include but are not limited to: documents produced to
7  Plaintiff subject to a Confidentiality Agreement pursuant to Delaware General Corporation Law 220
8  ("Section 220"), the Company's public filings with the  United States Securities and Exchange
9  Commission (the "SEC"), public court filings, media and financial analyst reports, and other public
10  sources.

11  **I.    NATURE OF THE ACTION**

12    1.    This case arises from a sustained failure of the members of Pinterest's Board to
13  implement and maintain an effective system of internal controls in violation of their fiduciary duties
14  and their filing of a materially false and misleading Proxy Statement.  The members of Pinterest's
15  Board (the "Individual Defendants") have permitted and condoned a culture of racial and gender
16  discrimination that led to a hostile work environment at Pinterest and lawsuits against the Company.

17    2.    Ironically, even though Pinterest markets itself to women as a source of lifestyle
18  inspiration, the company leadership team is male dominated, and gender-biased attitudes are
19  prevalent.  Claims of gender discrimination recently surfaced when the Company's former Chief
20  Operating Officer ("COO"), Francoise Brougher, filed suit against Pinterest.  Ms. Brougher claims
21  that despite notable successes she achieved in her executive position, she was systematically excluded
22  from important decision-making processes and paid substantially less than male executives at the
23  Company.  When she brought these facts to the attention of Benjamin Silbermann, the Company's
24  Chief Executive Officer ("CEO"), the situation was not remediated, but allowed to persist and fester.
25  Ultimately, rather than fix the problems with gender unfairness at the Company, Mr. Silbermann
26  terminated her employment, costing her tens of millions of dollars.

27

28

3.     Further, in Pinterest's filing with the Equal Employment Opportunity Commission ("EEOC") for 2018, the Company reported that 64 of its 1742 employees, less than 4%, were black. In the leadership ranks of the Company, that number dropped to a mere 1%. Employees have reported that they have been the victims of a system of racial discrimination at the Company.

4.     Indeed, *USA Today* reported that a founder of one of the venture capital firms that began investing in the Company nearly ten years ago and which holds about 10% of the Company's common stock made racially insensitive remarks at a Company presentation. Pinterest employees reacted with shock and horror: "I'm extraordinarily uncomfortable with using slavery and prison culture as 'good examples' for drawing the lessons we need to draw," one employee wrote.

5.     Subsequently, two black employees went public with claims of systematic discrimination against them at Pinterest, alleging they were subjected to "racism, gaslighting and disrespect" and describing their tenure at Pinterest as "a period of glaringly unfair pay, intense discrimination, and terrifying retaliation." After those claims were made public, Mr. Silbermann circulated an email to Pinterest employees admitting: "I need to do better. My leaders need to do better. And Pinterest needs to be better."

6.     In the wake of these revelations, Pinterest employees in August 2020 staged a walk-out and circulated a petition demanding that leadership prevent discrimination and harassment among workers and that women and minorities be given meaningful roles at the Company.

7.     Pinterest's Board members and top officers set a tone at the top that devalued women and minorities. The toxic work environment has not only led to lawsuits, but to departures of talent and irreparable damage to the Company's reputation.

8.     The Company's Board breached its fiduciary duties to monitor reports of and to take meaningful action against racial and sex discrimination and pay disparity and to put in place controls that would ensure greater transparency in Pinterest's work environment. Their breaches ensured that the toxic culture created by the Individual Defendants persisted and festered, resulting in material damage to the Company.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1   9.      Plaintiff seeks to hold the Individual Defendants accountable, to recover the

2   Company's damages from those responsible and to cause the Company to implement and maintain

3   an effective system of internal controls designed to end the hostile work environment at Pinterest.

4   10.     A majority of the Pinterest Board is neither independent nor disinterested in the

5   matters at issue.  As such, Plaintiff has not made a demand on the Company's Board of Directors

6   since to do so would be a wasteful and futile act.

7   **II.   PARTIES**

8   11.     Plaintiff Stephen Bushansky acquired Pinterest stock in the Initial Public Offering for

9   Pinterest shares (the "IPO") and has continuously held Pinterest stock since the IPO.

10  12.     Nominal Defendant Pinterest is an image sharing and social media service corporation

11  designed to enable saving and discovery of information on the internet using images and, on a smaller

12  scale, animated GIFs and videos, in the form of pinboards.  Pinterest's mission is to "bring everyone

13  the inspiration to create a life they love.  Pinterest is where 335 million people around the world go

14  to get inspiration for their lives."  Pinterest is a corporation duly organized and existing under the

15  laws of the State of Delaware with its principal offices located in San Francisco, California.  Pinterest

16  stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "PINS."

17  13.     Defendant Benjamin Silbermann ("Silbermann") has served as Pinterest's Chairman,

18  President & CEO since 2012 and has been a member of the Board since 2008.  As of 2019, Defendant

19  Silbermann owns over 27% of Pinterest's Class B shares and has over 24% of the Company's voting

20  power.  In 2019, Silbermann's compensation totaled $46,222,113.

21  14.     Defendant Jeffrey Jordan ("Jordan") has served on the Pinterest Board since October

22  2011.  Defendant Jordan is a member of the Nominating and Governance Committee.

23  15.     Defendant Leslie Kilgore ("Kilgore") has served on the Pinterest Board since March

24  2019.  Defendant Kilgore is a member of the Compensation Committee and Audit Committee.

25  16.     Defendant Jeremy Levine ("Levine") has served on the Pinterest Board since April

26  2011.  Defendant Levine is the Chair of the Nominating and Governance Committee.

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1       17.    Defendant Gokul Rajaram ("Rajaram") has served on the Pinterest Board since

2   February 2020.  Defendant Rajaram is a member of the Nominating and Governance Committee.

3       18.    Defendant Fredric Reynolds ("Reynolds") has served on the Pinterest Board since

4   December 2017.  Defendant Reynolds is a member of the Audit Committee.

5       19.    Defendant Evan Sharp ("Sharp") has served as Pinterest's Chief Design & Creative

6   Officer since 2011 and has been a member of the Board since March 2019.  As of 2019, Defendant

7   Sharp owns over 5% of Pinterest's Class B shares and has over 4% of the Company's voting power.

8   In 2019, Sharp's compensation totaled $46,075,013.

9       20.    Defendant Michelle Wilson ("Wilson") is the Lead Independent Director and has

10  served on the Pinterest Board since May 2016.  Defendant Wilson is the Chair of the Compensation

11  Committee and a member of the Audit Committee.

12      21.    The Defendants referenced in ¶¶ 13-20 are collectively referred to herein as the

13  "Individual Defendants."

14  **III.   RESPONSIBILITIES AND DUTIES OF THE INDIVIDUAL DEFENDANTS**

15      22.    Due to their positions as directors of Pinterest, and because of their ability to control

16  the business and corporate affairs of Pinterest, the Individual Defendants owed Pinterest and its

17  stockholders, among other duties, the fiduciary obligations of loyalty, due care and good faith.  The

18  Individual Defendants were, and are, required to act in furtherance of the best interests of Pinterest

19  and its stockholders, which, at a minimum, requires that they use their utmost abilities to manage

20  Pinterest in an honest, lawful and ethical manner.  The Individual Defendants were, and are, required

21  to provide good faith oversight of the Company's operations, particularly with respect to the most

22  significant risks the Company faces, as well as an affirmative obligation to ensure, at the very least,

23  that the Company has systems designed to maintain compliance with all relevant laws, rules and

24  regulations.  A fiduciary of a corporation is not loyally and in good faith discharging his or her

25  fiduciary duties if, knowing that the company is noncompliant with mandatory legal obligations

26  governing the company's business, he or she does not take affirmative action to correct the deficiency

27  and allows the company to continue to break the law.

28

23. Corporations are managed by or under the direction of the board. A director's meaningful and good faith oversight is particularly important when, as here, the board knows that management has financial and personal incentives to: (a) not comply with the law; and (b) to treat such non-compliance as a business risk that, if realized, will be compensated by the company. Directors acting in good faith to ensure compliance with the law may, for example, impose performance standards on executives for measuring their efforts in ensuring compliance with the company's mandatory legal obligations, hold executives accountable for continued non-compliance and continued failure to implement an effective compliance system, and seek outside review of the company's compliance systems.

24. When management has demonstrated an inability and/or unwillingness to bring a corporation into compliance with mandatory legal and ethical obligations governing the company's business, directors have an affirmative obligation to protect the company and its stockholders. Directors who are informed that management is nevertheless incapable and/or unwilling to implement compliant business practices that do not run afoul of laws, rules and regulations, are failing to act in the face of their known duty to stop illegal conduct and protect the company and its stockholders.

25. Because of their positions of control and authority as directors of Pinterest, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Through their directorial positions within Pinterest, each Individual Defendant had access to information regarding the improper business practices described herein.

26. The conduct of the Individual Defendants complained of herein involves a culpable violation of their fiduciary duties, the absence of loyalty and good faith on their part, and a knowing, reckless and grossly negligent disregard for their duties to the Company and its shareholders. The Individual Defendants were aware, or should have been aware, that those violations, the absence of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.

27.     Aside from their legally imposed duties as officers and/or directors of a publicly traded company, the Individual Defendants were also subject to particularized duties pursuant to specific policies in effect at Pinterest.

**A. Pinterest's Code Of Business Conduct & Ethics**

28.     The Individual Defendants are required to comply with Pinterest's Code of Business Conduct & Ethics (the "Code of Conduct"), which expressly mandates that they "respect all applicable law, including local laws and regulations that apply to [the] business." The Individual Defendants were and are required, pursuant to the Code of Conduct, to "[c]omply with all applicable law and follow our Pinterest policies and procedures."

29.     The Company requires its employees, directors, and officers to use "good judgment" when deciding whether a course of action violates its Code of Conduct. "Complying with the law is important, but we go further: we also act ethically and responsibly, use good judgment, protect the company, and treat our colleagues and members of the Pinterest community with respect." However, this judgment was ignored or disregarded when it came to violations of equal pay, and other discrimination allegations.

30.     The Code of Conduct has a clear written policy prohibiting sexual harassment and racial discrimination: "[w]e prohibit unlawful discrimination based on race, color, ethnicity, national origin, religion, sex (including pregnancy, childbirth, or related medical conditions), sexual orientation, gender, gender identity, gender expression, age, marital status, status as a protected veteran, physical or mental disability, medical condition, genetic information or characteristics (or those of a family member), or any other consideration made unlawful by applicable federal, state, or local laws."

31.     The Harassment and Discrimination Policy states:

Pinterest is committed to providing a work environment that is free of discrimination, harassment, mistreatment and retaliation. Comply with our Harassment and Discrimination Policy.

32.     The Individual Defendants could not waive their duties to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company without proper approval:

> Any waiver to this Code must be approved in writing by the General Counsel or his/her delegate; any waiver for a Pinterest officer or board member must be approved by the full Pinterest, Inc. Board of Directors and promptly disclosed in accordance with legal requirements.

**B. Pinterest's Corporate Governance Guidelines**

33.     Pinterest's Corporate Governance Guidelines (the "Guidelines") outline the responsibilities and functions of the Board.  The Guidelines provide, among other things, the role of the Board:

> Overseeing and reviewing the Company's strategic direction and objectives, taking into account (among other considerations) the Company's risk profile and exposures and its relationships with key stakeholders;
>
> Selecting, evaluating and compensating the Chief Executive Officer ("CEO") and other key executives, and planning for CEO and key executive succession;
>
> Overseeing the Company's compliance with applicable legal and regulatory requirements and the processes that are in place to safeguard the Company's assets and manage material risks;
>
> Monitoring the Company's accounting and financial reporting practices and reviewing financial and other controls; and evaluating the Board's composition, performance and effectiveness in carrying out such responsibilities.

34.     The Guidelines also mandate that the directors comply with the Company's Code of Conduct:

> The Board expects all directors to act ethically at all times and to adhere to the Company's Code of Business Conduct & Ethics and other applicable policies. Any request by a director or executive officer for a waiver under the Code of Business Conduct & Ethics must be sent to and approved by the full Board, and any approvals must be disclosed to stockholders, including the reasons for such approval, in accordance with the procedures set forth in the Code of Business Conduct & Ethics.

**C. Pinterest's Compensation Committee Charter**

35.     Pinterest's Compensation Committee Guidelines outline the responsibilities of the Compensation Committee to oversee the compensation of the Company's directors and employees and related matters, including matters relating to the attraction, development and retention of employees.  Additionally, the Compensation Committee members had the responsibility to adhere to the following, among other, rules and guidelines:

Executive Officer Compensation.  The Committee will evaluate the performance of the executive officers and determine the compensation of the executive officers of Pinterest based on such evaluations.

* * *

Incentive Compensation.  In determining incentive compensation for the CEO and other executive officers, the Committee will consider, among other factors it deems appropriate from time to time, Pinterest's performance during such periods as the Committee deems appropriate and the awards given in prior years.  The Committee will make recommendations to the Board for the establishment and terms of incentive-compensation and equity-based plans and will administer such plans, including determining awards for directors or executive officers under any such plan.  The Committee may establish policies and delegate authority in respect of equity-based compensation grants made to employees other than executive officers, as it deems appropriate in accordance with applicable law.

* * *

Severance and Post-Service Arrangements.  The Committee will evaluate the post-service (including severance) arrangements and benefits of the CEO and other executive officers and their reasonableness in light of practices at comparable companies and any benefits received by Pinterest in connection with such arrangements.

* * *

Say-on-Pay Vote.  When performing its responsibilities and exercising its authorities under this Charter, the Committee will consider the most recent shareholder advisory vote on executive compensation required by Section 14A of the Exchange Act (the "Say-on-Pay Vote"), review and recommend to the Board the cadence of conducting Say on Pay Votes, and review and approve proposals regarding the Say-on-Pay Vote to be included in Pinterest's proxy statement.

* * *

Stock Ownership Guidelines.  The Committee will establish and review annually any stock ownership guidelines applicable to directors and executive officers of Pinterest and will recommend to the Board revisions to any such guidelines as appropriate.

Compensation Disclosures; Committee Report.  The Committee will review and discuss with management the Compensation Discussion and Analysis ("CD&A") disclosure and related tabular presentations regarding named executive officer compensation and, based on this review and discussion, recommend to the Board whether to include the CD&A disclosure and related tabular presentations in Pinterest's annual public filings.  The Committee will furnish its report on the Committee's discussions and recommendations for inclusion in Pinterest's annual public filings as required by applicable law.

* * *

Leadership Development and Succession Planning.  The Committee will oversee short-term and long-term management succession planning and leadership assessment and development.  The Committee will provide regular reports to the Board.

**D.  Pinterest's Audit Committee Charter**

36.     While the entire Board retains ultimate responsibility to monitor and oversee the Company's compliance with legal and regulatory requirements, the Audit Committee has certain specific responsibilities.  The Audit Committee Charter sets for the purpose of the Audit Committee:

Oversee Pinterest's accounting and financial reporting processes, including Pinterest's disclosure controls and procedures, system of internal controls, internal audit function and audits of Pinterest's consolidated financial statements;

Oversee Pinterest's relationship with its independent auditors, including appointing or changing Pinterest's auditors and ensuring their independence, qualification and performance;

Provide oversight regarding significant financial matters, including Pinterest's tax planning, treasury policies, financial risk exposures, dividends and share issuances and repurchases; and Oversee Pinterest's compliance with applicable legal and regulatory requirements and Pinterest's enterprise risk management program.

37.     The  Audit  Committee  Charter,  in  pertinent  part,  identifies  the  following responsibilities for Audit Committee members:

Responsibilities

The  Audit  Committee's  main  responsibility  is  to  oversee  Pinterest's  financial reporting process, including Pinterest's disclosure controls and procedures and system of internal controls.   The Audit Committee believes that Pinterest's policies and procedures should remain flexible in order to best react to changing conditions and circumstances.  This list is intended as a guide, with the understanding that the Audit Committee  can  supplement  it  as  appropriate,  consistent  with  the  requirements  of applicable rules and regulations.

* * *

Internal Controls; Oversight.  The Audit Committee will discuss with management and the independent auditors, and provide oversight over, the design, implementation, adequacy and effectiveness of Pinterest's internal controls and material changes in such controls.  The Audit Committee will review any significant deficiencies in the design or operation of internal control over financial reporting or  material weaknesses therein  and  any  fraud  involving  management  or  other  employees  who  have  a significant role in Pinterest's internal control over financial reporting, and any required disclosures regarding Pinterest's internal controls.

* * *

Ability to Investigate; Retention of Advisors. Internal Controls; Oversight. The Audit Committee will discuss with management and the independent auditors, and provide oversight over, the design, implementation, adequacy and effectiveness of Pinterest's internal controls and material changes in such controls.  The Audit Committee will review any significant deficiencies in the design or operation of internal control over financial  reporting  or   material  weaknesses  therein  and  any  fraud  involving management or other employees who have a significant role in Pinterest's internal control over financial reporting, and any required disclosures regarding Pinterest's internal controls.   The Audit Committee has the power to investigate any matter

brought to its attention, with full access to all Pinterest books, records, facilities and employees. The Audit Committee has the sole authority to select, retain, oversee and terminate consultants, legal counsel or other advisors (each, a "Consultant") to advise the Audit Committee, at the expense of Pinterest, and to approve the terms of any such engagement and the fees of any such Consultants. In selecting a Consultant, the Audit Committee will take into account factors it considers appropriate or as may be required by applicable law or listing standards.

\* \* \*

Legal, Regulatory and Compliance. The Audit Committee will be responsible for overseeing legal and regulatory matters that have a material impact on Pinterest's financial statements and reviewing and approving the adequacy and effectiveness of Pinterest's compliance policies and procedures, including the Code of Conduct & Ethics. The Audit Committee shall have access to management, the General Counsel, internal and independent auditors in connection with such review. The General Counsel has express authority to communicate at any time with the Chair of the Audit Committee about compliance matters. Based on the Audit Committee Charter, the Individual Defendants serving on the Audit Committee knew, at all relevant times, that they had a heightened duty to ensure, monitor, and oversee the Company's compliance with laws, rules and regulations, including through cooperation with regulators and by responding in good faith to potential legal violations.

**E. Pinterest's Nominating And Corporate Governance Committee Charter**

38.     The Nominating and Corporate Governance Committee (the "Committee") charter sets forth the purpose of the Committee:

Assist the Board of Directors (the "Board") by identifying and evaluating individuals qualified to become Board members, consistent with criteria approved by the Board;

Assist the Board of Directors (the "Board") by identifying and evaluating individuals qualified to become Board members, consistent with criteria approved by the Board;

Recommend for the Board's approval the slate of nominees to be proposed by the Board to stockholders for election to the Board or nominees for election to fill interim vacancies on the Board;

Develop, update as necessary and recommend to the Board corporate governance guidelines applicable to Pinterest and oversee related corporate governance matters;

Lead the review of the performance of the Board and each of its standing committees;

In conjunction with the Compensation Committee, oversee the evaluation of management;

and recommend to the Board the directors who will serve on each committee of the Board.

39.     The Nominating and Corporate Governance Committee Charter is further charged with the following responsibilities:

- 11 -

Board Evaluations. The Committee will oversee the performance and annual self-evaluation process for the Board and each standing Committee, including conducting surveys of director observations, suggestions and preferences regarding how effectively the Board operates. The Committee will evaluate the participation of members of the Board in continuing education activities in accordance with any applicable listing rules. The Committee Chair will report the Committee's conclusions to the Board and may make recommendations to the Chairman of the Board regarding changes that the Committee deems appropriate. The Committee will evaluate whether a director who notifies the Board of a change in job responsibilities continues to satisfy the Board's membership criteria and recommend action to be taken, if any, with respect to the director.

\* \* \*

Corporate Governance Guidelines. The Committee will establish and recommend to the Board corporate governance guidelines ("Corporate Governance Guidelines") addressing, among other things, the size, composition and responsibilities of the Board and its Committees, including its oversight of management, risks and exposures associated with director and management succession planning, corporate governance, and overall board effectiveness. The Committee shall meet in executive session with key management personnel and representatives of outside advisors as required. At least annually, the Committee will review the Corporate Governance Guidelines and make recommendations to the Board with respect to changes that the Committee deems appropriate.

\* \* \*

Ability to Investigate; Retention of Advisors. The Committee has the power to investigate any matter brought to its attention, with full access to all Pinterest books, records, facilities and employees. The Committee has the authority to select, retain, oversee and terminate consultants, legal counsel or other advisors, including director search firms (each, a "Consultant"), to advise the Committee, at the expense of Pinterest, and to approve the terms of any such engagement and the fees of any such Consultants. In selecting a Consultant, the Committee will take into account factors that are required by applicable law or listing standards and such other factors that it considers appropriate.

## IV.   JURISDICTION AND VENUE

40.     The Court has jurisdiction over the causes of action asserted under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 14a-9 promulgated thereunder by the SEC, pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act. Supplemental Jurisdiction over the remaining claims exists pursuant to 28 U.S.C. § 1367. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

41.     This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, is an

1   individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction
2   by the District courts permissible under traditional notions of fair play and substantial justice.

3          42.     This action is not a collusive one to confer jurisdiction on a court of the United States
4   which it would not otherwise have.

5          43.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a
6   substantial portion of the transactions and wrongs complained of herein occurred in this District, and
7   the Defendants have received substantial compensation in this District by engaging in numerous
8   activities that had an effect in this District.

9   **V.     SUBSTANTIVE ALLEGATIONS**

10  **A. Background of Pinterest**

11         44.     As Yale classmates, Paul Sciarra and Silbermann cofounded a startup called Cold
12  Brew Labs in 2008.  Its first product was Tote, a shopping app for the iPhone.  The app had a feature
13  that Sciarra says was an afterthought; it let people save items for later, like folding down pages in a
14  paper catalog.  Ultimately, this was the feature users took to, and the startup became Pinterest.  After
15  Sharp joined, in March 2010, the trio launched the first desktop version of Pinterest, which revolved
16  around saving and sharing images through virtual collections.  Silbermann, Sharp and Sciarra are
17  referred to collectively herein, and in Pinterest's filings with the SEC, as the "Co-Founders."

18         45.     In 2011, Pinterest achieved a $200 million valuation after venture capital firms
19  Bessemer Venture Partners ("Bessemer") and Andreessen Horowitz provided substantial financing
20  to the Company.  On October 7, 2011, Business Insider reported Defendant Jordan as stating that
21  Andreessen Horowitz invested $27 million in Pinterest.

22         46.     Sciarra, however, didn't stay at Pinterest for long.  While regulatory documents from
23  2010 list him as Pinterest's President and CEO, Silbermann, a former management consultant,
24  reportedly started taking on those duties in early 2012.  Soon afterwards, Sciarra announced he was
25  departing Pinterest.  "After lots of reflection and plenty of discussion with Ben and others, I've
26  decided that now is a good time for me to step down formally from day-to-day involvement," Sciarra

27

28

said in an April 2012 blog post.  "Ben was the guy to take the company into its next phase, and he's

doing an excellent job," Sciarra told *Forbes* in 2014.

47.     Sciarra became an entrepreneur in residence at Silicon Valley venture capital firm

Andreessen Horowitz, which had led the $27 million investment round in Pinterest in late 2011.

**B. Pinterest is Controlled by Holders of its Class B Common Stock, including Defendants Silbermann and Sharp**

48.     On April 18, 2019, Pinterest held an initial public offering of its shares (the "IPO").

According to Amendment No. 2 to the S-1 Registration Statement for the IPO (the "S-1"), following

the IPO the Company would have a dual stock structure with material differences between the Class

A and Class B common stock:

> The rights of the holders of Class A common stock and Class B common stock will be identical, except with respect to voting, conversion and transfer rights.  Each share of Class A common stock will be entitled to one vote.  Each share of Class B common stock will be entitled to 20 votes and will be convertible at any time into one share of Class A common stock.  All shares of our common stock outstanding immediately prior to this offering, including all shares held by our executive officers and directors, will be reclassified into shares of our Class B common stock immediately prior to the completion of this offering.

49.     The S-1 advised that holders of Class B common stock would hold 92% of the

Company's voting power "and will have the ability to control the outcome of matters submitted to

our stockholders for approval, including the election of our directors and the approval of any change

in control transaction."

50.     In the S-1, it was disclosed that Silbermann, Sciarra, and Sharp would receive 11.4%,

9.3%, and 2.1% of the Class B common stock, respectively.  Bessemer would receive 13%, making

it the Company's largest stockholder, and Andreessen Horowitz would receive 9.6% of the Class B

common stock.

51.     One of the risks highlighted in the S-1 is: "The dual class structure of our common

stock will have the effect of concentrating voting control with those stockholders who held our capital

stock prior to the completion of this offering, including our co-founders, executive officers,

employees and directors, their affiliates, and all of our other existing stockholders (including those

1    unaffiliated with any of our co-founders, executive officers, employees or directors). This will limit

2    or preclude your ability to influence corporate matters."

3         52.    Elaborating upon the influence that the Co-Founders, Bessemer and Andreessen

4    Horowitz will have, the S-1 states:

> Our Class B common stock will have 20 votes per share, and our Class A common
> stock, which is the stock we are offering in this offering, will have one vote per share.
> Because of the 20-to-1 voting ratio between our Class B and Class A common stock,
> the holders of our outstanding Class B common stock will initially hold approximately
> 99.2% of the voting power of our outstanding capital stock following this offering,
> with 67.9% of the voting power of our outstanding capital stock following this offering
> held by our co-founders, executive officers, directors, and holders of more than 5% of
> our outstanding capital stock and their affiliates. Because the holders of our Class B
> common stock will hold in the aggregate significantly more than a majority of the
> combined voting power of our capital stock upon the completion of this offering, such
> holders (which include all of our existing stockholders, including those holders
> unaffiliated with any of our co-founders, executive officers, employees or directors)
> could control all matters submitted to our stockholders for approval. The holders of
> Class B common stock will no longer hold in the aggregate over 50% of the voting
> power of our outstanding capital stock once the Class B common stock represents in
> the aggregate less than approximately 4.76% of the outstanding capital stock of the
> company.
>
> As a result, for the foreseeable future, holders of our Class B common stock could
> have significant influence over the management and affairs of our company and over
> the outcome of all matters submitted to our stockholders for approval, including the
> election of directors and significant corporate transactions, such as a merger,
> consolidation or sale of substantially all of our assets, even if their stock holdings were
> to represent in the aggregate less than 50% of the outstanding shares of our capital
> stock. In addition, this may prevent or discourage unsolicited acquisition proposals or
> offers for our capital stock that you may feel are in your best interest as one of our
> stockholders. These holders of our Class B common stock may have interests that
> differ from yours and may vote in a way with which you disagree and which may be
> adverse to your interests. This control may adversely affect the trading price of our
> Class A common stock. Despite no longer being employed by us, Paul Sciarra, one of
> our co-founders, remains able to exercise significant voting power. ***If we terminate
> our other co-founders' employment, they would also continue to have the ability to
> exercise significant voting power to the extent they were to retain their Class B
> common stock*** while our other existing holders disposed of their Class B common
> stock.

23        53.    In the S-1 it is disclosed that there is an "Investor Rights Agreement" between, among

24    others, Silbermann, Bessemer, Andreessen Horowitz, and Sciarra and that Board members Jeffrey

25    Jordan and Jeremy S. Levine are affiliated with Andreessen Horowitz and Bessemer Venture Partners,

26    respectively.

27    **C. Pinterest is Accused of Racial Discrimination by Former Employees**

28

54.     In Pinterest's filing with the EEOC for 2018, the Company reported that 64 of its 1742 employees, less than 4%, were black.  In the leadership ranks of the Company, that number dropped to 1%.  The few who were hired by the Company have recently gone public with claims of systematic discrimination against them at Pinterest.

55.     On January 20, 2020, *USA Today* reported that Ben Horowitz, one of the co-founders of Andreessen Horowitz, the venture capital firm holding about 10% of Pinterest stock that designated Defendant Jordan to sit on Pinterest's Board, made controversial remarks at a Company-wide fireside chat conducted by the Human Resources chief Jo Dennis; the first in a series called "Progress" addressing the Company's priorities for 2020.

56.     At the fireside chat, Ben Horowitz compared prison culture to corporate culture According to screenshots leaked to *USA Today*, Pinterest employees reacted with shock and horror as Horowitz used a violent incident in prison – a shanking – to illustrate the need for people to adapt to the culture in which they find themselves.  "I'm extraordinarily uncomfortable with using slavery and prison culture as 'good examples' for drawing the lessons we need to draw," one employee wrote.

57.     On June 15, 2020, two former employees who had until recently served in key public policy roles at Pinterest made public their claims of racial discrimination at the Company.  Both of them had left the Company in May 2020.

58.     One of these employees was Ifeoma Ozoma, Pinterest's public policy and social impact manager, despite being widely credited for leading its efforts to combat misinformation, in particular regarding vaccines.  Ms. Ozoma is a Yale graduate who previously worked at Google and Facebook.

59.     Ms. Ozoma disclosed in a Twitter post that, among other things, she was unfairly paid during her time at the Company.  According to *The Washington Post*, Ozoma began raising concerns about mistreatment to the Company in January 2019.

60.     Ms. Ozoma accused her manager of "racism, gaslighting and disrespect" and slammed the Company's response to online harassment at the hands of a colleague at Pinterest.  In an interview with *The Washington Post*, Ms. Ozoma said that the ex-colleague sent her personal information,

including her cellphone number, to a rightwing activist group that then "shared my personal information on just about every dark corner of the Internet." Ozoma says the Company's inadequate response to the online harassment forced her to hire Storyful, a social media intelligence agency, and enlist the help of former coworkers at Google and Facebook to monitor and protect her personal information.

61.     Since she went public regarding her mistreatment at Pinterest, Ms. Ozoma said that she had been contacted by other black employees of Pinterest who shared similar experiences but were scared to say anything.

62.     The other former employee who disclosed her experience with racial discrimination at Pinterest was Aerica Shimizu Banks, who served in federal government relations for the Company. Ms. Banks said on Twitter that she received "disparaging comments about my ethnicity in front of my team."

63.     Banks said her manager made "disparaging comments" about her ethnicity, which she reported to human resources.  A report on the incident compiled by Pinterest Human Resources, shared with *The Washington Post*, confirms that Banks, who is half Japanese, reported that a supervisor "made comments to you about the origin of ramen noodles as a result of a bias towards you." *The Washington Post* reported that the Company investigated and cited from internal Pinterest emails the conclusion that these comments "do not indicate bias on their own and are not a violation of our Code of Conduct."

64.     Banks described her tenure at Pinterest as "a period of glaringly unfair pay, intense discrimination, and terrifying retaliation."

65.     *The Washington Post* reported that Pinterest has a reputation of being more aggressive in addressing harmful content than other social networks.  Contrary to that reputation, Ozoma told the paper that she was criticized for her recommendations to Pinterest for stamping out racist content. Among those recommendations, Ozoma noted that the Company stop promoting content romanticizing weddings at former slave plantations, a move that was widely praised in the media.

1    Yet, documents shared with The Technology 202 show that her supervisor criticized her for not

2    providing more options to consider, other than an outright ban.

3        66.    On June 18, 2020, *Bloomberg News* reported that Silbermann sent an email to

4    employees in the wake of the revelations of racial discrimination.  "I'm embarrassed to say that I

5    didn't understand the depth of the hardship and hurt many of our team members have experienced,"

6    Silbermann wrote in the email, obtained by *Bloomberg News*.  "I need to do better.  My leaders need

7    to do better.  And Pinterest needs to be better."  He also outlined a list of steps the Company will take,

8    including boosting diverse representation at senior levels and improving understanding and awareness

9    of racism and bias.

10       67.    On June 29, 2020, it was announced that a newly formed committee of the Board has

11   hired the law firm WilmerHale to conduct a "comprehensive and independent review of our policies

12   and practices concerning discrimination, harassment, and other workplace issues."

13       **D. Pinterest is Sued for Sex Discrimination**

14       68.    On August 11, 2020, Pinterest was sued by Francoise Brougher, the Company's

15   former Chief Operating Officer ("COO") for gender discrimination, retaliation, and wrongful

16   termination.

17       69.    Ms. Brougher had developed a sterling reputation over 20 years serving as an

18   executive in some of Silicon Valley's most successful companies.  She serves on the Board of

19   Directors of Sodexo, a French multinational company operating in 70 countries.

20       70.    Ms. Brougher joined Pinterest in March 2018 as the COO.  After she joined Pinterest,

21   revenue grew in the third and fourth quarters of 2018, paving the way in part for a successful IPO.

22   Under her leadership, her team became more disciplined around sales process and customer

23   segmentation.  They made significant progress toward rebuilding the marketing team, diversifying

24   advertisers, and building a stronger ecosystem by re-engaging partners.  The communication team's

25   promotion of the Company resulted in more positive mentions in the press.  She encouraged Pinterest

26   to keep political advertising off Pinterest.  Her team introduced new processes to increase velocity

27   and clarity of goals.

28

71.     In her complaint, Ms. Brougher avers that when she raised questions about Pinterest policies, Silbermann criticized her for not being collaborative and told her that she did not have consistently healthy cross-functional relationships.   When Ms. Brougher asked him specifics, he could not provide them.   Instead, he told her to keep quiet, saying she should "be mindful" of how she acted in group setting.   He discouraged her from communicating directly, saying it was unacceptable for her to say, "we have basically not improved x."

72.     Silbermann's comments were paradigmatic of gender discrimination.   Women are encouraged to be assertive in the workplace, but assertiveness is a liability for women, even for executives.   Whereas male executives are viewed as bold, thoughtful, and engaged leaders when they challenge and critique proposed strategy decisions, female executives are viewed as uncooperative. In Ms. Brougher, candor was detrimental, despite being a corporate core value.

73.     About one year after being hired, Ms. Brougher discovered that the Company discriminated against her in the structure of her equity compensation.

74.     Ms. Brougher averred that when she was hired, she was told that that the Board had directed that executives receive backloaded equity grants, *i.e.*, that the majority of the shares would vest in the last two years of the grant.   Specifically, her equity grant provided that only ten percent of the shares vested the first year; twenty percent vested the second year; thirty percent vested the third year; and forty percent vested the fourth year.

75.     As Pinterest approached its IPO, it offered Ms. Brougher an IPO retention grant that was even more backloaded.   Starting in March 2019, Ms. Brougher was to receive stock over five years with the last two years making up most of the reward.   She was scheduled to vest zero stock in the first year, five percent in the second year, five percent in the third year, forty-five percent in the fourth year, and forty-five percent in the fifth year.   She subsequently learned that not all Pinterest executives were treated equally.

76.     The Company's S-1 filing with the SEC reflected the salaries of Pinterest's highest-paid employees.   Even though Ms. Brougher was the COO and managed a large, complex organization, she was not on that list.   She also discovered that her male peers had been given more

1   favorable vesting schedules.  For the male executives on the list, their initial equity grants were not

2   backloaded and their IPO retention grants were much less backloaded that Ms. Brougher's.

3        77.    Compared to the initial grant to Morgenfeld, the Company's CFO, Ms. Brougher's

4   was significantly backloaded.  Morgenfeld received 812,500 shares in his first year, but Ms. Brougher

5   only received 300,000 shares, a mere 37% of the equity paid by the Company to Morgenfeld.

6        78.    Ms. Brougher raised her concerns about the disparate treatment in compensation

7   policies with Silbermann, but he told her to take those concerns to the Human Resources ("HR")

8   department of the Company.  Ms. Brougher prepared a spreadsheet reflecting the disparate pay

9   provided to her vs. her male peers and brought it to HR.  According to Ms. Brougher's complaint,

10  Silbermann then relented in part and authorized an adjustment to her equity package.

11       79.    After the IPO, Ms. Brougher claims that she was no longer invited to Pinterest Board

12  meetings even though sometimes members of her team, without her knowledge, were invited to

13  attend.  Her male colleagues also excluded her from Ads team meetings.

14       80.    In Silbermann's mid-year performance review for Ms. Brougher, he acknowledged

15  her accomplishments focused on her relationships, such as her focus on engagement, having an

16  operationally focused team, attracting talent, and promoting the "Care with Candor" value.  However,

17  Silbermann omitted any mention of Ms. Brougher's success in revenue growth, which had risen from

18  less than $500 million to over $1.1 billion during her tenure.  Silbermann also critiqued Ms.

19  Brougher's style and, without identifying substantive examples, encouraged her to be proactive and

20  collaborative.

21       81.    Ms. Brougher avers that around January 2020, Morgenfeld became increasingly

22  disrespectful to her.  He frequently ignored her and undermined her authority by talking directly to

23  her team members, even on projects she was leading.  In one meeting, Morgenfeld disparaged her in

24  front of her peers by sarcastically asking, "What is your job anyway?"  Most of Morgenfeld and Ms.

25  Brougher's one-on-one meetings were taken off calendar.

26       82.    Pinterest did nothing to stop Morgenfeld's discriminatory and harassing conduct, and

27  instead it permitted his behavior to continue.

28

83.     Often, Silbermann would hold off on making key strategy decisions until after the meetings Ms. Brougher attended. Later, he would meet with one or two male colleagues and together they would make the decision - without Ms. Brougher in the room. Her experience is common to women and minorities who often do not have informal handshake relationships with their male colleagues and are regularly excluded from the rooms where decisions are made.

84.     For example, Silbermann chose not to invite Ms. Brougher on Pinterest's IPO roadshow despite the fact that she was managing approximately half of the Company as COO, was responsible for all of Pinterest's revenue, had prior roadshow experience, and knew many of the investors. Nevertheless, Mr. Silbermann told her to stay back at the Company and invited to the roadshow an executive with whom he was friendly, the Head of Global Communication, even though his role overlapped with the Head of Investor Relations, who also attended.

85.     In February, Ms. Brougher received a peer review from Morgenfeld in which his only comment on her 2019 achievements was that: "Seems to be a champion for diversity issues" – ignoring numerous other successes for which she was responsible that year.

86.     Ms. Brougher texted Silbermann that she was upset by Morgenfeld's feedback. His response to her concerns was to suggest that she approach the problem with "curiosity."

87.     Ms. Brougher tried to address her concerns directly with Morgenfeld in a videoconference on February 21, 2020. On the call, she reiterated her goal of working collaboratively with him, explained that she wanted to better understand his peer feedback and asked him why his only comment about her achievements was that she was a "champion for diversity." Morgenfeld responded defensively, asserting that she was a champion of women's issues. Ms. Brougher asserts that she was taken aback by Morgenfeld's response and replied that being a female executive does not make her a champion of women's issues, nor is that the appropriate measure of her capabilities as COO. Morgenfeld became angry, raising his voice, and calling her a liar. He bragged about his "impeccable" record on diversity, questioned the value she brought to the Company then hung up.

88.     On February 24, Chief Human Resources Officer Jo Dennis met with Ms. Brougher to discuss her call with Morgenfeld. Dennis agreed that it was inappropriate for Morgenfeld to have

1   used "diversity" as the main criteria to evaluate Ms. Brougher's performance as COO.  Ms. Brougher

2   emphasized that she liked her job and wanted to find a way to work with Morgenfeld but explained

3   that because of his behavior during their last conversation, she was uncomfortable meeting with him

4   without someone else in the room until this was resolved.

5          89.     Rather than attempt to mediate this dispute between Ms. Brougher and Mr.

6   Morgenfeld, Dennis treated the matter as a potential legal issue for the Company and escalated it to

7   the Company's in-house counsel.

8          90.     The same day, Ms. Brougher met with Silbermann and the topic of Ms. Brougher's

9   call with Morgenfeld came up.  Again, Ms. Brougher explained to Silbermann that Morgenfeld's

10  comments toward her were demeaning and offensive and that she felt tired of the abuse and was

11  uncomfortable meeting with Mr. Morgenfeld without a witness present because of his hostility toward

12  her.  Silbermann responded that the situation was analogous to an old couple fighting over who would

13  make coffee and made it clear that he did not want to get involved, rather he would let Dennis work

14  it out.

15         91.     In the midst of Ms. Brougher's efforts to address the discriminatory conduct, the

16  COVID-19 crisis took the entire executive team's focus.  As COO, Ms. Brougher rose to the occasion

17  and did a tremendous job responding to the crisis.

18         92.     On March 26, Dennis contacted Ms. Brougher and informed her that Morgenfeld's

19  comment in her peer review was appropriate because he believed his statement to be true, *i.e.* that

20  Ms. Brougher was seen as an advocate for diversity.  Dennis did not propose any action to address

21  the disagreement.  Instead, she placed the burden on Ms. Brougher, saying, "Let me know if you'd

22  like to discuss further, very happy to jump on a call with you, or with you and [Mr. Morgenfeld]."

23         93.     A week later, Dennis reached out to Ms. Brougher to warn her that her role at Pinterest

24  would be changing.  Dennis tried to insulate Silbermann from any pushback by assuring Ms. Brougher

25  that he "cared" about her.  On April 2, 2020, Silbermann called her and terminated her employment.

26  He asked her to transition her responsibilities to Morgenfeld over the next month.

27

28

94.     The explicit reason he gave for her termination was her "cross-functional" relationships.  Silbermann asked Ms. Brougher to cover up the Company's decision to terminate her employment by telling her team that she had decided to leave the Company.  She declined to do so. Officially, her termination occurred on April 7, 2020.  Silbermann concealed the Company's actions by issuing a note to Pinterest's employees thanking Ms. Brougher for her work.

95.     Ms. Brougher alleges that her termination cost her tens of millions of dollars in lost earnings and equity compensation.

96.     In an article entitled "The Pinterest Paradox: Cupcakes and Toxicity," published on August 11, 2020 on Medium, an online publishing platform, Ms. Brougher further discussed the gender discrimination she faced at Pinterest:  "Although 70 percent of Pinterest's users are women, the company is steered by men with little input from female executives.  Pinterest's female executives, even at the highest levels, are marginalized, excluded, and silenced."

97.     Contrary to Pinterest's purported reason for terminating her employment, *i.e.*, not being "collaborative," Ms. Brougher wrote that she believed that she was fired for speaking out about the rampant discrimination, hostile work environment, and misogyny permeating Pinterest.  "What happened to me at Pinterest reflects a pattern of discrimination and exclusion that many female executives experience, not only in the tech industry but throughout corporate America," she wrote. "[I]f someone of my privilege and seniority is fired for speaking out about these issues, the situation is likely far worse for people earlier in their careers."

98.     On August 14, 2020, *The New York Times* published an opinion piece by Kara Swisher entitled "Hitting the Glass Ceiling, Suddenly at Pinterest."   The article discusses the gender discrimination faced by Ms. Brougher and others at Pinterest.  Defendant Silbermann was interviewed for the article.  When Ms. Swisher pointed out that Pinterest's web page listing its management had exactly three men on it and no one else – unusual even for tech companies – Mr. Silbermann responded, "I had no idea."  (When Ms. Swisher checked the web page after speaking with Mr. Silbermann, that page had disappeared.  Pinterest confirmed to Ms. Swisher that it was replaced by a page with additional executives on it, who were notably more diverse.)

99.     The article reported that Mr. Silbermann apparently didn't have any idea either about the depth of the culture issues at Pinterest, which both alumni and current employees describe as cliquish and secretive — a critique leveled even by a person whom Pinterest itself introduced Ms. Swisher to as a supporter.  Most said that management gave favorable treatment to men over women and treated people of color even worse.  "It's a nepotism that favors those who cozy up and say yes to power, which are the same small group of men," a former female executive said.

100.     The Individual Defendants allowed a culture where alleged victims were silenced, and the victimizers awarded, even as the Company itself purported to be investigating their misconduct. The Board's abject failure to exercise independent oversight permitted rampant and obvious sexual harassment, discrimination, and retaliation that went unabated for years.  It was only after *The New York Times* revealed the Board's misconduct that the Company was forced to address the rampant problem of sexual improprieties at Pinterest.

**E.  The Individual Defendants Cause Pinterest To File With The SEC A False And Misleading Proxy Statement**

101.     On April 9, 2020, the Individual Defendants caused Pinterest to file with the SEC the Company's Proxy Statement soliciting stockholders to, among other things:  (1) elect directors Jordan, Levine and Rajaram to new terms on the Board of Directors; and (2) approve, on an advisory basis, the frequency of future advisory votes to approve our named executive officers' compensation. The Proxy Statement contained several materially misleading statements and omitted material information that should have been disclosed to stockholders in connection with the solicitation of their votes.

102.     Egregiously, the Individual Defendants represented in the Proxy Statement that "Françoise Brougher left the Company effective April 7, 2020 and Todd Morgenfeld, our Chief Financial Officer, assumed her responsibilities."  Ms. Brougher avers in her lawsuit that she didn't leave the Company but was terminated.  Moreover, Ms. Brougher avers that her termination was a culmination of a pattern of gender discrimination spanning the entire period that Pinterest was a public company.  The stockholders were thus kept in the dark about the circumstances regarding the termination one of the Company's five highest executive officers (described in the Proxy Statement

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

as the "named Executive Officers" or "NEOs") and the substantial liability incurred by the Company thereby.

103.    The Individual Defendants further represented in the Proxy Statement, with regard to compensation policies, that:

- "[T]he majority of our NEOs' target total direct compensation is linked to the value of our stock, which will reflect how we create value over the long term. In addition, executives are eligible to receive periodic grants following the annual review cycle. When determining the amount of such awards, the compensation committee considers the company's performance as measured against financial, operational and strategic objectives as well as each named executive officer's individual contribution to that performance;"

- The Compensation Committee considers "each of our named executive officer's roles and responsibilities, qualifications, skills, experience, and tenure, including on a relative basis to other similarly situated executives at the companies in our compensation peer group" and "the performance of each of our named executive officers, based on a qualitative assessment of his or her contributions to our overall performance, ability to lead his or her business unit or function, ability to collaborate across the company and potential to contribute to our long-term financial, operational and strategic objectives;"

104.    With regard to Ms. Brougher's compensation, the Individual Defendants represented in the Proxy Statement:  "Françoise Brougher received an RSU award with a grant date fair value of $21.4 million which vests quarterly over five years as described under the '2019 Grants of Plan-Based Awards Table' below.  This award was granted by the board in 2019 after considering her past performance, expected future contributions and the criticality of her role to Pinterest, and expected contributions, as well as the total unrealized value of her outstanding equity awards and their vesting terms relative to our compensation peer group data and other Pinterest executives."

105.    The cited statements in the Proxy Statement were materially misleading and omitted material information.  Pinterest's compensation structure was rife with gender disparity that was not disclosed in the Proxy Statement and which rendered the statements made false and misleading. Indeed, the Proxy Statement omitted that compensation awarded to Ms. Brougher was substantially less than that of her male colleagues, and vested at less favorably terms than her male colleagues, and, in fact, did not reflect her individual contribution to the Company's performance and the "criticality of her role to Pinterest."

**F. Employees Walkout To Demand Change At Pinterest**

106.    On August 14, 2020, *Techcrunch.com* reported that Pinterest employees were staging a walkout to protest racial and gender discrimination at the Company.  Organizers of the walkout encouraged employees to post the following message in the #qanda and #pinployees-global channels on *Slack*: "I am [upset/angry/shocked/unhappy/whatever you're feeling] about the racial and gender discrimination that has happened at Pinterest, and am leaving work early today.  Join me. changeatpinterest.com."

107.    In addition to the walkout, a petition circulated throughout the Company demanding systemic change, including full transparency about promotion levels and retention, total compensation package transparency and for the people within two layers of reporting to the CEO to be at least 25% women and 8% underrepresented employees.

108.    "These are not isolated cases," workers wrote in the petition. "Instead, they are representative of an organizational culture that hurts all Pinterest workers, and keeps us from achieving our mission of bringing everyone the inspiration to create a life they love.  We recognize that Pinterest has been a leader in diversity and inclusive hiring, with the diversity goals for new hires. It's become clear that this is not enough, and that the diversity goals need to apply from the top down, not just the bottom up.  Not only will diverse and inclusive leadership prevent discrimination and harassment among workers, it will help us build a product that is relevant on a global scale."

**G. More Pinterest Employees Come Forward With Gender And Racial Discrimination Claims**

109.    On September 11, 2020, *The Verge*, a technology news site, reported on the discrimination faced by McKenna Rogers, a Pinterest employee in the finance department. *The Verge* reported that "[t]he issues with the finance team go beyond what Brougher laid out in her lawsuit. Interviews with four former employees suggest a pattern of unequal treatment for women and people of color in the department, including inappropriate comments from managers and unequal pay and leveling."

110.    *The Verge* reported that the issues for Ms. Rogers began shortly after she started her job, when her boss showed a keen interest in her personal life.  Ms. Rogers was separated from her

husband and said that her boss often asked about who she was dating and offered to give her rides home. She finally relented and let him drive her to the train station. On the ride, he told her all about his divorce. When she said she'd met her boyfriend through a previous job, she says he expressed excitement that she dated at work. The interaction made her deeply uncomfortable.

111. Ms. Rogers told *The Verge* that her boss did not set clear goals and often insinuated that she wasn't meeting his expectations. He'd leave the office for days at a time, then return and micromanage her work. He often routed her projects through another member of the team, though this person was not Rogers' manager.

112. When Pinterest sent out a Pulse survey and followed up with employees about the results, Ms. Rogers, assuming the information would be kept private, relayed her thoughts on how her manager could improve. Later, her manager pulled her aside and berated her. "Going to my boss with your feedback is disappointing because it makes me look bad," Ms. McKenna recalled him saying. This interaction was repeated in emails Rogers sent to the HR team in 2019, which *The Verge* reported it has reviewed.

113. *The Verge* reported that Ms. Rogers' relationship with her boss then deteriorated. He canceled their one-on-one meetings and in her midyear performance review in 2019, Ms. Rogers' boss said he wanted her to "foster more team health by expressing gratitude when someone is mentoring or helping her."

114. Ms. Rogers further told *The Verge* that during a team happy hour, her boss told a joke about a dog "licking his balls under the table at work." At this point, she decided to go to HR. In a detailed email sent on August 1, 2019, Ms. Rogers wrote that her boss had made an inappropriate joke at a happy hour and that he no longer responded to her *Slack* messages. She noted she was being passed over for assignments.

115. On August 8th, 2019, Ms. Rogers sent a follow-up email to the HR team saying that she and her boss had met and that it hadn't gone well. Ms. Rogers informed HR that she would be working from home for the day because she no longer felt comfortable in the office.

116.    Ultimately, the HR team decided not to further investigate Ms. Rogers' claims, according to emails between her and the HR team which *The Verge* reports that it has reviewed. Instead, Ms. Rogers and the HR team agreed she and her boss would have mediated meetings.  The HR team also sent her resources for requesting a leave of absence.

117.    Ms. Rogers met with her manager in a mediated meeting in 2019, as suggested by HR. She thought that with an HR team member present, she would be able to give her boss feedback and hear how she might improve.  Instead, she says her boss lost his temper during the meeting.  In a follow-up email with the HR team, Ms. Rogers says, "I understand this was a highly emotional conversation, but is this something you could follow up with him about?  Lately in our 1:1s it tends to head this direction and I'd like to figure out how to diffuse it."

118.    *The Verge* reported that Ms. Rogers decided to quit after her therapist told her she was suffering from PTSD and severe depression.  In her resignation email to her boss and the HR team, she said: "My reason for leaving at this point in time is due to your poor treatment of me over the past 6-8 months…I've developed PTSD due to this and it is time for me to leave Pinterest."  Her boss never responded to her email.  The person who did was an HR coordinator who sent a perfunctory note about doing an exit interview and forgot to even fill her name into the blank on the form letter, instead writing: "Hi McKenna, my name is [Name]."

119.    Ms. Rogers says she would not have come forward if Ifeoma Ozoma and Aerica Shimizu Banks hadn't spoken up first.

120.    According to *The Verge*, Ms. Rogers is not alone.  Another woman who worked on the payroll team says she, too, came into her job thinking Pinterest was going to be a positive and supportive place to work.  She quickly came to believe, however, that the expectations of her were different than that of men on the team.  She helped oversee payroll for multiple countries, regularly working nights and weekends, but her boss insinuated this wasn't enough.  If a man on the team forgot to release payroll, she says her boss would blame her for not reminding them.

121.    Eventually, the pressure became too much, and she quit.  "I felt like a failure.  I gave up my equity, I gave up this great role.  I felt like I was being pushed out of my job," she told *The*

*Verge.*  She got severance when she left that was contingent on her not disparaging the Company, which is why she is not named the article.

122.     Employees told *The Verge* that senior men at Pinterest tended to get favorable treatment.  According to another woman on the finance team, who asked not to be named for fear of professional retaliation, some got outsized equity grants compared to their female colleagues.

123.     *The Verge* also reported on systematic racial discrimination at Pinterest.  Months earlier, a man who worked on the finance team looked at the payroll data and realized that black people at the Company were being underpaid compared to their white colleagues.  He asked not to be named in the article for fear of legal retaliation.  When he brought the data reflecting pay disparities to the HR team, he assumed they would be grateful.  However, instead of asking him about the data, he says they questioned him about why he'd pulled the information and who had put him on the project.

H.   **The Individual Defendants Were Aware Of Racial And Gender Discrimination At Pinterest But Failed To Take Timely Action**

124.     Though Pinterest had begun to publicly offer shares in April 2019, REDACTED REDACTED PINS-220_0000405.

125.     On August 15, 2019, REDACTED REDACTED REDACTED PINS-220_0000406.

126.     On November 21, 2019, REDACTED REDACTED REDACTED PINS-220_0000412.

127.     In the first and second quarters of 2020, REDACTED REDACTED PINS-220_0000371, PINS-220_0000378.

1    128.   On June 28, 2020, REDACTED

REDACTED

REDACTED                    PINS-220_0000548.

129.   At the June 28, 2020 REDACTED

REDACTED

REDACTED             PINS-220_0000548-49.   REDACTED

REDACTED

REDACTED                         PINS-220_0000549.

130.   By the third quarter of 2020, REDACTED

REDACTED                                                      PINS-

220_0000396.  The Audit Committee was informed that REDACTED

REDACTED             *Id.*  REDACTED                                  the

Audit Committee was advised that REDACTED

REDACTED          PINS-220_0000397.

131.   On August 15, 2020, REDACTED

REDACTED

REDACTED                   PINS-220_0000402.   The requirement that such issues

REDACTED

REDACTED          PINS-220_0000397.

## VI.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

132.   In committing the wrongful acts alleged herein, the Individual Defendants have

pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with

and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

133. The Individual Defendants initiated a course of conduct that was designed to and did conceal and condone that Pinterest was in violation of its own internal rules, as well laws regarding discrimination and harassment.

134. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law and Pinterest's Code of Conduct, including breaches of fiduciary duty.

135. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by purposefully or recklessly failing to comply with relevant laws, rules and regulations and the Company's own Code of Conduct. Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

136. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.

## VII.    DERIVATIVE ALLEGATIONS

137. Plaintiff brings this action derivatively in the right and for the benefit of Pinterest to redress the breaches of fiduciary duties and other violations of law, as well the Company's Code of Conduct, by the Individual Defendants as alleged herein. Plaintiff is a current stockholder of the Company and was a stockholder during the events complained of. Plaintiff will continue to hold Pinterest shares through the duration of this action.

138. Plaintiff will adequately and fairly represent the interests of Pinterest and its stockholders in enforcing and prosecuting the Company's rights, and Plaintiff has retained counsel experienced in prosecuting this type of derivative action.

1    **VIII.    DEMAND FUTILITY ALLEGATIONS**

2           139.    Plaintiff has not made a demand on Pinterest's Board to investigate and prosecute the

3    wrongdoing alleged herein.  Such a demand would be a futile and wasteful act for the reasons set

4    forth below.  Under such circumstances, demand is excused.

5           140.    As the Company itself admits in the 2020 Proxy, two of its Directors are not

6    independent as defined by the New York Stock Exchange, *i.e.,* Defendants Silbermann, and Sharp.

7           141.    At all relevant times, Defendant Silbermann was the Company's CEO, and therefore

8    was not independent.  As an employee, Silbermann derives substantially all of his income from his

9    employment with Pinterest, thus he could not disinterestedly consider a demand for action that might

10   require him to sue the directors and/or fellow members of management with whom he works on a

11   day-to-day basis.  Moreover, Silbermann's own conduct is implicated in Ms. Brougher's lawsuit and

12   Silbermann cannot act with the requisite disinterest and independence in considering his own conduct,

13   as well as that of his close allies at the Company.

14          142.    At all relevant times, Defendant Sharp was the Company's Chief Design and Creative

15   Officer, and therefore was not independent.  As an employee, Sharp derives substantially all of his

16   income from his employment with Pinterest, thus could not disinterestedly consider a demand for

17   action that might require him to sue the directors and/or fellow members of management with whom

18   he works on a day-to-day basis.

19          143.    Defendants Silbermann and Sharp are Co-Founders of Pinterest.  Silbermann owns

20   over 27% of Pinterest's Class B shares and has over 24% of the Company's voting power.  Defendant

21   Sharp owns over 5% of Pinterest's Class B shares and has over 4% of the Company's voting power.

22   As such, Silbermann and Sharp have significant influence over the management and affairs of the

23   Company, as well as all matters requiring stockholder approval, including the election of directors

24   and significant corporate transactions for the foreseeable future.  The Company even acknowledges

25   in that same filing that the concentration of voting power in the hands of the Company's Co-Founders

26   "limit[s] or preclude[s] [stockholders'] ability to influence corporate matters."

27

28

144.    Defendants Jordan and Levine are closely allied with the Co-Founders, having worked with them for many years.   Jordan and Levine are representatives of Andreessen Horowitz and Bessemer, respectively, which own about 10% and 13% of the Company's Class B shares and, as such have significant influence over the management and affairs of the Company, as well as all matters requiring stockholder approval, including the election of directors and significant corporate transactions for the foreseeable future.  Indeed, Defendant Jordan published an article on Andreessen Horowitz's website acknowledging that "Pinterest was one of my first investments when I moved into venture capital, and its IPO is officially my first in my 8-year tenure as an investor."

145.    Moreover, Defendant Jordan is neither disinterested nor independent since Andreessen Horowitz's conduct is at issue.  On January 20, 2020, *USA Today* reported that Ben Horowitz, one of the co-founders of Andreessen Horowitz, made controversial remarks at Pinterest during a companywide fireside chat conducted by the Human Resources chief Jo Dennis and was the first in a series called "Progress," which was supposed to be a gathering during which Company leaders address the 2020 priorities of the Company.  Ben Horowitz compared prison culture to corporate culture.  According to screenshots leaked to *USA Today*, Pinterest employees reacted with shock and horror as Horowitz used a violent incident in prison – a shanking – to illustrate the need for people to adapt to the culture in which they find themselves.  "I'm extraordinarily uncomfortable with using slavery and prison culture as 'good examples' for drawing the lessons we need to draw," one employee wrote.  Defendant Jordan cannot fairly and impartially consider a demand under such circumstances.

146.    The remaining Individual Defendants are and have been wholly under the domination of Defendant Silbermann, Sharp, Levine and Jordan, preventing them from taking remedial action. These Defendants have the power to terminate any director.  Indeed, it is admitted in the 2020 Proxy Statement that the Co-Founders could continue to exercise significant voting power even if terminated so long as they maintain their Class B common stock holdings.  A demand is therefore futile and excused.

1    147.    As each of the Individual Defendants faces a substantial likelihood of liability for the

2    misconduct alleged herein, there is a reasonable doubt as to their disinterestedness in deciding whether

3    pursuing legal action would be in the Company's best interest.

4    148.    The Board was put on notice of legal and ethical violations at Pinterest, and breaches

5    of its Code of Conduct, as well as other misconduct, but failed to take action against those responsible.

6    Timely action could have prevented, or at least minimized, the damage caused to Pinterest by such

7    misconduct.

8    149.    The Audit Committee Defendants (Chairperson Reynolds, Kilgore and Wilson) are

9    disabled from objectively considering pre-suit demand to bring these claims because, as members of

10   the Audit Committee during the relevant period, they face a substantial likelihood of liability for

11   wrongdoing.  The Audit Committee of the Board had oversight responsibilities for the Company's

12   internal control policies and procedures, was required to ensure that the Company was operating in

13   accordance with its prescribed policies, procedures and codes of conduct, and was charged with

14   overseeing the Company's compliance with laws and regulations.  Indeed, the Company's compliance

15   program REDACTED                        PINS-220_0000416.  REDACTED

16   REDACTED

17   REDACTED                                                                              PINS-

18   220_0000416.  It was their decision as Audit Committee members not to take timely action to put the

19   Company in compliance with relevant laws and rules and/or to disregard the failure to comply

20   therewith.  Timely action by the Individual Defendants serving on the Audit Committee would have

21   prevented, or at least minimized, the damages caused to Pinterest and its shareholders by the

22   wrongdoing discussed herein.

23   150.    The Compensation Committee Defendants (Chairperson Wilson and Kilgore) are

24   disabled from objectively considering pre-suit demand to bring these claims because, as members of

25   the Compensation Committee during the relevant period, they face a substantial likelihood of liability

26   for wrongdoing.  The Compensation Committee of the Board had oversight responsibilities for the

27   Company's internal control policies and procedures, was required to ensure that the Company was

28

operating in accordance with its prescribed policies, procedures and codes of conduct, and was charged with overseeing the Company's compliance with laws and regulations. It was their decision as Compensation Committee members not to take action to put the Company in compliance with these laws and rules and/or to disregard the failure to comply therewith. Timely action by the Individual Defendants serving on the Compensation Committee would have prevented, or at least minimized, the damages caused to Pinterest and its shareholders by the wrongdoing discussed herein.

151. Pinterest has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will suffer thereby.

152. The Individual Defendants knew of the racial and gender discrimination taking place at Pinterest. These violations were open and notorious and were either known to, or recklessly disregarded, by the Individual Defendants. The Individual Defendants, however, took no action to stop or to prevent the substantial damage caused to the Company and its shareholders by those violations. The Individual Defendants were required to investigate and take action to prevent damage to Pinterest and its stockholders but failed to take timely action. Thus, it is clear that the Individual Defendants would have refused to institute this action.

153. The acts complained of herein are illegal and improper and constitute breaches of fiduciary duties by the Individual Defendants and are, thus, incapable of ratification.

154. Publicly traded companies, such as Pinterest, typically carry Director & Officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that would foreclose a recovery from the insurers in the event that Pinterest sues to recover its damages from the Board.

155. The Individual Defendants were aware of, but failed to investigate, red flags of illegal, unethical or improper conduct and failed to take timely action to prevent, or at least minimize, the damages caused.

156. The Individual Defendants herein, received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the

Board and their control of Pinterest.  They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Individual Defendants also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves.

157.   The Individual Defendants' disregard of illegal and improper conduct, as embodied by their systematic failure to implement and maintain adequate internal controls sufficient to monitor and prevent the officers, directors, employees, and agents of the Company from violating or acting in contravention to applicable laws, rules and regulations, and the Company's Code of Conduct, constitutes breaches of their duties of good faith and loyalty such that they face a substantial likelihood of liability for their actions/inactions.

## IX.   CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT AND RULE 14A-9
### (AGAINST THE INDIVIDUAL DEFENDANTS)

158.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

159.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

160.   Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations at the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit

the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

161. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

162. The Individual Defendants caused the Company to issue a Proxy Statement filed with the SEC and disseminated to stockholders to solicit their votes that contained false and misleading statements and omitted material information concerning, among other things, the Company's compensation practices, the termination of Ms. Brougher, and the failure to maintain adequate controls and oversight to prevent such wrongful conduct.

163. The misrepresentations and omissions were material to the Company's shareholders in voting on matters set forth for shareholder determination in the Proxy Statement, including the election of directors, and advisory approval of executive compensation.

164. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

165. Plaintiff on behalf of Pinterest has no adequate remedy at law.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**(AGAINST DEFENDANTS SILBERMANN AND SHARP**
**AS CONTROLLING STOCKHOLDERS)**

166. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though full set forth herein.

167. As controlling stockholders of Pinterest, Defendants Silbermann and Sharp owed and owe Pinterest fiduciary obligations. By reason of their fiduciary relationships, Silbermann and Sharp owed and owe Pinterest the highest obligation of good faith, fair dealing, loyalty, and due care.

168.    Defendants Silbermann and Sharp violated and breached their fiduciary duties of candor, good faith, loyalty, and due care by abusing their control over the Company by, among other things, participating in, or failing to prevent, the unlawful acts complained of herein.

169.    Defendants Silbermann and Sharp owed Pinterest the highest duty of care and loyalty. These Defendants breached their duty of care and loyalty by causing or recklessly permitting a culture of racial and gender discrimination to persist and fester.  Accordingly, Silbermann and Sharp breached their duties of good faith, due care and loyalty to the Company as controlling stockholders.

### COUNT III
### BREACH OF FIDUCIARY DUTY
### (AGAINST THE INDIVIDUAL DEFENDANTS)

170.    Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

171.    The Individual Defendants owed and owe fiduciary duties to Pinterest and its stockholders.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Pinterest and its shareholders the highest obligation of good faith, due care and loyalty in the administration of the affairs of the Company, including, without limitation, the oversight of Pinterest's compliance with, and the duty to conduct a good faith investigation into, violations of laws, regulations, and internal policies concerning racial and sexual harassment and discrimination, and to take timely action against those responsible for such violations.

172.    The Individual Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways: (i) willfully abdicating their roles as fiduciaries by permitting or condoning a hostile work environment, which included racial and sexual discrimination, and retaliation; and (ii) hiding the extent and nature of such misconduct from the Company's stockholders.

173.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, Pinterest has sustained, and will continue to sustain, significant damages – both financially and to its corporate image and goodwill.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

174.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company for the damages resulting directly and proximately from these breaches of fiduciary duty.

### COUNT IV
### WASTE OF CORPORATE ASSETS
### (AGAINST THE INDIVIDUAL DEFENDANTS)

175.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

176.     The Individual Defendants knowingly, intentionally, recklessly or negligently breached their fiduciary duties and, thereby, caused Pinterest to waste its assets, expend millions of dollars of corporate funds, and impair its reputation and credibility for no legitimate business purpose, as a result of which the Company has been and continues to be substantially damaged.

177.     The Individual Defendants have bestowed upon themselves grossly excessive compensation that has no reasonable or legitimate basis, which has caused substantial damage to the Company and its shareholders.

178.     As a direct and proximate result of these breaches of their fiduciary obligations, Pinterest has sustained and will continue to sustain significant damages, as alleged herein.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

179.     Plaintiff, on behalf of Pinterest, have no adequate remedy at law.

## X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

a.     Determining that this action is a proper derivative action maintainable under the law and that demand was excused;

b.     Finding that the Individual Defendants breached their fiduciary duties;

c.     Finding that Defendants Silbermann and Sharp breached their fiduciary duties as controlling stockholders;

d.     Finding that the Individual Defendants violated Section 14(a) of the Exchange Act by filing a materially false and misleading Proxy Statement;

e.     Finding that all Individual Defendants were unjustly enriched;

1      f.      Finding that the Individual Defendants are liable to the Company for damages incurred

2 as a result of the Individual Defendants' breaches of fiduciary duty;

3      g.      Awarding extraordinary equitable and injunctive relief as permitted by law and/or

4 equity against all Individual Defendants and in favor of the Company;

5      h.      Directing the Company to take all necessary actions to reform and improve its internal

6 controls and Board oversight concerning racial and gender discrimination, as well as pay disparity;

7      i.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

8 attorney's, consultant's and expert's fees; and

9      j.      Granting such other and further relief as the Court deems just and proper.

10 **XI.**    **JURY DEMAND**

11      Plaintiff hereby demands a trial by jury.

12 Dated: November 25, 2020

13                              **WEISSLAW LLP**

14                              */s/ Joel E. Elkins*

15                              Joel E. Elkins
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210

16                              Telephone: (310) 208-2800
Facsimile:  (310) 209-2348

17

18                              **WEISSLAW LLP**
Joseph H. Weiss (*pro hac vice* to be sought)

19                              David C. Katz (*pro hac vice* to be sought)
Joshua M. Rubin (*pro hac vice* to be sought)

20                              1500 Broadway, 16th Floor
New York, NY  10036

21                              Telephone:  (212) 682-3025
Facsimile:  (212) 682-3010

22

23                              *Counsel for Plaintiff*

24

25

26

27

28

                                - 40 -