**RENNE PUBLIC LAW GROUP**
LOUISE RENNE (SBN #36508)
lrenne@publiclawgroup.com
350 Sansome St., Suite 300
San Francisco, CA 94104
Telephone:   (415) 848-7200
Facsimile:   (415) 848-7230

**COHEN MILSTEIN SELLERS & TOLL PLLC**
JULIE GOLDSMITH REISER (*pro hac vice*)
jreiser@cohenmilstein.com
1100 New York Ave. NW, 5th Floor
Washington, DC  20005
Telephone:   (202) 408-4600
Facsimile:   (202) 408-4699

*(Additional Counsel Listed on Signature Block)*

**WEISSLAW LLP**
JOSEPH H. WEISS (*pro hac vice*)
jweiss@weisslawllp.com
1500 Broadway, 16th Floor
New York, NY 10036
Telephone: (212) 682-3025
Facsimile:  (212) 682-3010

**BOTTINI & BOTTINI, INC.**
FRANCIS A. BOTTINI, JR. (SBN 175783)
fbottini@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile:  (858) 914-2002

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

*In re Pinterest Derivative Litigation*

**Lead Case No. 3:20-cv-08331-WHA**

**VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, ABUSE OF CONTROL, UNJUST ENRICHMENT, AND VIOLATIONS OF FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Judge:        Hon. William Alsup
Courtroom:   Courtroom 12 – 19th Floor

Plaintiffs the Employees' Retirement System of Rhode Island ("ERSRI"), Stephen Bushansky ("Bushansky"), and Sal Toronto, Trustee of the Elliemaria Toronto ESA ("Toronto") (together, "Plaintiffs") submit this Verified Shareholder Derivative Consolidated Complaint on behalf of nominal defendant Pinterest, Inc. ("Pinterest" or the "Company") against certain current officers and directors of the Company for breaches of fiduciary duty, waste of corporate assets, abuse of control, unjust enrichment, and violation of Section 14(a) of the Exchange Act.  Plaintiffs make these allegations after reviewing, among other sources, public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, news articles, public statements, court records, documents produced by Pinterest pursuant to Plaintiffs' demands for inspection pursuant to 8 *Del. C.* §220 ("Section 220") subject to Confidentiality Agreements, interviews of former employees, and investigations undertaken by Plaintiffs' counsel. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery. On behalf of themselves and the shareholders they seek to represent, Plaintiffs allege as follows:

## I.    NATURE OF THE CASE

1.    From at least February 2018 through the present (the "Relevant Period"), Pinterest's Board of Directors and top executives were involved in and tacitly endorsed a culture that countenanced race and sex discrimination and permitted retaliation against those who challenged its White, male leadership.  In one instance, Pinterest's Board and certain top executives breached their fiduciary duties by setting discriminatory pay for their Chief Operating Officer and by failing to prevent their Chief Executive Officer and Chief Financial Officer from retaliating against her after she complained. The Company has since settled her claim for $22.5 million, the largest public settlement of a sex discrimination claim.

2.    Pinterest has also settled the claims of two well-credentialed and respected Black women whose work brought high praise to the Company while they internally fought against discriminatory leveling and pay practices and then were targeted through internal investigations.  The

Complaint alleges that the Defendant officers and directors breached their fiduciary duties to Pinterest by themselves engaging in discrimination and setting a tone at the top that allowed discriminatory practices to thrive throughout the Company.

3.     Pinterest is a visual social media platform. The Company quickly grew from a small start-up founded by Defendants Silbermann and Sharp through investment from large venture-capital firms, Andreessen Horowitz and Bessemer Venture Partners. Those funds' investment secured them seats on Pinterest's Board of Directors, on which Jeffrey Jordan has served since October 2011 and Jeremy Levine has served since April 2011.

4.     Since Pinterest's founding, Silbermann has controlled the Company and the Board. Indeed, when a colleague asked Silbermann why Board members were quiet in meetings and did not ask probing questions, Silbermann bragged, "***I chose them***."

5.     Silbermann's insistence on fealty caused the Board to approve a discriminatory salary for its former Chief Operating Officer and to stand idly by while she was systematically excluded from doing the work she was hired to do, until she disappeared from Board and other important meetings altogether. As Francoise Brougher pointedly remarked after her discriminatory firing, "*Pinterest's female executives, even at the highest levels, are marginalized, excluded, and silenced*." In December 2020, Brougher announced that she had settled her lawsuit against the Company for ***$22.5 million.*** The *Washington Post* reported that it was "the largest publicly announced individual settlement for gender discrimination in U.S. history."

6.     Officer and Director involvement in Brougher's discrimination further solidified Pinterest's tone at the top as one that normalized race and gender discrimination while permitting retaliation against those who complained. This toxic culture spilled out publicly over the course of two months in the summer of 2020, when three female senior executives at Pinterest, two of whom are Black women, exposed the hypocrisy of the Company that bills itself as the "nicest place on the Internet." These highly competent and well-respected women generated significant value for Pinterest and Pinterest held them out as examples of the Company's dedication to workplace equity and inclusion.

7.      Ifeoma Ozoma ("Ozoma") and Aerica Shimizu Banks ("Banks") are Black women who were responsible for the policy initiatives which made Pinterest famous, including prohibiting health misinformation on the platform, ending promotion of slave plantations as wedding sites, and developing strong partnerships with community organizations. Notably, Ozoma's foresight in addressing misinformation and disinformation on the Pinterest platform allowed Pinterest to avoid the public scrutiny and advertiser backlash now facing many of its peers in Silicon Valley and generated significant positive press (and thus, value) for the Company leading up to its IPO. But internally, senior executives at Pinterest discriminated against these highly accomplished Black women and then retaliated against them for seeking equitable leveling and pay. Ozoma and Banks were underpaid for work equivalent to their White, male colleague; senior executives ignored their warnings of an imminent doxxing[1] attack, thereby tacitly endorsing the endangerment of Ozoma and other employees; and the Company repeatedly subjected Ozoma, Banks, and their close colleagues to invasive investigations designed to frame and punish Ozoma and Banks because they complained about being under-leveled and underpaid. Ultimately, Ozoma and Banks were forced to leave the Company on May 22, 2020 after it was clear that their requests for fair treatment and pay would only lead to further retaliation.

8.      Just days after their departure, in response to a Minneapolis police officer's killing of George Floyd and renewed national attention on systemic racism in America, Pinterest issued a public statement claiming:  "With everything we do, we will make it clear that our Black employees matter, Black Pinners and creators matter, and Black Lives matter." Unable to stand the hypocrisy of Pinterest's claim to support Black lives and employees while it engaged in clear and egregious employment discrimination against those very same Black lives and employees, on June 15, 2020, Ozoma and Banks went public with their stories.  Ozoma prefaced her frustration with the following tweet: "*As a Black woman, seeing @Pinterest's middle of the night 'Black employees matter' statement made me scratch my head after I just fought for over a full year to be paid and leveled fairly…*". Their stories brought

---

[1]Doxxing is a cyberattack wherein an individual's identity, contact information, and other personal information is posted publicly. Swarms of people then engage in cyber-bullying and, terrifyingly, may also cross over to in-person harassment.

prompt and widespread public attention, with articles in major media outlets including *Bloomberg*, *The Washington Post,* and *The New York Times*, as well as a rebuke from racial justice organization Color of Change: "*Like so many tech companies that are posting messages of solidarity with Black Lives Matter, Pinterest's actions undermine the company's own words.*"

9. Two months later, Francoise Brougher revealed her own experience of discrimination and retaliation at Pinterest. Brougher was Pinterest's top female executive and the Company's first Chief Operating Officer. She generated extraordinary value for the Company, including growing the Company's revenue from $500 million to $1.1 billion, increasing its advertiser base from 10,000 to 80,000, and expanding its operations to 20 countries. Yet, Brougher was substantially underpaid relative to her similarly situated male colleagues. After she complained, she was retaliated against; as Brougher explained, "*[w]hen men speak out, they get rewarded. When women speak out, they get fired*." On account of her sex and in retaliation for challenging unequal pay, Silbermann prevented her from performing her essential job duties to the Company's detriment. Though Brougher was the only executive with pre-IPO experience, Silbermann prevented her from attending investor meetings, instead bringing along his male friend; Silbermann cut Brougher out of Board meetings, instead inviting her subordinates without telling her; and Silbermann cut Brougher out of product meetings, preventing her from understanding new developments that impacted the advertiser base she was charged with supporting and growing. Ultimately, Silbermann fired Brougher and asked her to lie and pretend she was leaving the Company of her own accord.

10. On August 11, 2020, Brougher filed a lawsuit against the Company claiming gender discrimination and retaliation. Her lawsuit ushered in a new round of negative press for Pinterest, including coverage by *The New York Times*.

11. In solidarity with these former colleagues, on August 14, 2020, outraged Pinterest employees staged a virtual walkout, demanding greater transparency in compensation and increased diversity among Pinterest's senior leadership. As the organizers' website "changeatpinterest.com" aptly notes: "*Even when unintended, all forms of discrimination and retaliation at Pinterest must stop*." The employees made clear that Ozoma, Banks, and Brougher's discriminatory experiences were "not

isolated cases … Instead, they are representative of an organizational culture that hurts all Pinterest workers." Indeed, as an in-depth article published by *Business Insider* demonstrated shortly thereafter, at least eleven other former employees described Pinterest as a discriminatory and toxic place to work, including multiple Black employees who complained of being fired or pushed out of the Company with no real explanation after receiving positive reviews and exceeding performance goals.  As set forth herein, Plaintiffs' investigation reveals additional experiences of race and gender discrimination within Pinterest from former employees.

12.    The Individual Defendants, Benjamin Silbermann, Evan Sharp, Jeffrey Jordan, Jeremy Levine, Gokul Rajaram, Fredric Reynolds, Michelle Wilson, Leslie Kilgore, and Todd Morgenfeld, all top executives and Board members at Pinterest, breached their fiduciary duties to the Company by perpetrating or knowingly ignoring red flags about the long-standing and systemic culture of discrimination and retaliation at Pinterest.

13.    Most egregiously, Defendant Silbermann, Pinterest's co-founder, CEO, and Board Chair, wholly abdicated his fiduciary duties. He discriminated and retaliated against Brougher. He knew about the discriminatory and retaliatory treatment of Ozoma, Banks, and other employees of color. But Silbermann did nothing beyond feigning "sadness" over their mistreatment.  Repeatedly, he placed himself before the Company, surrounding himself with yes-men and marginalizing female employees. And when the news of Pinterest's discriminatory culture broke publicly, Silbermann admitted his complacency and accountability in allowing repeated, instances of employment discrimination, stating "[w]hat I've learned over the past few weeks is that parts of our culture are broken. Truthfully, I didn't understand just how much work we have to do. ***That's not an excuse, that's a failure in leadership****.*"

14.    Because of their fealty to Silbermann rather than the Company, the Director Defendants (all Individual Defendants with the exception of Officer Defendant Todd Morgenfeld) permitted and condoned this discriminatory and retaliatory conduct in breach of their fiduciary duties. They approved a compensation structure that underpaid Brougher relative to her similarly situated male colleagues. They failed to investigate widespread complaints of discriminatory pay and leveling, including by

Brougher as early as March 2019 and by Ozoma and others by July 2019. They submitted to Silbermann's discriminatory and retaliatory treatment of Brougher, despite its obvious harm to the Company. Indeed, no Board member questioned why she was excluded from the pre-IPO roadshow even though she was the hired as the only executive with IPO experience or why she suddenly stopped appearing at Board meetings following the IPO; nor did they intervene to prevent that discriminatory and retaliatory exclusion. And, they swiftly accepted her termination, with no independent inquiry to understand the full context and ensure the Company had acted properly.

15.    In sum, the Board wholly deferred to Silbermann, allowing him to continue running a company that now belonged to its shareholders as his private fiefdom. Further, the Individual Defendants failed to ensure that Pinterest's human capital management policies and procedures were effective. Instead, they permitted internal complaints to be investigated and handled by interested, conflicted individuals.  And, even after purporting to empower a Special Committee to investigate the then-public discrimination and harassment concerns, the full Board considered and weighed in on the recommendations, revealing the Special Committee's lack of independence.

16.    In violation of Section 14(a) of the Exchange Act, Rule 14A-9, and their fiduciary duties, the Director Defendants also permitted Pinterest to file a false and misleading annual proxy statement with the SEC. The proxy statement misled investors regarding Pinterest's compensation practices, oversight over those practices, and the true reason for Brougher's departure from Pinterest.

17.    The Individual Defendants who served on the Audit Committee and Compensation Committee further breached their fiduciary duties by failing to fulfill the obligations set forth in the Committee Charters.

18.    Additionally, Individual Defendants Sharp and Morgenfeld breached their fiduciary duties by engaging in and condoning widespread discrimination at Pinterest. In particular, as the executive sponsor of Pinterest's Black employee resource group, Sharp was apprised that numerous employees of color had faced retaliation from Pinterest's Legal and Human Resources ("HR") Department, but did nothing ensure that the Company met its legal obligations.

19.     Individual Defendants' breaches of their fiduciary duties and violations of law have allowed Pinterest's hypocritical, discriminatory, and retaliatory culture to harm the Company. The Company paid $22.5 million to resolve Brougher's lawsuit and has paid undisclosed amounts to resolve lawsuits brought by Ozoma, Banks, and others. Public scrutiny of Pinterest and press coverage of discrimination at the Company has continued for months, leading to a user boycott and a public petition signed by 25,000 people demanding Pinterest "*Pay your Black employees what you owe them*!," deterring advertisers who do not wish to be associated with a women-focused product under intense criticism for discriminating against women, particularly women of color, and harming Pinterest's financial position, goodwill, and reputation. Correspondingly, publicity surrounding employees' claims of systemic discrimination caused harm to the Company's ability to hire and retain talent, particularly diverse talent, which Pinterest itself admits harms its business.

20.     Plaintiffs bring this shareholder derivative action to recover damages; obtain injunctive relief, including corporate governance reforms; and obtain other relief on behalf of Nominal Defendant Pinterest and against the Individual Defendants for breaches of fiduciary duties, corporate waste, abuse of control, unjust enrichment, and violations of Section 14(a) related to the actions and inactions detailed herein that ultimately caused, and continue to cause, the Company substantial harm. Absent the relief sought herein, this harm will go unaddressed and the damage to the Company will continue.

## II.    JURISDICTION AND VENUE

21.     The Court has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78n(a), and Rule 14a-9 promulgated thereunder. The Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

22.     The Court also has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1332 because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23.     The Court has jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible.

24.     This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District because Pinterest conducts business and maintains its principal executive office in this District. One or more of the Defendants reside in this District. Further, a substantial portion of the acts and omissions alleged in this action occurred in this District, Pinterest engages in numerous activities and conducts business here, which had an effect in this District, and Individual Defendants have received substantial compensation due to their activities in this District.

## III.     INTRADISTRICT ASSIGNMENT

26.     Pursuant to Local Rules 3-2(c and d), a substantial part of the events or omissions giving rise to the claims in this action occurred in San Francisco, California, where Pinterest is headquartered, within the San Francisco/Oakland division.

## IV.     PARTIES

### A.     Plaintiffs

27.     Plaintiff ERSRI protects and oversees more than $8.5 billion in Rhode Island public assets, including retirement funds held in trust for hundreds of thousands of Rhode Island teachers, police, firefighters, nurses, and other public employees. ERSRI's offices are located at 50 Service Avenue, Warwick Rhode Island, 02886.

28.     ERSRI served a books and records demand on Pinterest pursuant to Section 220 and received books and records in response pursuant to a Confidentiality Agreement.

29.     ERSRI has continuously held Class A common stock in Pinterest since June 26, 2020.

30.     Plaintiff Bushansky lives in New York. Bushansky served a books and records demand on Pinterest pursuant to Section 220 and received books and records in response pursuant to a

Confidentiality Agreement. Bushansky has continuously held Class A common stock in Pinterest since its IPO.

31.     Plaintiff Toronto is the Trustee of the Elliemaria Toronto ESA. He lives in New Jersey. Toronto served a books and records demand on Pinterest pursuant to Section 220 and received books and records in response pursuant to a Confidentiality Agreement. Toronto has continuously held Class A common stock in Pinterest since May 2, 2019.

**B.      Defendants**

**1.      Nominal Defendant**

32.     Nominal Defendant Pinterest is a visual discovery engine people use to find lifestyle inspiration, including recipes, home and style ideas, travel destinations and more. People have saved more than 240 billion Pins across a range of interests. Pinterest launched in 2010 and has hundreds of millions of monthly active users around the world.

33.     Pinterest is a Delaware corporation with corporate headquarters in San Francisco, California. Pinterest's Class A common stock carries one vote per share, and its Class B common stock twenty votes per share. Pinterest stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "PINS."

**2.      Director Defendants**
**a.   Benjamin Silbermann**

34.     Benjamin Silbermann is Pinterest's co-founder, CEO, and Chairman of the Board. Prior to co-founding Pinterest, Silbermann worked at Google from 2006 to 2008. Silbermann is the Company's largest shareholder and, according to the Company's 2020 Proxy Statement, dated April 9, 2020 (the "2020 Proxy"), Silbermann, along with certain venture capital investors with a seat on the Board (Andreesen Horowitz and Bessemer Venture Partners), all hold Class B shares of Pinterest entitled to twenty votes per share.  According to the Company's Proxy Statement, Silbermann owns 24.77% of the voting control of the Company's shares and Silbermann, Sharp, Andreesen Horowitz entities and Bessemer Venture Partners entities together have voting control over 62.07% of the Company's shares.

35. As Chairman and CEO, Silbermann presides over meetings of the Board; consults with the lead independent director on the agenda for Board meetings; consults, as needed, on evaluating and recommending candidates for election to the Board; and oversees the activities of the Board.

36. Silbermann has been richly rewarded by Pinterest. In 2019 alone, his total compensation from the Company (including cash and stock) was $46,222,113. Forbes reports his current net worth to be $4.1 billion.

37. As indicated in Pinterest's 2020 Proxy Statement, Silbermann does not qualify as an independent Director under the applicable standards of the NYSE.

38. Silbermann was Chairman of the Pinterest Board at all relevant times.

39. As an Officer of the Company and the Director of its Board, Silbermann has the duties enumerated below in Sections V and VI.

### b. Evan Sharp

40. Defendant Sharp has served as a member of the Company's Board since 2019. Sharp is a Co-Founder of Pinterest and serves as Pinterest's Chief Design & Creative Officer. Since joining Pinterest, Sharp has overseen the creative, product and design teams. He was previously a product designer at Facebook from 2010 to 2011.

41. Sharp has also been richly rewarded by Pinterest. In 2019 alone, his total compensation from the Company (including cash and stock) was $46,075,013. Forbes reports his current net worth to be $1 billion.

42. Sharp has voting control over 4.82% of the Company's shares.

43. Sharp does not qualify as an independent Director under the applicable standards of the NYSE.

44. As an Officer of the Company and the member of its Board, Sharp has the duties enumerated below in Sections V and VI.

### c. Jeffrey Jordan

45. Defendant Jordan has served as a Director of Pinterest since 2011. Jordan has also served as a General Partner of Andreessen Horowitz since 2011. Previously, Jordan served as President and Chief Executive Officer of OpenTable, Inc., an internet and mobile services company, from 2007

to 2011. He served as President of PayPal, the internet-based payment system then owned by internet company eBay, Inc., from 2004 to 2006.

46.     In 2019, Jordan received $291,245 in compensation from the Company for his Board service.

47.     As a member of the Company's Board, Jordan has the duties enumerated below in Sections V and VI.

### d.  Jeremy Levine

48.     Defendant Levine has served as a Director of Pinterest since 2011. Jeremy Levine has served as a partner at Bessemer Venture Partners, a venture capital firm, since 2001, where his investment experience includes entrepreneurial startups and high growth companies including consumer internet, consumer software and business software and services.

49.     In 2019, Levine received $294,995 in compensation from the Company for his Board service.

50.     As a member of the Company's Board, Levine has the duties enumerated below in Sections V and VI.

### e.  Gokul Rajaram

51.     Defendant Rajaram has served as a Director of Pinterest since 2020. Gokul Rajaram has served as the Caviar Lead at DoorDash, a food ordering service, since November 2019. Previously, from 2013 to 2019, Rajaram led several product-development teams at Square, Inc. a financial technology company, most recently as the Caviar Lead. Prior to Square, Inc., from 2010 to 2013 Rajaram served as Product Director of Ads at Facebook. Previously, Rajaram was Product Management Director for Google AdSense.

52.     As a member of the Company's Board, Rajaram has the duties enumerated below in Sections V and VI.

### f.  Fredric Reynolds

53.     Defendant Reynolds has served as a Director of Pinterest since 2017. Fredric Reynolds served as Executive Vice President and Chief Financial Officer of CBS Corporation, a mass media company, from 2006 to 2009. From 2001 to 2005, he served as President and Chief Executive Officer

of Viacom Television Stations Group and as Executive Vice President and Chief Financial Officer of Viacom Inc. from 2000 to 2001.

54.     In 2019, Reynolds received $306,245 in compensation from the Company for his Board service.

55.     As a member of the Company's Board and Chair of its Audit Committee, Reynolds has the duties enumerated below in Sections V and VI.

### g.   Michelle Wilson

56.     Defendant Wilson has served as a Director of Pinterest since 2016. Michelle Wilson worked in various capacities, including serving for thirteen years until 2012 as Senior Vice President and General Counsel, at Amazon.com, Inc.

57.     In 2019, Wilson received $326,870 in compensation from the Company for her Board service.

58.     As a member of the Company's Board, Compensation Committee, and Audit Committee, Wilson has the duties enumerated below in Sections V and VI.

### h.   Leslie Kilgore

59.     Defendant Kilgore has served as a Director of Pinterest since 2019. Leslie Kilgore served as Chief Marketing Officer of Netflix, Inc., an online entertainment service, from 2000 to 2012.

60.     In 2019, Kilgore received $706,258 in compensation from the Company for her Board service.

61.     As a member of the Company's Board, Audit Committee, and Compensation Committees, Kilgore has the duties enumerated below in Sections V and VI.

### 3.     Officer Defendant
### a.   Todd Morgenfeld

62.     Todd Morgenfeld ("Morgenfeld") is Pinterest's Chief Financial Officer, a role he has held since November 2016. Prior to joining Pinterest, he served as Vice President of Finance at Twitter from 2015 to 2016 and Treasurer and Senior Vice President of Corporate Development and Corporate Financial Analytics at Hewlett-Packard Company from 2013 to 2015. He served as an investment partner at Silver Lake from 2004 to 2013.

63.     In 2018, his total compensation from the Company (including cash and stock) was $22,389,196 and in 2019, was $360,500.

64.     As an executive, Morgenfeld has the duties enumerated below in Sections V and VI.

### 4.     Doe Defendants

65.     Except as described herein, Plaintiffs are ignorant of the true names of defendants sued as Does 1 through 30, inclusive, and therefore Plaintiffs sue those defendants by such fictitious names. Following further investigation and discovery, Plaintiffs will seek leave of Court to amend this Complaint to allege their true names and capacities when ascertained. These fictitiously named defendants are Pinterest officers, other members of management, employees, and/or consultants of third parties who were involved in the wrongdoing detailed herein. These defendants aided and abetted, and participated with and/or conspired with the named defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences, and events alleged in this Complaint.

## V.     FACTUAL ALLEGATIONS

### A.     Pinterest Understands that Engaging Women Is Critical to Its Success

66.     Pinterest was founded in 2010 by Silbermann, Sharp, and Paul Sciarra ("Sciarra"). Pinterest is a social media platform entirely about images. On Pinterest, users save, or "pin", beautiful, aspirational, and inspirational images – as the Company describes it, a "productivity tool for planning your dreams." Popular uses for Pinterest include collecting ideas for wedding décor and aggregating recipes.

67.     Pinterest is remarkable among tech companies for its fast growth, quickly becoming the third-largest social network in the U.S. Pinterest's rapid growth is due in large part to significant early investment from venture capital firms Andreessen Horowitz and Bessemer Venture Partners. Silbermann solicited both firms to become involved in Pinterest's $27 million series B in 2011, and again they participated in a $100 million investment round in 2012. Board member Jordan is a partner at Andreessen Horowitz; he has a close and significant relationship with the Company because as he explained in an April 2019 blog post, "Pinterest was one of my first investments when I moved into

venture capital, and its IPO is officially my first in my 8-year tenure as an investor." Similarly, Board member Levine of Bessemer Venture Partners warmly recalls meeting Silbermann for what was planned to be a ten-minute meeting in Silbermann's apartment, which led to Bessemer Venture Partners leading Pinterest's $10 million Series A round just a few weeks later.

68.     Beyond the ongoing investment and Board membership, there is fluid movement between Pinterest and its early investors. In early 2012 when Sciarra decided to move on from Pinterest, he went to Andreessen Horowitz as an entrepreneur in residence. Sarah Tavel of Bessemer Ventures co-led the Series A with Levine, and then the next year joined Pinterest in a business development role.

69.     Pinterest is strongly branded to engage women, recognizing that women influence 70-80% of consumer spending. According to Pinterest's Form 10-K, filed with the SEC on February 6, 2020, two-thirds of Pinterest's users are female, and the Company reaches eight out of ten moms.



Source: Digital 2020

70.     Moreover, Pinterest is keenly attuned to average revenue earned per user, which is how Pinterest attracts advertisers:



71.     It is a business imperative, therefore, for Pinterest to reflect its user-base's preferences. Pinterest has carefully cultivated an image of a kinder, gentler social media site; an outlier in ambitious, cutthroat Silicon Valley. In fact, the first rule on Pinterest's etiquette board was "Be nice."

72.     Pinterest markets its workplace the same way. Pinterest claims that it is "creating a company that includes all people, and building a product that reflects our diverse population of 415+ million Pinners." In recruiting employees, the Company states, "[w]e're looking for all kinds of people. To build an app that's used and loved by people all around the world, we need a team with all kinds of different perspectives, experiences and backgrounds."

73.     Pinterest recognizes that its ability to attract and retain a diverse workforce is critical to its success. In an August 7, 2019 "Founder's Journey" profile featured on Bessemer Venture Partners' website, Sharp emphasized the centrality of representation to Pinterest's success, stating "[d]iverse perspectives – from both people on our teams and people using our products – are invaluable . . . It's hard to solve for the real problem if you can't relate to someone's real experience" and that diverse teams "***produce the best outcomes for our users***."

74.     Similarly, in January 2020, Pinterest's Chief Human Resources Officer wrote, "research shows that diverse teams make us more creative, diligent and hard working. When we are building products, a team of people with different backgrounds enables us to think through products, policies, and safety from all angles . . . ***Inclusion and diversity is not only a value; it's foundational to making the best decisions and building the strongest teams over time***."

75.     When Ozoma, Banks, and Brougher publicly revealed their experiences in summer 2020, Pinterest's rhetoric and platitudes about diversity and inclusion were exposed as mere lip service. Their experiences reflect a Company that hypocritically uses women executives, particularly women of color, to publicly attract users but behind the curtain underpays, marginalizes, and ultimately forces out those very same employees.

**B.      Individual Defendants Breached Their Fiduciary Duties by Perpetrating and Permitting Discrimination on the Basis of Race and/or Gender, and Retaliating Against Those Who Spoke Up**

76.     The Board is responsible for oversight and compliance with the Company's internal controls regarding human capital management, which includes diversity, anti-discrimination, pay equity, hiring and promotion.

77.     Pinterest's Code of Business Conduct & Ethics (the "Code") sets forth the Board's expectations for running Pinterest.  Pinterest's Code notes "*that complying with the law is important, but we go further,*" including by "*protect[ing] the company*" and "*treat[ing] colleagues . . . with respect*." The Code also has an express prohibition on unlawful discrimination. Pinterest also has a Harassment and Discrimination Policy stating that "Pinterest is committed to providing a work environment that is free of discrimination, harassment, mistreatment and retaliation."

78.     Pinterest's Corporate Governance Guidelines ("Governance Guidelines") set forth the Board's responsibilities and functions, including that the Board's "primary function is oversight" and to "define[] and enforce[] standards of accountability" for senior management, "all with a view to enabling senior management to execute their responsibilities fully and in the best interests of the Company and its stockholders."

79.     As set forth in the Governance Guidelines, the Board's key responsibilities include:

- Overseeing and reviewing the Company's strategic direction and objectives, taking into account (among other considerations) the Company's risk profile and exposures and its relationship with key stakeholders;

- Selecting, evaluating and compensating the Chief Executive Officer ("CEO") and other key executives, and planning for CEO and key executive succession;

- Overseeing the Company's compliance with applicable legal and regulatory requirements and the processes that are in place to safeguard the Company's assets and manage material risks;

- Monitoring the Company's accounting and financial reporting practices and reviewing financial and other controls; and

- Evaluating the Board's composition, performance and effectiveness in carrying out such responsibilities.

80.     The Guidelines further state that all directors are expected "to act ethically at all times and to adhere to the Company's Code of Business Conduct & Ethics."

81.     Title VII of the Civil Rights Act of 1964 ("Title VII") is a federal law that prohibits discrimination in employment on the basis of sex, race, color, national origin, and religion, and it applies to employers, like Pinterest, with 15 or more employees. Title VII also makes it illegal to retaliate against a person who complains about discrimination, filed a charge of discrimination, or participated in an employment discrimination investigation or lawsuit. Likewise, employment discrimination is prohibited in jurisdictions around the country where Pinterest operates its businesses, where the alleged conduct took place, and where Pinterest is incorporated. *See* Del. Code Ann. tit. 19, § 711A (West 2019).

82.     The Directors and senior executive officers' fiduciary duties require them to monitor the Company's compliance, reputational, and ethics risks. These risks include acts that may violate Title VII, state anti-discrimination and anti-retaliation laws, and the Company's Code of Business Conduct and Ethics. Its fiduciaries have a duty to act promptly when presented with credible evidence of misconduct occurring within the Company's executive ranks: they must address leaders' wrongdoing; guard employees from retaliation and further abuse; protect the Company's public image; and require leaders to speak truthfully to investors. This duty also requires Board members to put the Company's interests before those of any one individual and to ensure that Pinterest management conducts itself in a manner befitting a major public corporation whose success depends on maintaining a positive reputation with its largely female consumer base. Board members and executives owing fiduciary

duties must also avoid violating anti-discrimination and anti-retaliation laws through their actions on behalf of the Company.

83.    In addition to the general duties owed by each Board member, members of the relevant Committees owe additional, specific duties.

84.    The Compensation Committee is charged with overseeing and determining compensation at Pinterest. Its charge is not limited to top leadership; rather, the Compensation Committee Charter states that "[t]he Committee's main responsibility is to oversee the compensation of Pinterest's directors and Employees and related matters, including matters relating to the attraction, development and retention of Employees."  Duties include "evaluat[ing] the performance of executive officers and determin[ing] the compensation of the executive officers of Pinterest based on such evaluations"; "review[ing] periodically the operation and structure of Pinterest's compensation program"; and "oversee[ing] . . . leadership assessment and development" including through "provid[ing] regular reports to the Board."

85.    The Audit Committee, according to its Charter, is charged with "oversee[ing] Pinterest's compliance with applicable legal and regulatory requirements and Pinterest's enterprise risk management program." To fulfill those duties, it "must maintain free and open communication with . . . Pinterest's management." Responsibilities include "reviewing and approving the adequacy and effectiveness of Pinterest's compliance policies and procedures, including the Code of Conduct & Ethics."

86.    It is the Board's duty to cause the Company to comply with the law and its own Code of Business Conduct and Ethics. Yet in violation of its fiduciary obligations of trust, loyalty, good faith, and due care, the Board and senior executives repeatedly breached these commitments by perpetrating or permitting discrimination on the basis of race and/or sex, and retaliation against those who spoke up. The Individual Defendants knew, for years, that the Company lacked diversity on the Board and among senior management, and that women and Black employees and other minorities were conspicuously underrepresented and discriminated against.

87.     Instead, Pinterest uses its corporate governance charter to protect Silbermann and his selected inner circle of White, male colleagues.  Internal documents and witnesses show that Pinterest's compliance with state and federal antidiscrimination laws is a superficial exercise. Defendants Silbermann and Morgenfeld perpetrated discrimination and then retaliated against their victims – women who fought for equal treatment and dared to challenge men in leadership.  Meanwhile, the Director Defendants tacitly endorsed their misconduct by allowing Silbermann, Morgenfeld, and Pinterest's Legal Department led by General Counsel Christine Flores to "investigate" complaints of their own misconduct, while intentionally looking the other way.

88.     Since March 2019, when Brougher complained of pay discrimination, the Individual Defendants have known of accusations by former Pinterest employees who are women and/or people of color which reveal that Pinterest's internal culture falls woefully short of its idealistic public image.

89.     Then in summer 2020, multiple former executives came forward with their stories of discrimination and retaliation at the Company, which unlocked an avalanche of other former employees with similar experiences. Notably, these stories revealed that the Officer Defendants were not only aware of these complaints, but in many instances were the primary perpetrators of discrimination and retaliation, further demonstrating that the Individual Defendants knowingly failed to ensure effective internal controls or meaningfully address a pervasive culture of discrimination on the basis of race and/or sex at Pinterest. These actions have caused, and will continue to cause, harm to the Company.

1.     **Ifeoma Ozoma and Aerica Shimizu Banks Are Recruited to Pinterest Under False Promises of Fair Treatment**

90.     Ifeoma Ozoma is a graduate of Yale University, alumnus of Google and Facebook, and member of the Brookings Institution's Transatlantic Working Group on Disinformation. In July 2018, a Pinterest recruiter contacted Ozoma about joining the Company to run its United States policy, develop relationships with key third-party governmental and non-governmental organizations like the Center for Disease Control and National Suicide Prevention Lifeline, and to bring those organizations' public health expertise into Pinterest. This was a unique opportunity. Established social media companies like Facebook and Google had public policy teams with hundreds of employees. At Pinterest, Ozoma would be the second member of the public policy team, which at the time was staffed

exclusively by Charlie Hale ("Hale"), and she was promised the chance to build the team from the ground up before the Company went public.

91.     Intrigued, Ozoma joined Pinterest as the Public Policy and Social Impact Manager. Once there, she hit the ground running, leveraging her past success and playing a critical role in Pinterest's policies to block health misinformation and disinformation.

92.     Despite her credentials and public success on the Company's behalf, Ozoma soon learned that Pinterest misled her about her compensation and underpaid her compared to Hale – a White man with whom she worked as a close partner and with whom she split work equally

93.     Pinterest, like most tech companies, sets pay via "leveling." Each business unit within Pinterest has its own pay scale comprised of a series of levels, with pre-determined pay ranges for each level based on a set of criteria. Most business units have eight levels. Upon hiring, a new employee is assigned to a level and to a salary within that level. Pinterest managers are given discretion to set a new employee's pay within the salary range for her level. Over time, a successful employee can receive a raise within their level or move up to a higher level.

94.     Although Pinterest has published a Diversity Report each year since 2015, those reports have never disclosed any information regarding pay equity.

95.     When Pinterest hired Ozoma, she vigorously negotiated her compensation and was told that her offer was the best the Company could do for the role (not for her, but for the role). She was not explicitly told her level or the criteria for that level. In September 2018, several months after she started at the Company, Ozoma saw for the first time the Public Policy level chart, which sets forth the criteria and pay for each of the levels within a department at Pinterest. She discovered that she was hired as a level 4, the second to lowest level for her team; by contrast, Hale was at the highest pay level, a level 8. This differential existed despite the fact that Ozoma had more relevant experience than Hale and that her work, including leading half of the global public policy team's work and building the team, made her Hale's co-equal.

96.     Ozoma spoke with Hale about her concerns and he told her that they would address her pay at the end-of-year performance cycle. But she did not receive a satisfactory answer or any meaningful promotion at the end of 2018.

97.     Nonetheless, Ozoma continued her diligent work for the Company. Working in close partnership with Pinterest's Trust and Safety team and content policy teams, both of which are responsible for content moderation and ensuring a positive and safe user experience, Ozoma developed Pinterest's misinformation and disinformation policy. That policy was still in use at the time of her departure from the Company. In February 2019, Pinterest implemented that policy to prohibit anti-vaccination content on Pinterest – a groundbreaking move long before any other Silicon Valley company tried to address health misinformation.

98.     Significantly, Ozoma's leadership in Pinterest's anti-vaccination content ban boosted the Company's valuation just in time for its IPO. The Company was rewarded for Ozoma's leadership with its best-ever news cycle, with positive articles in *The Wall Street Journal*, CNN, NPR, *Fast Company*, and other top outlets in the weeks right before Pinterest's IPO. The vaccine policy was cited as a positive example of a social media company actually responding to misinformation, and featured Ozoma as Pinterest's public spokesperson.

99.     On April 18, 2019, Pinterest went public at $19 a share, with a $10 billion valuation.

100.    That day, Hale acknowledged in an email to Ozoma that many of the IPO news stories referenced her work.

101.    But even after the IPO, Pinterest refused to fairly value Ozoma and her contributions. After asking Pinterest for the better part of a year to assign her the pay level she deserved and being summarily ignored, in May 2019, Ozoma hired a lawyer.  When Ozoma's attorney asserted that Pinterest should have hired her at level six, two levels higher on the pay scale than her junior level of four, Pinterest responded by arguing that Ozoma had insufficient years of experience to be assigned a higher pay level, a criterion which did not appear on the level chart.

102.    In the spring of 2019, Ozoma was at a Pinterest women's group event, sitting in the front row.  Hale was one of two men among three supervisors leading a panel on how women should

negotiate for pay increases. According to *Business Insider*'s investigation, Hale is "part of CEO Ben Silberman's inner circle."  Hale, who had stonewalled Ozoma's requests for pay increases, looked directly at her when he delivered the message: "***adjust your expectations***," and instructing (her) "***you should only ask for what you deserve***."  Ozoma described Hale's performance as "gaslight[ing]" her by publicly critiquing her request for a pay increase. Hale's public rebuke reflected classic racist and sexist tropes, suggesting that Ozoma's request for increased compensation was pushy and more than she deserved, when she was simply trying to receive comparable pay and leveling to her similarly situated White, male counterpart with whom she shared equal responsibilities.

103.    In May 2019, Banks joined Ozoma at Pinterest in the role of Head of Federal Affairs, becoming the third member of the public policy team. Banks identifies as a Black and Japanese woman. Like Ozoma, she is extraordinarily well-credentialed – she spent six years at Google in Executive Recruiting and on the Legal Team working on patent policy and developing diversity, equity, and inclusion policies; was an appointee in President Barack Obama's administration; and holds a Masters in Science degree from Oxford University.

104.    When Banks was hired, her role was described to her as an equal partner with Hale; her responsibilities were loosely defined but she was promised that she would be given a budget for her work and that promotion would be based on the quality of her work, not her tenure at the Company. In particular, the Company was enthusiastic about her past deep work in racial equity and her connections in Washington, D.C.

105.    Like Ozoma, Banks did not see the level chart until after she was hired. However, during her salary negotiations, Banks was told that Ozoma had played a role in creating the public policy team's level chart along with Hale and that Ozoma was apprised of every aspect of Banks's hiring. Neither was true. Banks later concluded that Hale "outright lied to me during the negotiation process on leveling, pay, and promotion." Hale created the level chart. Ozoma had no role in creating the level chart and, to the contrary, challenged its application as to herself at the very time Banks was being recruited to join her team. And, although Banks was hired at a level higher than Ozoma (level 5), that

level was still lower than appropriate for the work Banks actually performed and fell three levels below Hale.

106.    Despite her unequal and discriminatory pay and leveling, like Ozoma, Banks excelled in her job and did meaningful social impact work that brought positive attention to Pinterest, including leading the Company's sustainability efforts and managing due diligence to establish Pinterest's philanthropic arm. Additionally, Banks opened Pinterest's Washington, D.C., office and served as the Company's representative with government officials. Also, it was Banks who decided the division of labor for the three team members (herself, Ozoma, and Hale).

107.    A colleague of Ozoma's and Banks' observed the discrimination and later retaliation against Ozoma and Banks firsthand. Confidential Witness 1 worked on Pinterest's Community Operations team, focused on trust and safety issues, from prior to the Relevant Period through March 2020. Trust and Safety oversees content moderation, making daily decisions about what content is and is not permitted on the Pinterest platform. Confidential Witness 1 worked closely with Charlie Hale in her early years at the Company, but once Ozoma joined Pinterest, Confidential Witness 1 and Ozoma partnered and worked together on a daily basis. Confidential Witness 1 greatly valued the working partnership with Ozoma, because Ozoma was the first person at the Company who could really teach her new things and acted as a mentor to her. She had significant experience working on the issues most relevant to the Company and working with nonprofits and governmental agencies, which Hale did not have. It thus surprised Confidential Witness 1 when she learned that Ozoma was at a salary level below her own. Confidential Witness 1 was also surprised that Banks was paid more than Ozoma because Ozoma was more experienced and mentored Banks.

108.    Confidential Witness 1 confirmed the retaliatory repercussions of Ozoma having raised pay equity concerns within Pinterest. At first, Hale and the HR department stalled – they were intentionally slow to respond, letting weeks go by between responses. When after a few months Ozoma did not drop her concerns, people within the Company – namely Hale, Flores, and members of the HR department – started turning against Ozoma with negative feedback and indignation at her requests for non-discriminatory pay. Ozoma regularly discussed this with Confidential Witness 1 and showed her

emails and performance reviews she received reflecting these inaccurate, unfair, and negative opinions about her. Confidential Witness 1 learned from Ozoma that Hale had described her as having a negative "tone", was too "angry," was not being sufficiently collegial, and would not take feedback. In Confidential Witness 1's opinion, these criticisms were false and racist tropes that were totally inconsistent with Ozoma's job performance and demeanor. As a close working partner of Ozoma, Confidential Witness 1 was extremely impressed with Ozoma's work product and found her very easy to work with. She admired Ozoma's persistence and did not agree at all that Ozoma was angry or non-collegial.

109.    Confidential Witness 1 gave Ozoma a very positive peer review. When Ozoma ultimately had her performance review with Hale a few months later, his review was very negative, including criticizing Ozoma for failing to take feedback constructively. Ozoma pointed out to Hale that his perception totally contradicted her peer review from Confidential Witness 1. Hale dismissed her, saying Confidential Witness 1's positive review was not meaningful because she and Ozoma were friends. Confidential Witness 1 was shocked by Hale's comment – that her review as a manger and close colleague was dismissed, because she worked daily with Ozoma and found her to be a person of high integrity, extremely collaborative, and extremely committed to and successful at mentoring and supporting her colleagues. But Hale just disregarded Confidential Witness 1's peer review because it did not fit his negative opinion about Ozoma.

110.    His rejection of Confidential Witness 1's peer review also wholly undermined Pinterest's peer review process. At Pinterest, employees are required to solicit peer reviews from individuals with whom they closely collaborate every six months. Employees are encouraged to seek at least some peer reviews from people outside of their primary team to assess their collaboration skills. Managers have the authority to veto an employees' selected peer reviewers if they believe they are not appropriate or helpful. Ozoma selected Confidential Witness 1 as a peer reviewer. Hale approved that selection – showing that he did accept that Confidential Witness 1 had relevant information on Ozoma's work performance and was well-suited to offer feedback. To then turn around and dismiss Confidential Witness 1's positive reviews from the people who worked with her regularly and instead center negative

performance issues was a rejection of the process, did not fairly capture Ozoma's actual performance, and made her performance review arbitrary and inaccurate.

### 2. Pinterest Celebrates Ozoma and Banks Publicly, While Discriminating and Retaliating Against Them Internally

111.   In the year following Pinterest's IPO and Banks joining Pinterest, the Company continued publicly celebrating and deriving value from their work while continuing to pay them unfairly and engaging in a retaliation campaign against them and their closest colleagues.

### a. Pinterest Ignores Ozoma and Banks' Warnings, Tacitly Endorsing its Employees' Harassment by Doxxers

112.   As a social media platform, Pinterest is constantly making content moderation decisions to ensure that the material placed on the platform by users does not violate law and is consistent with Pinterest's policies.

113.   In June 2019, Pinterest made the decision to block content from LiveAction, an advocacy organization. The Company made this choice because it determined that LiveAction spread "harmful misinformation, [which] includes medical misinformation and conspiracies that turn individuals and facilities into targets for harassment or violence," which violated Pinterest's policies.

114.   After this decision was made, a White, male Pinterest employee secretly leaked documents related to this and other content moderation decisions to Project Veritas, an extremist news site best known for its undercover videos.

115.   LiveAction began publishing and tweeting articles about Pinterest's content moderation decision. Those articles at first included a timeline of Pinterest's decision-making that made it very likely that an employee had leaked this information; Ozoma immediately notified Pinterest leaders Deputy General Counsel Anthony Falzone ("Falzone"), Charlie Hale, Jud Hoffman, and other policy and operations managers via email, but everyone brushed her off.

116.   Throughout the day as the team was making decisions, those internal decisions were promptly showing up in LiveAction tweets and articles – making it obvious that someone was leaking information, but Falzone kept disagreeing with Ozoma, saying there was no evidence of a leaker within Pinterest and no serious risk to any Pinterest employee's safety.

117.     Then, LiveAction started publishing articles containing screenshots of Slack conversations of Pinterest employees, which revealed personal identifying information. Ozoma and Banks warned that this created a safety risk to individual Pinterest employees who would likely be targeted for "doxxing." Doxxing is a cyberattack wherein an individual's identity, contact information, and other personal information is posted publicly. Swarms of people then engage in cyber-bullying and, terrifyingly, sometimes also cross over to in-person harassment. Doxxing in its most vicious forms involves threats of physical and sexual violence, typically against women, particularly women of color. Ozoma and Banks promptly sent emails to Pinterest leadership – including Flores and Falzone – warning that harassment was imminent, and that Pinterest needed to set alerts and protection for the Trust and Safety team. They made this request based on the experiences of friends employed at Google and Twitter who had experienced doxxing threats themselves.

118.     Ozoma urged the Company to do something, but Pinterest leadership again refused to acknowledge any threat.

119.     Confidential Witness 1 believed the unwillingness to take Ozoma seriously reflected already-existing prejudices against her.

120.     Confidential Witness 2 is a woman who worked on Pinterest's Trust and Safety team during the Relevant Period until she departed the Company in April 2020. She recalled that immediately after the Project Veritas communications, Ozoma and Banks were totally disregarded. Falzone from the Legal department said they were rushing to conclusions, the threat did not matter, and he did not care.

121.     Beyond employee warnings, Pinterest had reason to know of the threat to its employees as these threats were made publicly via Twitter. On June 11, 2019, Live Action tweeted that Pinterest had banned it from the platform and at least one follower promptly responded "Start doxxing Pinterest execs."

122. But because of Pinterest's racial and gender bias against Ozoma and Banks, these credible threats were not addressed. Flores and Pinterest ignored their concerns and failed to take prompt action to protect Pinterest employees from doxxing and ensure their immediate physical safety.

123. This failure to act in the face of a threat of harassment against employees who were acting on their employer's behalf constitutes a tacit endorsement of the harassment in violation of employment laws.

124. Just as Ozoma and Banks warned, Project Veritas released a video that disclosed Ozoma's photo, address, and phone number and wrongly attacked her as the architect of a biased policy. The video was quickly shared on websites including extremist forums, 8chan and 4chan, where users organize harassment campaigns. In one of the documents that was leaked and highlighted in the video, Ozoma suggested looking into creating an advisory warning for content from conservative media personality Ben Shapiro, whom she described as "a White supremacist." This angered Shapiro's supporters, who now had access to Ozoma's photo and contact information. Within minutes, a host of racist, bigoted comments began to appear in the video, published to YouTube and Facebook. Ozoma, watching the comments pour in, emailed her team to ask if Pinterest had a plan to protect staff. Hours elapsed, and she made the request again: "Can someone please let us know what [our] security options are?" she wrote in an email to the policy, safety and security, and legal teams.

125.   Ozoma was immediately targeted with death and rape threats.

126.   At least two other female Pinterest employees were also doxxed.

127.   Several hours later, a representative from Pinterest's legal team asked Ozoma to reach out to a third-party company named Storyful, which she had worked with on health misinformation, to ask whether they could "help advise" on what to do. Pinterest's Legal department then asked Storyful to investigate whether Shapiro actually was a White supremacist. Ozoma later expressed appropriate shock at this decision: "Instead of focusing on security and making sure that we were fine and validating the concerns that we had, their concern was: Is what you said valid? Almost like [the employee] had a legitimate reason to share my personal information all over the Internet."

128.   In an email exchange with Silbermann the day she was doxxed, Ozoma shared her disappointment in Pinterest's handling of the situation, including screen images of the harassment she received. Silbermann responded, "***I'm personally concerned that when these risks were raised, we didn't take the right steps***." He vowed to ask his deputies to look into the matter, but then just brushed it under the rug. Ozoma received no follow-up from Silbermann or any other Pinterest executive.

129.   It took the Company over a week to engage in any meaningful steps to try to scrub its employees' personal information from the Internet. Ozoma had to reach out to friends at Facebook and Google for help because Pinterest refused to act promptly.

130.   Confidential Witness 1 noted that a member of the Trust and Safety team – not Pinterest's Security team – first discovered visual clues that led the Company to identify the internal leaker. And it was Ozoma who had to obtain physical security for herself, because the Company did not take the threat seriously.

131.   Confidential Witness 1 believes that the Company failed not only in its response to the doxxing, but also in its efforts to learn from the situation. She was particularly concerned that the very same people that had failed to take the risk of doxxing seriously were leading the post-mortems, particularly, Falzone. Confidential Witness 1 participated in one of the post-mortem sessions arising from the doxxing incident. With the exception of Confidential Witness 1, participants failed to take personal responsibility for how they or their teams fell short during the post-mortem.

132.     Confidential Witness 1 participated in two debrief sessions with her superiors, who both kept implying that the controversial decision to ban LiveAction or keep it banned was due, in part, to Ozoma involving herself inappropriately and pushing for a particular outcome. Confidential Witness 1 was confused and surprised by these claims. It is common and appropriate to collaborate with close cross-functional partners on controversial content decisions, specifically communications and public policy (which Ozoma represented). Both of Confidential Witness 1's superiors had been briefed on the rationale behind the decision and approved or agreed with the outcome. For these reasons, Confidential Witness 1 formed the conclusion that her superiors' suggestions that Ozoma was inappropriately involved or over-involved reflected their bias against Ozoma, not the actual facts. Confidential Witness 1 believed the conversation needlessly focused on Ozoma and finding some way to blame her instead of trying to understand what actually happened and what could be learned from the incident.

133.     Thus rather than openly listening to the employees, Pinterest's Legal and Compliance leaders took the incident as an opportunity to unfairly target Ozoma. The Company's refusal to act in response to a known threat to its employees was a tacit endorsement of harassment, as was the subsequent focus on the question of Ozoma's involvement in the decision to ban LiveAction.

### b. The Company Agrees with Ozoma and Banks' Policy Recommendations, But Retaliates Against Them Nonetheless

134.     Over the subsequent months, Ozoma and Banks continued to raise concerns internally and outside Pinterest regarding pay equity and other discriminatory treatment.

135.     In July 2019, after over a year of unsuccessful efforts to negotiate a pay increase even with the help of her outside attorney, Ozoma filed a complaint against Pinterest with the California Department of Fair Employment and Housing. Under California Department of Fair Employment and Housing regulations that complaint was served on the Company within 60 days, and likely within 10 days.

136.     In September 2019, Banks raised concerns to Pinterest's HR department about Hale's discriminatory behavior, including that he had made racially charged comments about her ethnic background and criticized her "tone"—a common, biased criticism of women of color. In raising her concerns, Banks asked that Hale be provided with coaching. Although the HR department found that

Hale had made the comments, they concluded that they did not qualify as biased comments because Hale did not have ill intent. Instead, the HR Department just chalked it up to him being an inexperienced manager. Thus, Hale was protected by being part of Silbermann's inner-circle and was not required to undertake any coaching or other corrective action.

137.    In October 2019, Banks asked Hale for information about the process by which she could be considered for promotion, in order to prepare herself for the upcoming performance and promotion review cycle. Hale ignored her for weeks, and did not provide her any clear response in writing about the promotion process until she sought help from a member of the HR department.

138.    Then in November 2019, Pinterest employees learned that the Company was refusing to provide holiday pay for its contract employees – janitorial, security, and catering staff. This was a change from the prior year, when the Company had provided holiday pay to contractors. Employees learned this not from the Company, but rather from a news article. Banks was concerned about this development and believed it was the wrong choice; she promptly conferred with the Company's federal government affairs consultants, who agreed with her and said the decision should be reversed. Banks, Ozoma, and Hale discussed the decision and agreed they should recommend that Pinterest reverse it.

139.    But when it came time to actually raise the concern to Pinterest's Legal Department, Banks and Ozoma stood by the team's recommendation and Hale went silent. Their recommendation, led by Banks, was not well received. Flores sent Banks a berating email questioning her competence, told her the proposal had embarrassed an upper-level manager, asked whether she knew how to represent the Company in high-stakes issues, and stripped her of her responsibilities.

140.    The Company ultimately did reverse its decision on contractor holiday pay, but Flores went out of her way to tell Banks that her advocacy played no role in the Company's reversal. Flores accused Banks of lying about whether she had actually discussed the issue with the government affairs consultants (despite Banks having emails reflecting those conversations). Further, despite the Company ultimately agreeing with her, Banks was demoted, received a negative performance review, and all conversations regarding her career path and promotion potential were halted.

141.    Banks was also subjected to a two-hour interrogation on the process by which she made the recommendation. Banks was promised a recording of the interrogation, but never received it, never received any follow-up, and never learned of any findings.

142.    Further, Flores led the Company in an aggressive interrogation into the media leak regarding contractor pay, as well as the recommendation to reverse that policy decision. Numerous employees who worked with Banks and Ozoma or had a good relationship with them, were interrogated. Members of Pinterest's Business Conduct Team, including members of the Legal Department, confiscated employees' phones and personal devices, poured over their social media accounts, and repeatedly asked whether Ozoma leaked the information.  It was obvious that the Business Conduct Team was focused on Ozoma and Banks because they accidentally forwarded to Banks their screenshots of other employees' social media conversations with Ozoma and Banks.

143.    Pinterest employees felt the investigation's goal was to frame Ozoma and further retaliate against Ozoma for raising pay equity and discrimination claims. Notably, this investigation commenced just a week after Ozoma communicated to the Company her willingness to take her pay discrimination concerns to court.

144.    Confidential Witness 1 was one of the people interviewed in connection with the contractor pay leak investigation. Confidential Witness 1 had no professional duties related to contractor pay or the decision to rescind holiday pay. Thus, Confidential Witness 1 believes the common thread of the people interviewed was their close working relationship with Ozoma. During her interview, the investigator focused questions more on Ozoma than anyone else, and pulled up private chat transcripts between Ozoma and Confidential Witness 1. Confidential Witness 1 felt the investigator was trying to get her to speculate as to whether Ozoma was involved in the leak.

145.    Confidential Witness 1 learned from Ozoma that Silbermann knew of the pay leak investigation and the names of the interviewees.

146.    Confidential Witness 2 was subjected to the investigation into who leaked to media about Pinterest's decision to cut contractor pay for the holidays. The investigator asked Confidential Witness 2 numerous questions about how she felt about the leaks, the underlying situations, showed

her screenshots of Slack conversations with Ozoma and Banks, if she was in contact with journalists, and at one point directly asked if she was the leaker. Then the investigator accused Ozoma of being the leaker, which Confidential Witness 2 said she did not believe was accurate.

147.    Confidential Witness 2 shared that an incredibly talented female member of the public relations team was fired after her interrogation. That employee was Pinterest's public face for discussing sensitive issues, including the sensitive and timely topic of election misinformation. This female employee had a particularly aggressive interrogation, including being forced to let the investigator go through her social media accounts. After her interrogation she was put on administrative leave and told she could not return until she told them who the leaker is. No one at the Company reached out to her for approximately two weeks and then she ultimately elected to leave the Company because its leaders had treated her so terribly. Confidential Witness 2 was shocked by Pinterest's treatment of this employee because she absolutely loved the Company; she was a kind and lovely person who did key work on high-profile issues.

148.    For Confidential Witness 2 and other close colleagues, it felt like Pinterest was holding this employee hostage to get the actual leaker to come forward so the Company would back off this beloved colleague. And this was in stark contrast to Pinterest's treatment of the male Project Veritas leaker who was responsible for his colleagues' personal information being spread across the Internet, resulting in their doxxing. Pinterest communicated with that person, told him what was happening, and maintained open lines of communication. But for the female public relations employee, she was left totally in the dark.

149.    In December 2019, at the same time that Ozoma was being accused by the Company of leaking and it was conducting an investigation seemingly intended to frame her, she continued doing praise-worthy work on its behalf. In concert with other major websites, she ended the promotion of slave plantations as wedding venues on Pinterest. This initiative stemmed from a request by Color of Change, a national racial justice organization with a particular focus on online hate speech. Color of Change came to Ozoma to inform her that slave plantation weddings were trending on Pinterest and to request that the Company stop promoting plantations as sites for modern-day celebrations. Ozoma

brought that recommendation to her team, and after two months of back-and-forth, the Company agreed to stop promoting slave plantations. That decision resulted in another extremely positive news cycle, with dozens of positive stories, many featuring Pinterest in the headline.

150.    Pinterest benefitted from the policies that Ozoma championed and from having a woman of color as a public spokesperson. Pinterest advertised Ozoma's policies as part of the Company's progress, specifically in the areas of diversity and inclusion. In January 2020, Pinterest's Chief Human Resources Officer wrote:[2]

> We can feel the impact of a more representative workforce, not just across our teams but also in product and policy decisions . . . We regularly look for and limit content that could make people feel unwelcome and unsafe. We also work with outside organizations to ensure our policies are equitable and comprehensive. For instance, we limited the distribution of wedding venues that were former slave plantations.

151.    Nonetheless, that same month, Ozoma received a negative performance review at the Company. This retaliatory review came one year and three months after she first complained about unequal pay. The criticism was connected to her recommendation that Pinterest stop promoting slave plantations as wedding venues. Though the Company agreed, and instituted the policy, Hale criticized her for not exploring both sides of the issue and presenting the positives of highlighting plantations as a great location for a wedding. According to Ozoma, "[i]t was mind-boggling, almost like trying to search for things to criticize me for in my performance review, and performance reviews that affect your pay."

152.    In January 2020, seeing no progress in correcting the under-leveling and amidst Pinterest's retaliation campaign, Banks filed a complaint with the California Department of Fair Employment and Housing alleging pay discrimination based on sex and race as well as retaliation for reporting the discrimination. She received the right to sue in February 2020.  The Audit Committee would have been apprised of this on February 27, 2020 as part of its quarterly briefings. PINS-220-0000047.

153.    Banks was subjected to continued retaliation. Although her job responsibilities included acting as a community-builder in Washington, D.C., and she was hired specifically because

---

[2] https://newsroom.pinterest.com/en/post/diversity-report-2020

of her strong relationships in the Black community, the Company scrutinized and rejected expenditures related to her partnerships with Black-owned organizations and businesses (but not with other organizations). Charges that normally would not be reviewed were questioned. When Banks submitted lunch receipts, she was quizzed on whether she actually went to lunch.

### 3. Ozoma and Banks Go Public, Triggering Additional Revelations of Discrimination at the Company and Extensive Public Scrutiny

154.    After enduring repeated acts of discrimination and retaliation, Ozoma and Banks decided to leave Pinterest, with a common last day of May 22, 2020.

155.    Just days later, in response to George Floyd's death at the hands of a Minneapolis police officer and a renewed national focus on racism in America, Pinterest issued a public statement claiming: "With everything we do, we will make it clear that our Black employees matter, Black Pinners and creators matter, and Black Lives matter."

156.    Outraged at the hypocrisy of Pinterest claiming support for its Black employees and burnishing its own reputation as a diverse and inclusive workplace, Ozoma and Banks went public with their stories.

157.    On June 15, 2020, Ozoma and Banks published lengthy threads on Twitter detailing their experience of discrimination at Pinterest, alleging that Pinterest underpaid them; that Pinterest tacitly endorsed Ozoma's harassment after being warned that a White male colleague shared Ozoma's cell number, photo, and name with a right-wing extremist group and claimed it was no big deal; and, that Pinterest retaliated against both for speaking up about discrimination at the Company. Ozoma reported that Pinterest's assigning them to improper pay levels resulted in the loss of stock options worth hundreds of thousands of dollars.

158.    Their posts included the following indictments of Pinterest and its leadership:

 **Aerica Shimizu Banks** @erikashimizu · Jun 15
What should have been a moment of pride and the beginning of a long journey achieving federal and social impact wins for the company, Pinners, and the communities it serves instead marked a period of glaringly unfair pay, intense discrimination, and terrifying retaliation. 3/

♡ 1          ⟲ 26          ♡ 185          



**Ifeoma Ozoma** @IfeomaOzoma · Jun 15   
Replying to @IfeomaOzoma

I am SO proud of the initiatives I led in my time there - addressing health misinfo decisively is no longer novel thanks to that work. I just wish it wasn't sullied by the racism, gaslighting, & disrespect from my manager, skip level, and the company's legal & HR leadership. 7/

    ♡ 11       ⟲ 208       ♡ 2.7K       ⬆

**Ifeoma Ozoma** @IfeomaOzoma · Jun 15   

Racism is dehumanizing and exhausting. I busted my ass at Yale, Google, then Facebook before Pinterest recruited me as the *second hire* on the global Public Policy team. I led work that raised our public policy profile globally. It didn't matter because I'm a Black woman. 8/

    ♡ 9       ⟲ 270       ♡ 2.7K       ⬆

159.     Their posts were shared thousands of times, including by high-profile celebrities like Lady Gaga, and received sympathetic responses from others who had experienced discrimination at Pinterest, including one individual who tweeted, "I left pinterest a long time ago due to the racist vitriol."

160.     Hours after Ozoma and Banks came forward, in an effort to cover-up Pinterest's mistreatment of Ozoma and Banks, Silbermann sent Pinterest employees an email disputing the women's claims without mentioning their names and claiming "[t]he investigations found that we treated these employees fairly."  Silbermann failed to tell employees that the same people accused of retaliating against them were also taking the lead on those investigations.

161.     Ozoma and Banks' stories received swift and extensive media coverage, including numerous articles corroborating their stories and those of other current and former employees at Pinterest who alleged discrimination on the basis of race and/or gender, retaliation, and harassment.

162.     That day, Color of Change issued a nationwide statement entitled *Pinterest's Hypocrisy is Glaring* in which the organization highlighted its work with Ozoma and Banks to restrict the marketing of plantation weddings on Pinterest and to overhaul the Company's anti-harassment policies,

and indicting Pinterest's failure to treat these valuable employees equally. "We credit them for orienting the company's policies toward racial justice. However, even while claiming 'Black lives matter,' Pinterest sidelined Ifeoma and Aerica after they made the platform safer for Black users. To make matters worse, the company's leadership failed to intervene after Ifeoma was doxxed by another Pinterest employee."

163.    On June 16, 2020, *The Washington Post* published an article entitled, "Two former Pinterest employees allege racial discrimination at the company" and noted that Pinterest's most recent diversity report stated that only 4% of Pinterest employees are Black, and Black people comprise only 1% of its leadership.

164.    A June 20, 2020 *Business Insider* article interviewed eleven former employees who all indicted Pinterest and its executives. Former employees said Pinterest has a "dog-eat-dog culture that they believe goes well beyond the 'brilliant jerk' standard that's accepted at many Silicon Valley companies." Employees described feeling "duped" because the Pinterest product is so friendly and the Company's motto is "the last positive corner on the internet" but really the Company has a "toxic, chaotic culture" where:

- "People, especially Black employees, were suddenly fired or 'pushed out' after meeting or exceeding their performance goals.'"

- "Poor management skills created a culture of firing that left everyone fighting for recognition. Internal teams felt pitted against each other, taking credit for each others' work."

- "Multiple people said they suffered stress-induced conditions. Some said they required medical treatment ranging from 'stroke level' high blood pressure to clinical depression and PTSD."

- "Many women believed they were underpaid compared to what male coworkers were earning."

- "When complaints were made to human resources, HR routinely sided with managers, multiple people said. Those employees then often received negative reviews, despite meeting performance goals, while managers were promoted, they said."

- Complaints "went into the garbage" and when they reached out to follow-up on previous reports or file new ones, were assigned to new HR representatives with no knowledge of previous complaints

- Pinterest was described as a "revolving door" for people of color, with eight Black former employees in a variety of jobs across the company all of whom left within two years and many reporting discriminatory and inappropriate treatment:

  o A Black male former salesperson said he was "pushed out" in late 2019; he brought in millions of dollars in sales from a high-profile client and then had the account reassigned to a White male, got cut from meetings, and received a bad review.

  o Another Black male former salesperson similarly hit or exceeded his sales goals (which were higher than others on his team) and received positive feedback, but then was called in and suddenly fired one day. He went to HR twice and never got a reason for the termination.

  o An experienced Black saleswoman was singled out by her White manager to the point that others noted it; her manager criticized her performance in front of the team and accused her of taking more time off than other workers because she was a mother. The employee spoke to HR several times and suggested her manager receive training, but HR backed the manager and said she should try to handle it herself. After meeting her sales goals but nonetheless receiving a bad review, she was put on a performance plan and fired 4 weeks after the plan ended.

  o One Black female executive assistant was assigned to a White female manager who immediately forced her to do personal chores like pay parking tickets and make doctors' appointments. When the manager had a urinary tract infection, she blamed it on her assistant failing to schedule her breaks.

165.    In the face of this public scrutiny and concern, on June 22, 2020, Pinterest changed its tune from its initial confidence in the fairness of its investigation and treatment of Ozoma and Banks, with Silbermann suddenly conceding his wrongdoing, writing that he had learned that "*parts of our culture are broken*," expressed "*I'm truly sorry for letting you down*," and claimed, "I'm embarrassed to say that I didn't understand the depth of the hardship and hurt many of our team members have experienced. *I need to do better*."

166.    On June 23, 2020, *NPR* covered the story as part of a special series *America Reckons with Racial Injustice*. The article quoted Ozoma, speaking about Pinterest's refusal to protect her from online harassment, with a particularly poignant phrase in the context of the social moment: "*Our Black lives were treated like they didn't matter*." In legal terms, Pinterest tacitly endorsed the harassment of its own employees.

167.    On July 2, 2020, Ozoma and Banks were invited to the Today Show to share their stories. Banks shared the personal toll her time at Pinterest had taken on her, including that she was forced to

take anti-anxiety and anti-depression medication. They also shared that each of their California Department of Fair Employment and Housing claims had resolved under confidential terms.

168.   On a July 2, 2020, Tech Freedom Policy podcast, Banks described the strong contrast between her prior roles and Pinterest. At Google she had an incredible experience pointing out where that company could do better. At the White House under President Barack Obama it was the most stressful but rewarding job she could have. But at Pinterest it was "*the most unethical, most hypocritical, and most unprofessional environment I've ever been in in my life.*"

169.   On that podcast, Banks emphasized the structural problems within Pinterest. The public policy and social impact team, of which she and Ozoma were members, was within the Legal organization, so her manager (Hale) was managed by the General Counsel (Flores). But even though Banks and Ozoma's discrimination and retaliation claims implicated their own business unit, those same individuals within the same management chain oversaw the purported investigations, rendering the investigations conflicted and biased.

170.   Ozoma also succinctly captured part of the harm to the Company caused by its discriminatory actions, explaining that her concern with her treatment and similar treatment of others at Pinterest was the loss of talent and its impact on the Company's long-term value. She likened this scandal to the sort of situation that could result in a lost financial opportunity as occurred in July 2020 when a number of advertisers pulled funds from Facebook out of concern about misinformation on that platform.  Had Pinterest not had its own scandal, it could have reached out to each of those ad agencies to invite them to spend those funds at Pinterest, a company that was more in line with their values – but because the news story about Pinterest in that moment was its egregious discrimination against Black women, the Company was not in a position to fully capture those advertising dollars.

171.   On July 4, 2020, Nitasha Tiku at *The Washington Post* wrote, "Black women say Pinterest created a den of discrimination — despite its image as the nicest company in tech. he article offered an in-depth profile of Ozoma and Banks' experience at Pinterest, as well as the outrage it had sparked within the Company, including over one hundred questions submitted in advance of a mid-June Company-wide Q&A gathering. Based on Tiku's investigation including speaking with former

employees and reviewing correspondence and other documents, the article also reported discriminatory experiences by numerous former employees. Tiku reported a marketing executive telling a Black employee that it was surprising that marketing materials depicting Black people were successful and a supervisor telling a Black female employee to stop speaking in meetings and taking her presentations to present to clients. The article also shared the story of a former employee who was the only Black employee on her team and went to a team dinner where a Pinterest executive said this sole Black person should act as "the servant" and "serve" her co-workers. "Everyone knew it was wrong, but nobody said anything in that moment," said the ex-employee, who said she was too scared of retaliation to report the incident to Human Resources.

172.    On July 20, 2020, *Fast Company*, the country's most widely read tech magazine, published a story entitled "Discrimination charges at Pinterest reveal a hidden Silicon Valley hiring problem". The article put Pinterest's discrimination in context of a tech industry where discriminatory under-leveling means "you never catch up" and the racial wage gap particularly punishes Black women. In particular, the article noted that Pinterest's pay level charts were neither transparent nor objective, wholly undermining the Company's supposed meritocracy.

### 4.    A Glass Ceiling, Even at the Very Top: Francoise Brougher

173.    Inspired in part by Ozoma and Banks publicly discussing the discrimination they faced at Pinterest, on August 11, 2020, Francoise Brougher filed a lawsuit in Superior Court of the State of California alleging discrimination and retaliation and published an article on Medium, *The Pinterest Paradox: Cupcakes and Toxicity*, elaborating on her experience at Pinterest.

174.    Like Ozoma and Banks, Brougher was highly qualified for her position. After very successful stints at Charles Schwab, Google, and Square, Brougher joined Pinterest in March 2018 as the Company's first COO.

175.    Silbermann hired Brougher as the Company's first ever COO specifically because he was looking for a seasoned executive who understood online advertising and had the relevant experience to help him take Pinterest public. At Google, Brougher had run a $16 billion ad sales

business and managed thousands of people. At Square, she had successfully ramped up revenues and been involved in the IPO process. It seemed a perfect fit.

176.     In less than two years at Pinterest, Brougher grew the Company's revenue from $500 million to $1.1 billion, increased the advertiser base from 10,000 to 80,000, and expanded operations to 20 countries. Half the Company's employees reported to her.

177.     Although Brougher was the COO, she did not have authority over all aspects of Pinterest's operations. Certain internal operational functions, such as customer service, had historically been under Morgenfeld's purview and remained within his portfolio after Brougher's role was created and she joined the Company.

> **5.     Directors and Top Executives Drastically Under-Pay Brougher and Prevent Her from Performing Her Job Duties, Including Raising Money for the Company**

178.     Like Banks and Ozoma, after her hiring, Brougher learned that she was underpaid compared to male colleagues. As one of Pinterest's highest-ranking executives, Brougher was not assigned a level like other Pinterest employees. The bulk of Brougher's compensation was not in salary, but in equity.

179.     At the time of her hiring, Pinterest's Board (composed of Defendants Silbermann, Levine, Jordan, Wilson, and Reynolds) approved Brougher's compensation, and told Brougher that all executives receive backloaded equity grants, meaning that the majority of an executive's shares do not vest within the first year. Brougher's equity grants followed this structure, which she believed to be common to all Pinterest executives.

180.     But in preparation for its IPO, Pinterest submitted company information in an S-1 to federal regulators and Brougher learned for the first time in March 2019 that male peers had more favorable vesting schedules, with no or less backloading. Specifically, Morgenfeld, Brougher's closest peer, received 812,500 shares in his first year, whereas Brougher received 300,000 shares—63% fewer. At the time of the IPO, Brougher's shares would have been valued at $5.7 million whereas, Morgenfeld's were valued at three times that amount – $15.4 million.

181.   Moreover, Brougher's equity grant provided that only ten percent of the shares vested the first year; twenty percent vested the second year; thirty percent vested the third year; and forty percent vested the fourth year.  By contrast, Morgenfeld's stock award had no backloading.

182.   As Pinterest approached its IPO, it offered Brougher an IPO retention grant that was even more backloaded. Starting in March 2019, Brougher was to receive stock over five years with the last two years making up most of the reward. She was scheduled to vest zero stock in the first year, five percent in the second year, five percent in the third year, forty-five percent in the fourth year, and forty-five percent in the fifth year. Other officers' retention grants were far less backloaded.

183.   Brougher raised concerns about this unequal treatment to Silbermann, who directed her to Human Resources. Eventually, as a result of Brougher's complaint, Pinterest modified Brougher's IPO retention grant, but only after she presented a spreadsheet illustrating the inequity and fought for her fair share. However, even with this adjustment Brougher was not made whole. Further, equity packages for other senior women executives at Pinterest continued to be backloaded, disadvantaging them in the same way that Brougher was disadvantaged before Pinterest partially corrected it.

184.   Brougher also faced additional forms of sex discrimination at Pinterest. Like Ozoma and Banks, after advocating for fair treatment in her retention grant, Brougher was marginalized and shut out of decision-making at the Company. Even though as COO she was formally second only to Silbermann in Pinterest's leadership structure, in practice, important decisions were often made in sidebar conversations between "Ben and two or three of his lieutenants, invariably men." According to Brougher, "Ben appeared to listen to only a few people and sealed himself off from opposing viewpoints. Ben's 'in group,' the men invited to 'meeting after the meeting,' held all the power and influence."

185.   Silbermann marginalized Brougher to the Company's detriment. Brougher noted a revenue decline in the quarter following Pinterest's IPO, which she ultimately concluded resulted from an engineering team decision that had not been conveyed to her team. When Brougher raised the concern that she was being cut out of key meetings and that ad revenue was declining because advertisers found Pinterest's product difficult to use, Silbermann disinvited her from the product team

meetings that he led. Excluded from meetings where decisions were made, Brougher was unable to do her job successfully, directly harming the Company's revenue generation.

186.    Relatedly, when Brougher raised questions to Silbermann about strategy decisions, he criticized her for not being collaborative and said she did not have healthy cross-functional relationships. Silbermann could not provide any specifics, instead telling her to "be mindful" of how she acted. Notably, in her mid-year performance review, Silbermann omitted her objective success in driving revenue, which had risen from less than $500 million to over $1.1 billion during her tenure.

187.    The harshest public exclusion that Pinterest's executives perpetrated against Brougher was from Pinterest's pre-IPO investor roadshow, where executives travel across the country to meet investors. Though she was Pinterest's number two executive, specifically hired for her IPO experience, was the *only* executive on the team who had taken a company public before, and though she already had relationships with some of the investors the team would be meeting, Silbermann told Brougher to not come to the roadshow. Instead, he invited a male friend, the Head of Global Communication – even though that person was superfluous because his role overlapped with another attendee, the Head of Investor Relations.

188.    After the IPO, the Board of Directors ceased inviting Brougher to present at its meetings. At times, members of her team were invited, sometimes without her knowledge. But as the COO of Pinterest, Brougher no longer had meaningful engagement with the Board.

189.    Around January 2020, Morgenfeld became increasingly disrespectful to Brougher. He would ignore her and undermine her authority by talking directly to her team members, even if he knew she was leading a particular project. In one meeting, Morgenfeld disparaged her in front of her peers by sarcastically asking, "What is your job anyway?" Most of Morgenfeld and Brougher's one-on-one meetings were taken off calendar, shutting down avenues for communication between them.

190.    Then, in February 2020, Brougher received a peer review from Morgenfeld, though she was not asked to review him. Given that Pinterest's peer review process expects reviews to be conducted by close colleagues, the asymmetry was surprising. In his review, Morgenfeld dismissively identified Brougher's only 2019 achievement as "[s]eems to be a champion for diversity issues," totally

ignoring her accomplishments in increasing advertisers, users, and revenue. As her Complaint notes, "[b]y focusing only on 'diversity,' Mr. Morgenfeld . . . ignored and therefore demeaned Brougher's many significant accomplishments as COO in 2019, including: scaling the business team to transition from a private to a public company, diversifying Pinterest's advertiser base, and leading an effort to expand the company's monetization efforts in Europe. His snide comment was further enfeebled by his use of the verb 'seems,' which cast doubt on whether she really did champion diversity (her only perceived accomplishment) or merely seemed to do so." Ignoring Brougher's accomplishments in leading operations and focusing only on diversity was understandably offensive to Brougher, and as Brougher's complaint aptly notes, "[r]educing a female executive's achievements to "diversity" is a common form of gender discrimination."

191.   When Brougher tried to address the review with Morgenfeld directly, he called her a liar, questioned the value she brought to the Company, and hung up on her. Brougher raised concerns about this conversation to Silbermann, who failed to take any steps to meaningfully investigate and prevent discrimination against the Company's number-two executive. Instead, he inappropriately minimized the problem, likening it to an old couple fighting over who made coffee and said the HR department would work it out.

192.   According to Brougher, at this point, Morgenfeld stopped speaking to her entirely, did not acknowledge her in meetings, and went behind her back to reach out to her team members. HR promised to bring the two together, but that meeting never happened.

193.   At the end of March, Pinterest's Chief Human Resources Officer sent Brougher a note that the investigation into Morgenfeld's behavior was closed and that Morgenfeld was found to have done nothing wrong. Brougher responded that she needed help to repair their working relationship in order to perform her job. Pinterest's HR department never answered.

194.   Shortly thereafter, Silbermann fired Brougher and told her to transition her responsibilities *to Morgenfeld*. In what has proved a common refrain for Silbermann, he expressed that he was "sad" about having to fire someone so "logical" – as if he, the CEO and Board Chair had no control over the decision.

195.    Silbermann requested that Brougher cover-up the Company's decision to fire her by telling her team that she decided to leave the Company, and offered her a non-disclosure agreement. Brougher refused to lie and declined the non-disclosure agreement.

6.    **Pinterest Filed a Misleading Proxy Statement, Concealing the Pay Discrimination Against Brougher and the True Reason for Her Departure**

196.    On April 9, 2020, Pinterest filed with the SEC its Proxy Statement. The Proxy Statement solicited shareholders to (1) elect Jordan, Levine and Rajaram to terms on the Board of Directors and (2) approve, on an advisory basis, the timing of future advisory votes to approve compensation for certain executives. The Proxy Statement was issued by order of the Board of Directors (Jordan, Kilgore, Levine, Reynolds, Rajaram, Silbermann, and Wilson). It was signed by Flores, Pinterest's General Counsel.

197.    In the 2020 Proxy Statement, the Directors included the following representation that Defendant Silbermann, despite not being independent, was ensuring that the Board was exercising effective oversight of management:

**Board Leadership Structure**

***Our Co-Founder, President and CEO, Benjamin Silbermann, currently serves as chairman of the board***, and the board has appointed an independent director, Michelle Wilson, to serve as lead independent director. ***Although our bylaws do not require that the positions of chairman and CEO be combined, we believe that this structure is in the best interest of our company given Mr. Silbermann's deep understanding of our business and culture, as well as his leadership in shaping and driving the company's strategic priorities and business plans***. This structure also facilitates a regular flow of information between management and the board and provides a clear chain of command. Our chairman, amongst other things:

- presides over meetings of the board;

- consults with the lead independent director on the agenda for board meetings;

- consults, as needed, on evaluating and recommending candidates for election to the board; and

- oversees the activities of the board**.**

198.    The Proxy Statement further stated that "our corporate governance guidelines provide that one of our independent directors should serve as our lead independent director at any time when our chief executive officer serves as the chairman or if the chairman is not otherwise independent. ***We***

1   *have structured the lead independent director role in a manner that reinforces the independence of*

2   *the board and serves as an effective balance to a combined chair and CEO*."

3        199.    The 2020 Proxy also contained a "Say on Pay" proposal that the Company requested

4   shareholders to vote in favor of. The Proxy Statement misled investors regarding Pinterest's

5   compensation system and the efficacy of oversight for that process. It stated that the "majority of our

6   [Named Executive Officers'] target total direct compensation is linked to the value of our stock . . .

7   When determining the amount of such awards, the compensation committee considers the company's

8   performance as measured against financial, operational and strategic objectives as well as each named

9   executive officer's individual contribution to that performance." It further stated that in overseeing

10  compensation, the Compensation Committee considers "each of our named executive officer's roles

11  and responsibilities, qualifications, knowledge, skills, experience, and tenure, including on a relative

12  basis to other similarly situated executives at the companies in our compensation peer group" and that

13  "the performance of each of our named executive officers, based on a qualitative assessment of his or

14  her contributions to our overall performance, ability to lead his or her business unit or function, ability

15  to collaborate across the company and potential to contribute to our long-term financial, operational

16  and strategic objectives."

17       200.    As to Brougher, the Proxy Statement explained that she received an RSU award granted

18  in 2019 by the Board considered "her past performance, expected future contributions and the criticality

19  of her role to Pinterest, and expected contributions, as well as the total unrealized value of her

20  outstanding equity awards and their vesting terms relative to our compensation peer group data and

21  other Pinterest executives."

22       201.    These statements to Pinterest's shareholders were materially misleading, including due

23  to the omission of material information. The statements omitted that the Compensation Committee had

24  assigned Brougher's RSUs in an amount that discriminated on the basis of sex, was not fully reflective

25  of her role, contributions and ability to contribute to Pinterest's long-term objectives, and that the

26  decisions made to set her RSUs treated her unequally relative to her similarly situated male

27  counterparts.

28

202.    The Proxy Statement also misled investors regarding Brougher's departure from the Company, stating that "Francoise Brougher left the Company effective April 7, 2020 and Todd Morgenfeld, our Chief Financial Officer, assumed her responsibilities."

203.    This statement was materially misleading, including due to the omission of the highly material fact that Silbermann terminated Brougher on the basis of her sex after she had challenged the Company's discriminatory pay practices and that both Silbermann and Morgenfeld had ostracized her in retaliation for making such a complaint.

204.    The Defendants were also well aware, as alleged herein, that rampant gender and race discrimination was taking place at Pinterest and that the Company's internal controls were not effective to prevent such discrimination and that the Board was blindly deferring to Silbermann, Sharp, and the Company's other controlling insiders.

205.    The Proxy also stated that the Audit Committee members had "reviewed and discussed with management the audited financial statements for the fiscal year ended December 31, 2019." The Proxy thus contained a representation that the Audit Committee members had discussed the effectiveness of the Company's internal controls with its auditor and had determined that the controls were effective.

206.    This was false.  As the Audit Committee members knew, the Company's internal controls were ineffective because they failed to properly investigate or prevent harassment, discrimination, and retaliation. As of the date the Proxy was filed with the SEC on April 9, 2020, Brougher, Ozoma, and Banks had all complained about serious pay inequity and retaliation. Further, the Audit Committee had received quarterly Compliance Reports and charts summarizing investigation matters revealing that the top internal complaint was discrimination and harassment.

**7.      Brougher Went Public, Triggering Additional Revelations of Discrimination at the Company and Further Public Backlash Against Pinterest**

207.    On August 11, 2020, Brougher took her story public, filing her complaint, publishing an article on Medium, and tweeting about her experience.

208.    Like Ozoma and Banks, she received swift and widespread attention.

209.   In Brougher's story on *Medium*, "The Pinterest Paradox: Cupcakes and Toxicity," she shared her own story and elaborated that over her time at Pinterest, other women shared their struggle to succeed in the male-dominated environment. As Brougher wrote: "[m]ost wanted advice on dealing with being excluded or undervalued. I heard stories of blatant gender discrimination. Certain teams could not retain women because the workplace was so toxic. Some women were offered spot bonuses not just to stay at the Company, but to stick it out in certain departments that were particularly fraught. Women were pushed out for being too candid, others for being too caring. Many women felt they had been under-leveled when they were hired and could not get promoted."

210.   The *New York Times* promptly covered the story, in an August 11, 2020 article by Erin Griffith titled "Pinterest Accused of Gender Bias in Suit by Former No. 2 Executive", summarizing the lawsuit and Brougher's apt explanation of her time at Pinterest: "When men speak out, they get rewarded. When women speak out, they get fired." Griffith reported discriminatory and disrespectful treatment by Morgenfeld, including excluding her from the pre-IPO roadshow and excluding her from Board meetings after the Company went public (while bringing in members of her team without her knowledge). Griffith also shared the demeaning exchange in which Morgenfeld, in front of Brougher's peers asked her, "[w]hat is your job, anyway?" Noting the significance of the case, *The New York Times* explained, "Ms. Brougher is one of the most prominent female tech executives to file a gender discrimination suit against her onetime employer since the venture capitalist Ellen Pao sued her firm, Kleiner Perkins Caufield & Byers, in 2012." For its part, Pinterest noted that the Company needed to change its culture so "all of our employees feel included and supported," implicitly acknowledging that Pinterest had failed to do so in the past.

211.   In an August 13, 2020 *Axios* article, former employees blamed Silbermann for creating a White, male inner circle that created an unfair work environment for women and people of color. One former employee stated, "[a]nyone who has worked at Pinterest knows that culture starts from the top with Ben which is reinforced by his small band of male cronies . . .  For too long, Ben has claimed to not understand what's going on at his own company. The time is up for Ben Silbermann."

212.    In response to Brougher sharing her story on Twitter, numerous former Pinterest employee echoed her experience including one who wrote, "Thank you for sharing! Many of the things you shared rang true for me as well during my 4 years at Pinterest."

213.    Then, on August 14, 2020, Pinterest employees staged a virtual walkout and circulated an employee petition that garnered 445 signatures calling for transparency on promotion and retention, total compensation package transparency at all levels of the Company, and 25% women and 8% underrepresented minorities within two layers of reporting to the CEO.

214.    The same day, top tech journalist Kara Swisher wrote an article entitled, "Hitting the Glass Ceiling, Suddenly, at Pinterest", published in *The New York Times*. She wrote, "*The stories of gender exclusion I heard this week from women working at Pinterest and their former colleagues were numbingly similar, with most using the same words over and over again: Sidelined. Shut down. Doors closed. Inner circles. Toxic secrecy. Homegrown boys club. Left out of meetings. Out of key decisions. Out of promotions. Out.*" Swisher described Brougher's experience as a storied career that led her to "her most powerful digital role yet – the No. 2 executive at Pinterest – ***but without any power***." And Swisher reported that most current and former employees she had interviewed reported that management favor men over women and treat people of color worse. One former female executive explained "[i]t's a nepotism that favors those who cozy up and say yes to power, which are the same small group of men."

215.    Swisher took Pinterest's leadership to task, explaining, "[w]elcome to what happens when tech start-ups that are created by people who have no real management experience grow large. It's complex, of course, but it also remains inexplicable that ***an industry that so loudly purports to celebrate meritocracy is actually a mirror-tocracy*** — reflecting only those who look just like themselves . . . at this point it's not a bug but a feature." When Swisher pointed out to Silbermann that the management page on Pinterest's website at the time featured three men and no one else, Silbermann "responded, looking appropriately dejected, 'I had no idea.'" Swisher reported that Silbermann recognized the changes that needed to be made, including fixing compensation and creating systems to actually hear his employees' experience. He also stated that he would fire people for nor adhering to

the new, better culture – implicitly recognizing that historically, executives' discriminatory conduct had been condoned.

216.    On September 11, 2020, *The Verge* published an article titled "Inside Pinterest, More Tales of Workplace Discrimination", with numerous serious accounts of discrimination suffered by members of Pinterest's Finance team.

217.    The article profiled a member of the Finance team who had access to payroll data and realized that Black employees were materially underpaid relative to their White colleagues. When he presented this data to the HR department, they questioned why he had gathered the data. He left the Company soon after and, like Banks, saw his expenses receive unusual scrutiny – he was demanded to repay expenses on his corporate credit card, including team happy hours and Wi-Fi on work-related flights. Other managers did not receive the same scrutiny, and he believed it was in retaliation for him raising pay equity concerns. The Company threatened to take him to court if he did not repay the expenses, so he did.

218.    A woman on the Finance team observed that male executives received outsized equity grants compared to female colleagues. She also reported being underpaid relative to male colleagues. The person who held the position before her managed both payroll and equity; although she asked to manage both functions, she was denied because she was told the Company no longer wanted those functions combined. But when she left, she was replaced by a male employee who got to manage both payroll and equity – exactly what her male predecessor received, and she had been denied.

219.    The article also profiled McKenna Rogers ("Rogers"), who joined Pinterest's finance team in 2018. Rogers reported that her supervisor treated her in a sexist and inappropriate manner: asking probing questions about her personal life, including who she was dating; expressing excitement that she had dated someone that she had met at work (indirectly suggesting she may be open to dating him); and making an inappropriate sexualized joke in a team meeting.  After Rogers declined his advances and went to the HR department for help, her supervisor cancelled meetings, cut her off from work, and berated her. The HR department did not help Rogers, ultimately terminating its investigation of her manager and giving her resources to request a leave of absence.  In addition to reporting to HR,

49

Rogers expressed concerns about her manager in a pulse survey. When Rogers left Pinterest, she told the HR department and her manager in writing that she was leaving because of the poor treatment and that she had developed PTSD during her time at Pinterest.

220.     Relatedly, a top executive came to Pinterest under much fanfare in 2017, received a substantial bonus in his first few months but then left within the year in early 2018, under reported claims of sexual harassment.

221.     In addition to the stories detailed in the media, numerous former employees have shared via Twitter or in interviews with undersigned counsel their own stories of discriminatory treatment at Pinterest, including pay inequity, unequal treatment, and roadblocks to professional advancement.

222.     Confidential Witness 2 shared that she was underpaid relative to her male colleague. She was managing a team before she was in a level with authority to supervise; when she was officially made a manager, she requested a raise to reflect her responsibilities, but it took six months before she received a raise. She hired a male direct report and although she was his manager, he received a higher salary than her own.

223.     Additionally, as a manager, Confidential Witness 2 saw Pinterest underpay her female subordinate relative to her male peer. Both employees switched from contractors to full-time employees. When this switch occurred in January 2019 for her female subordinate, that woman realized that she would actually receive a pay cut as a result (due to no longer receiving overtime), and she requested a raise. Confidential Witness 2 and her female subordinate advocated for the raise for six months. Then in September 2019, Confidential Witness 2's male subordinate was converted to a full-time employee. He sent an angry email to the very same HR representative that his female colleague had been working with, and was approved for a raise the very same day. Confidential Witness 2 and her supervisor raised this clear disparity to the HR representative, but he refused to acknowledge the unequal treatment of similarly situated men and women, and they had to continue fighting before her raise was approved later that month. Ultimately, that female subordinate left because she did not want to work for a company that discriminated against her.

224.    Confidential Witness 2 explained that women at Pinterest explicitly received the message to "wait your turn." Charlie Hale directly said that to women employees during a career panel that he participated in for the Company. Confidential Witness 2 also recalled a female colleague in the IT department who expressed concern that numerous men were promoted when she was not, and she was similarly told by her supervisor to wait her turn.

225.    Confidential Witness 3 is a Black woman who worked as an executive assistant at Pinterest, departing in August 2018. She took a pay cut to join Pinterest because she was told that she would have the opportunity for growth in a role that included project management and event work, in addition to traditional executive assistant duties. But those opportunities never materialized. Confidential Witness 3 shared that many Black employees at the Company complained that they were promised duties or advancement opportunities at the time of hiring that did not actually happen once they were on board, and that Black employees struggled to advance within the Company.

226.    Confidential Witness 3 noted that other employees of color went to leaders in the Human Resourced department and Partner Sales to share the frustration that they were not supported in attaining titles that accurately captured the work that they were doing for the Company. Employees came in as account coordinators and over time took on the work of account managers, but were not given the title or increase in compensation to reflect their actual work.

227.    Confidential Witness 4 worked on the People team at Pinterest from the start of the Relevant Period until summer 2020. Confidential Witness 4 observed a race-based disparity in pay at Pinterest—Pinterest offered White and Asian recruits higher compensation packages than Black and Latinx recruits. Confidential Witness 4 also observed rapid turnover of Black and Latinx employees, in all departments. Pinterest's People team had hired six Black employees between 2019 and 2020, and within a year, all but one left the Company. Confidential Witness 4 explained that this was due to lack of access to opportunities, lack of mentorship, pay inequity, and failure to acknowledge Black colleagues as peers. Similarly, a large percentage of the Latinx employees left the Company in summer 2020. The Company relied on a handful of recruiters and hiring managers that were passionate about

diversity to hire Black, Latinx and other underrepresented minority employees, but failed to support them at every turn.

228.    At a People team meeting in 2020, Confidential Witness 4 reported that the Head of People and Head of Diversity discussed the Company's difficulty retaining Black employees, including the lack of access to opportunities, lack of mentorship, pay inequity and failure from the team to acknowledge Black employees as peers. The Head of People was discussing really personal and sensitive experiences that Black employees had shared in a 'private' meeting with her that had taken place in 2019 and had been organized by her and the Head of Diversity at the time. This 2019 meeting took into account only one racial group's experiences and it was inappropriate to share these confidential conversations at all, much less as if Latinx employees hadn't had their own experiences of discrimination at Pinterest.

229.    Confidential Witness 4 also reported that many Black employees who left the Company had talked to Silbermann about their concerns (including at least one employee who spoke to Silbermann after that employee left the Company) and while Silbermann expressed that he was sad and felt bad, he did not do anything.

230.    The same was true for Sharp. He was the executive sponsor for the Black employees' group and was told by Confidential Witness 4 that people of color at Pinterest did not trust the HR department or the diversity departments because even within those departments there was inequitable treatment. But, knowing this, Sharp did not do any further investigation or make any meaningful changes.

231.    Many more stories about discrimination and harassment at Pinterest have been silenced by the Company's systemic and widespread use of severance packages and non-disclosure agreements that drastically limit former employees' ability to speak about their time at the Company. Brougher notably called out the Company's use of non-disclosure agreements. Her August 11, 2020 article pointedly recommended, "*Don't use NDA's to buy silence.*" In a CNBC interview that day, she elaborated that she was asked by Silbermann to tell her team that she was leaving by choice and to sign a non-disclosure agreement. Brougher refused, explaining, "I was not going to lie to my team and did

not sign the NDA presented to me . . . I realized it was more important to finally be an advocate for women at Pinterest, and for anyone else experiencing the pernicious effects of sexism, bias, and retaliation."

232.   On December 14, 2020, Brougher announced that she had settled her lawsuit with Pinterest for $22.5 million, the largest public gender discrimination settlement for an individual ever.

### 8.   Individual Defendants Have Been Awarded Unjust Compensation

233.   Throughout the Relevant Period, certain Individual Defendants received unjust compensation and/or compensation and payments that were higher due to their wrongdoing of causing and permitting women and people of color (including women of color) to be underpaid relative to similarly situated male and White colleagues, which in turn caused the Company to be more profitable.

234.   The following table provides additional information regarding compensation during part of the relevant time period and shows the compensation awarded or paid to, or earned by, Pinterest's named executive officers for 2019 and 2018, as applicable, in accordance with the SEC's transition rules for newly public companies.

### 2019 Summary Compensation Table

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)[1] | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| **Benjamin Silbermann** Co-Founder, President & CEO | 2019 | 197,100 | — | 45,745,013 | 280,000[2] | 46,222,113 |
| | 2018 | 197,100 | — | — | — | 197,100 |
| **Evan Sharp** Co-Founder, Chief Creative & Design Officer | 2019 | 330,000 | — | 45,745,013 | — | 46,075,013 |
| **Todd Morgenfeld** Chief Financial Officer | 2019 | 360,500 | — | — | — | 360,500 |
| | 2018 | 360,500 | — | 22,028,696 | — | 22,389,196 |

235.   The following table shows information regarding the number and value of shares of common stock acquired during 2019 by Pinterest's named executive officers from the vesting of RSUs and exercise of stock options.

### 2019 Option Exercises and Stock Vested Table

| | Option Award Exercises | | Stock Award Vestings | |
| Name | Shares Acquired (#) | Value Realized ($)(2) | Shares Acquired (#)(1) | Value Realized ($)(3) |
|---|---|---|---|---|
| Benjamin Silbermann | 399,000 | 7,128,933 | 991,666 | 25,390,144 |
| Evan Sharp | — | — | 566,666 | 15,123,278 |
| Françoise Brougher | — | — | 412,499 | 11,077,475 |
| Todd Morgenfeld | — | — | 929,175 | 23,642,025 |

236.    The following chart provides information about the compensation that the Director Defendants received during 2019:

### 2019 Director Compensation Table

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($)(1) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Jeffrey Jordan | 41,250 | 249,995 | — | 291,245 |
| Leslie Kilgore | 54,375 | 652,153 (2) | — | 706,528 |
| Jeremy Levine | 45,000 | 249,995 | — | 294,995 |
| Fredric Reynolds | 56,250 | 249,995 | — | 306,245 |
| Michelle Wilson | 76,875 | 249,995 | — | 326,870 |

237.    The Individual Defendants' compensation and stock awards detailed herein were unjust in light of their direct participation in the wrongful, bad faith, and disloyal conduct alleged herein, and as such should be disgorged or returned by such Defendants.

## VI.    THE INDIVIDUAL DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY PERPETRATING AND PERMITTING A GENDERED AND RACIST CULTURE TO FESTER

238.    By virtue of their roles as officers and directors of Pinterest and because of their ability to control Pinterest's business and corporate affairs, each of the Individual Defendants owed Pinterest and its shareholders the fiduciary obligations of trust, loyalty, due care, and good faith.  These duties required each of the Individual Defendants to act in the best interests of Pinterest and its shareholders, including ensuring that the Company complied with the law, its own Code and policies, and in a manner

that upheld Pinterest's goodwill and public reputation. The Individual Defendants were obligated to perform good faith oversight, ensure that Pinterest had adequate internal controls, and to act when presented with information demonstrating systemic discrimination and retaliation, as well as that perpetrators of these illegal acts were permitted to investigate their own misconduct and advise the Board and its Committees on those investigations. Each of the Individual Defendants breached these fiduciary duties to the Company by setting discriminatory pay for a top executive and preventing her from performing her job duties or endorsing that misconduct by someone else, and failing to prevent and protect the Company from risks that stemmed from discriminatory and retaliatory practices.

### A. Director Defendants

239. The Director Defendants breached their fiduciary duties because they themselves engaged in illegal behavior by awarding discriminatory compensation to Brougher. Defendants Silbermann, Levine, Jordan, Wilson, and Reynolds were on Pinterest's Board in March 2018, when Brougher joined the Company as its first COO. As described above, the Board approved her compensation – a discriminatory compensation package that awarded her back-loaded equity, unlike her male colleagues.[3] These Defendants' approval of discriminatory pay breached their duty of loyalty by knowingly causing the Company to pay her less than similarly situated men in violation of state and federal employment laws.

240. Given this decision and the tone set at the top, it is unsurprising that discriminatory pay and leveling occurred throughout the Company, as detailed above.

241. Additionally, the Director Defendants breached their fiduciary duties because they engaged in or condoned discriminatory or retaliatory interference with Brougher's performance of her job duties.

---

[3] In addition to reviewing executive compensation, the Board or Compensation Committee approved all equity grants. Confidential Witness 5 worked in Pinterest's Finance department from a few years until late winter 2018. Due to Confidential Witness 5's position, Confidential Witness 5 had visibility into all employees' equity grants. Confidential Witness 5 stated that either the Board or Compensation Committee had to approve all equity grants for all employees. Either the Board or Compensation Committee was presented with a comprehensive list for approval of employees' equity which included their name, their role, the country or state they're in, how many shares would be awarded, their vesting schedule, and when they start vesting.

242.   Silbermann led the discriminatory and retaliatory conduct. After hiring Brougher specifically for her expertise taking companies public and increasing advertising revenue, he cut her out of significant decisions, instead relying on his clique of predominantly White, male colleagues who did not question him or his authority. To the Company's detriment, he excluded her from the pre-IPO roadshow process in favor of his male friend. After the IPO, Brougher was no longer invited to Board meetings (instead subordinates on her team were invited), a matter of which Silbermann was aware or decided as Chair of the Board. After Brougher raised concerns about Morgenfeld, Silbermann brushed her off; when Morgenfeld refused to work with Brougher, Silbermann chose to punish Brougher, ultimately fired her, and asked her to sign an NDA and lie to her team about the circumstances of her departure. Silbermann repeatedly placed himself before the Company, surrounding himself with yes-men and marginalizing a female executive who dared to challenge Pinterest's leadership clique. Silbermann's discrimination against Brougher and failure to stop the discrimination against other female employees breached his fiduciary duties to the Company.

243.   Defendants Silbermann, Levine, Jordan, Wilson, Reynolds, and Sharp who served on the Board during this time did nothing to stop Silbermann. Putting him before the Company, they accepted her exclusion from the pre-IPO roadshow and did nothing to meaningfully intervene when she was disappeared from the post-IPO Board meetings. Even when she was terminated, not a single Board member reached out to hear her story and ensure the termination was the right decision for the Company (instead of suiting Silbermann's discriminatory preferences).

244.   Further, the Director Defendants set a culture at the top that permitted discrimination and retaliation to persist throughout the Company. As discussed further below, through information provided to the Audit Committee that was then shared with the Board, the Director Defendants were well aware that discrimination and harassment were the primary complaints lodged internally. Yet, they failed to conduct meaningful, independent investigations or prevent that misconduct from occurring. To the contrary, as detailed above, the Board took its cue from Silbermann and allowed ██████ ████████████████████████████  and other members of the Legal and HR Department that were

the subject of discrimination and retaliation claims by employees (including Ozoma and Banks) to investigate those complaints and then to advise the Board on them.

245.     This tone set by Silbermann and the other Officer and Director Defendants have led to a paucity of non-White employees at Pinterest.   The Company's most recent Diversity Report, published on January 16, 2020, revealed that Black individuals still comprise just 4% of all positions at the Company, and that number was only reached by providing an outsized portion of low-level "sales intern" positions to Black individuals. Pinterest did the same with respect to Hispanics/Latinos, which received 30% of the Sales Intern positions.   Pinterest failed to disclose whether the intern positions are even paid.   Meanwhile, Black individuals constitute only 1% of Leadership positions at Pinterest and women comprise only 25% of Leadership positions, as reflected in the attached chart provided by Pinterest in its report:



246.     A January 16, 2020 TechCrunch article titled *Pinterest's diversity report is missing some key data* noted that the Company demonstrated "little change in overall representation of underrepresented minorities year over year" and particularly abysmal leadership numbers:

247.     TechCrunch also specifically noted that Pinterest failed to include retention data and when requested, the Company refused to make that data publicly available. This decision was unusual in Silicon Valley; Google and Intel both report retention data and as TechCrunch noted:

It's important to examine and report this data, because it addresses whether a company is effective at fostering an inclusive environment. If retention rates are low, that's the ***equivalent of a leaky bucket***: a significant number of people are coming in with just as many – if not more – leaving.

***As for Pinterest, we won't have a way of knowing how it's going until it releases retention data.***

248.    Further, Pinterest's Board breached its fiduciary duties by approving massive compensation packages including huge equity grants to the Company's senior executives even though those executives were violating anti-discrimination laws. The Board's approval of these compensation packages was not tethered in any way to legal compliance or compliance with the Company's Harassment and Discrimination Policy. Instead, the Company's 2020 Proxy Statement and Executive Compensation Philosophy as of December 18, 2019 reveal that the focus is on the bottom line and legal compliance is entirely overlooked. PINS-220_0000472.

249.    Individual Defendants Jordan, Kilgore, Levine, Reynolds, Rajaram, Silbermann, and Wilson also breached their fiduciary duties to the Company by causing it to file a false and misleading Proxy Statement with the SEC, in violation of Section 14(a) of the Exchange Act and Rule 14A-9. Namely, they caused to be filed a Proxy Statement that misled investors regarding Pinterest's compensation practices (particularly with respect to Brougher's compensation), oversight over those practices, and the true reason for Brougher's departure from Pinterest, in breach of their fiduciary duties to the Company.

250.    The Special Committee convened in summer 2020 provides another egregious example of the Board's failure to effectively protect the Company, instead relying on conflicted individuals to investigate legal risk. On June 28, 2020, the Board held a telephonic meeting convening at 8:00am. Directors ███████████████████████████████ were present. Defendant ███ did not attend. The minutes of the meeting indicate that the purpose of the meeting was to review sexual harassment and discrimination claims, how the Company compensates and promotes employees, and "how the Company responds to and investigates complaints of discrimination, harassment, and retaliation, including developments since the last communication with the Board."

251.    The Board appointed Defendants ███████████████████████ to serve on the Special Committee. PINS-220_0000548. Yet, these directors are not independent and disinterested because they were involved in making discriminatory pay decisions and passively accepted Brougher's exclusion from pre-IPO roadshow and post-IPO Board meetings, and ultimately her termination. Putting the people who had a direct role in her discriminatory treatment in charge of a supposed special investigation into how the company handles discrimination, harassment and retaliation, with allegedly full authority to make decisions on the matter cannot pass even the most basic independence requirements for a Special Committee.

252.    On September 17, 2020, attorneys from the outside law firm retained by the Special Committee attended the full Board of Directors meeting to explain their investigation to date and share their observations and recommendations. According to the meeting minutes, their proposed recommendations were discussed with the full Board – including ███████ PINS-220_0000820.

253.    This full Board meeting negated the Special Committee's supposedly independent work and tainted the investigation and its outcome.

254.    On December 16, 2020, the Special Committee and its outside counsel's recommendations were released. Silbermann's public note accompanying the recommendations misleadingly touted their independence, noting that they stemmed from an "independent look at our culture and practices" and further falsely implying independence by stating that Pinterest's Leadership Team did not see the report before it was provided to employees, but omitting that he and his fellow Board members weighed in on the investigation and preliminary recommendations.

**B.    Audit Committee**

255.    Defendants Wilson, Kilgore, and Reynolds as members of the Audit Committee[4] breached their fiduciary duties by knowing of, but failing to address and remedy, inadequate systems that allowed discrimination on the basis of race and/or gender and retaliation to be maintained.

---

[4] Wilson and Reynolds were members of the Audit Committee for the entire Relevant Period and Kilgore since March 2019.

256.    Notably, although he was not a member of the Audit Committee, ███████ regularly attended Audit Committee meetings – diluting the independence of that Committee and its ability to effectively monitor him. The Audit Committee's acceptance of his constant presence underscores their fealty to him.

257.    At quarterly meetings throughout the Relevant Period, the Audit Committee received updates on the number of open investigations, including into discrimination and retaliation. Presumably, the complaints lodged by Ozoma, Banks, Brougher, and other employees discussed herein would have been reflected on the information provided to the Audit Committee. This information was summarized for the full Board; for example, a November 21, 2019 Q4 2019 Compliance Update specifically stated that "[t]he full Board receives regular updates on the Pinterest Compliance Program and education annually on the Compliance Focus Areas".

258.    On May 8, 2019, at the Q2'19 Audit Committee meeting, in an executive session attended by Audit Committee members ████████████████████████ ███████████ summarized the Company's investigations. PINS-220_0000598. The Compliance Update report provided to the Audit Committee revealed that of the issues reported thus far in 2019, 72.7% were discrimination or harassment. PINS-220_0000602.

259.    On August 15, 2019, at the Q3'19 Quarterly Meeting, the Audit Committee received a compliance update. That portion of the meeting was attended by Audit Committee members ████████ ███████████████████████████████████████ ███████████ PINS-220_0000053. At that meeting, ██████ provided the Audit Committee with an update on the year-to-date investigations. PINS-220_0000578. The Compliance Update report provided to the Audit Committee revealed that of the issues reported thus far in 2019, 58.8% were discrimination or harassment; the report also indicated retaliation claims but did not specify the number. PINS-220_0000406. The Audit Committee discussed the proposed Escalation Protocol, which provided guidance on whether and how to escalate certain types of complaints, but failed to provide any guidance on discrimination or retaliation complaints and made reporting of harassment allegations to the Audit Committee optional. PINS-220_0000407. The Audit Committee was also provided with a

detailed chart listing each current investigation matter, including into discrimination or harassment. PINS-220_0000616.

260.    On November 21, 2019, at the Q4'19 Quarterly meeting, the Audit Committee received a Compliance Update and Compliance Program Overview from ███ That portion of the meeting was attended by Audit Committee members ████████████████████████████████████████ ████████████████████████████████████████████. PINS-220_0000054. At that meeting, █████ provided an update on investigations and the proposed compliance focus areas for 2020. PINS-220_0000566. The Compliance Update report provided to the Audit Committee revealed that of the issues reported thus far in 2019, 60.0% were discrimination or harassment and 6.7% were for retaliation. PINS-220_0000412. The Compliance Update also highlighted "Race/gender-based allegations in recruiting, pay equity, treatment" under a section titled "Key Cases." PINS-220_0000412. Further demonstrating the Individual Defendants' knowledge of the existing legal risks, the Q4 2019 Compliance Update noted that "[t]he Chief Compliance Officer has direct access to the Audit Committee" and also specifically stated that "[t]o help the Board of Directors and Audit Committee fulfill their oversight obligations, we provide regular reporting and information about the operation of the Compliance Program, substantive legal developments, potential future risks or legal obligations, industry trends, and performance metrics." PINS-220_0000416, 423. The Audit Committee was also provided with a detailed chart listing each current investigation matter, including into discrimination or harassment. PINS-220_0000612.

261.    On February 27, 2020, at the Q1'20 Quarterly Meeting, the Audit Committee received a Compliance Update from ████████████████████████. That portion of the meeting was attended by Audit Committee members ████████████████████████████████ ████████████████████████████████████████. PINS-220_0000047. ████ summarized the compliance team's compliance risk assessment, including discussing the 2020 compliance focus areas and discussed the Company's investigations. PINS-220_0000793. The Compliance Update report provided to the Audit Committee revealed that of the issues reported in 2019 over the course of the full year, 60.9% were discrimination or harassment and 8.7% were for retaliation.

PINS-220_0000371. The Audit Committee was also provided with a detailed chart listing each current investigation matter, including into discrimination or harassment. PINS-220_0000618.

262. On May 21, 2020, at the Q2'20 Quarterly Meeting the Audit Committee received a Compliance Update and Compliance Program Overview from ████. That portion of the meeting was attended by Audit Committee members ████████████████████████████████████ ████████████████████████████████████. PINS-220_0000049. ████ led a discussion of key compliance and investigations updates, including "certain retaliatory and contractor investigations" which presumably reflected the investigation into Pinterest's decision to cut and then reinstate holiday pay for contractors, discussed at Section V.B.2. *See* PINS-220_0000574. Notably, this meeting occurred the day before Ozoma and Banks left the Company.  The Compliance Update report provided to the Audit Committee revealed that of the issues reported thus far in 2020, 41.2% were discrimination or harassment and 14.7% involved retaliation. PINS-220_0000378. The Audit Committee was also provided with a detailed chart listing each current investigation matter, including into discrimination or harassment. PINS-220_0000624.

263. On August 13, 2020, at the Q3'20 Quarterly Meeting the Audit Committee received a Compliance Update and Compliance Program Overview from ████. That portion of the meeting was attended by Audit Committee members ████████████████████████████████████ ████████████████████████████████████. PINS-220_0000051. The Compliance Update report provided to the Audit Committee revealed that of the issues reported thus far in 2020, 61.8% were discrimination or harassment and 11.8% involved retaliation. PINS-220_0000396. The report also noted that the Company was seeing "more cases of micro-aggressions." *Id.* The volume of sexual harassment/discrimination/retaliation claims required the ████████ ████ to state in ██ August 13, 2020 report that Pinterest was "[r]ecruiting new investigator to support growing caseload." PINS-220_0000397. The Audit Committee was also provided with a detailed chart listing each current investigation matter, including into discrimination or harassment. PINS-220_0000620.

264.     On November 17, 2020, at the Q4'20 Quarterly Meeting the Audit Committee received a Compliance Update and Compliance Program Overview from ██████. That portion of the meeting was attended by Audit Committee members ███████████████████████████████████████████████ ██████████████████████████████████████████████████████. PINS-220_0000797. The Compliance Update report provided to the Audit Committee revealed that of the issues reported thus far in 2020, 52.3% were discrimination or harassment and 15.3% involved retaliation. PINS-220_0000812. The Audit Committee was also provided with a detailed chart listing each current investigation matter, including into discrimination or harassment. PINS-220_0001052.

265.     In breach of their fiduciary duties and obligation to ensure adequate internal controls, the Audit Committee opted to be advised by the very people complicit in Pinterest's violation of antidiscrimination laws. As set forth above, Flores and Taylor failed to heed Ozoma and Banks' warnings regarding the LiveAction doxxing, failed to promptly provide physical security to employees, and failed to promptly work to scrub its employees' information from the Internet, constituting a tacit endorsement of their harassment. Further, Flores retaliated against Ozoma and Banks for raising discrimination concerns, including demoting Banks and leading invasive and retaliatory investigations designed to frame Ozoma. Despite their own misconduct, those same people were leading or attending Audit Committee discussions of compliance and regulatory issues. *See* PINS-220_0000053 (Third Quarter 2019 Audit Committee Meeting Agenda with Legal privileged session led by ██████ including Compliance Update from ██████; PINS-220_0000054 (Fourth Quarter 2019 Audit Committee Meeting Agenda with Legal privileged session led by ██████ including Compliance Update and Compliance Program Overview from ██████); PINS-220_0000047 (First Quarter 2020 Audit Committee Meeting Agenda with Legal privileged session led by ███████████ including Compliance Update from ██████; PINS-220_0000049 (Second Quarter 2020 Audit Committee Meeting Agenda with privileged session led by ███████████ including Compliance Update from ██████; PINS-220_0000051 (Third Quarter 2020 Audit Committee Meeting Agenda with privileged session led by ███████████ including Compliance Update from ██████).

266.     Indeed, the Audit Committee specifically declined to ensure that it was receiving prompt information regarding discrimination and retaliation claims. In 2019, the Audit Committee reviewed Pinterest's Investigation Escalation Protocol, which governs to whom significant investigations are reported. Although the approved Investigation Escalation Protocol identifies the escalation protocol for numerous example scenarios including significant harassment allegations or financial fraud allegations, it provides **no guidance** on escalation of discrimination or retaliation claims. Additionally, under **no scenario** is escalation to the Audit Committee mandatory. The Investigation Escalation Protocol was discussed at the Audit Committee's meeting for the second quarter of 2019 and then reviewed in final format at the meeting for the fourth quarter of 2019. *See* PINS-220_0000403; PINS-220_0000410; PINS-220_0000566; PINS-220_0000578; PINS-220_0000736.

267.     The Audit Committee revisited this Protocol following widespread reporting of Pinterest's toxic culture.  Yet, the Committee still did not clarify whether and when to elevate retaliation complaints. Rather, the proposed changes made elevation of significant harassment or discrimination complaints even more discretionary, suggesting that the General Counsel and Chief Human Resources Officer report such complaints to the CEO and/or Audit Committee "if appropriate," rather than "if substantiated." PINS-220_0000402.

**C.     Compensation Committee**

268.     Further, the Compensation Committee, consisting of Defendants Wilson and Kilgore,[5] was well aware of Pinterest's inconsistent pay practices but failed to take meaningful action to monitor or correct compensation to ensure it was fair and in accordance with the equal pay laws. Their failure to effectively oversee compensation and, indeed, approval of senior executive pay, permitted Silbermann, Morgenfeld, among others to engage in pay discrimination with impunity.

269.     Although they knew Brougher complained about pay inequity and as early as June 2019 the Company used an "external statistician to ensure there are no inappropriate disparities amongst gender, age, or ethnicity" there is no indication that the Compensation Committee requested briefing

---

[5] Andrea Wishom joined Pinterest's Board in August 2020 and is a member of the Compensation Committee, but is not named as a defendant in this action.

on that statistician's work. To the contrary, ███████████ left it to the same executives who were accused of behaving with discriminatory animus and then retaliating to ensure fairness and equity in compensation.

270.   Company policy stated that "[i]f outliers are identified, Legal and HR determine appropriate adjustments to ensure we pay equally for equal work" with no process of escalation to the Compensation Committee and no review of leveling to see if the absence of certain outliers was skewed by an improper assignment level in the first instance. *See* PINS-220_0000762. Thus, ██████ ████ breached their duty of loyalty to the Company and obligation to ensure adequate internal controls by not insisting on having executive discrimination complaints escalated to them and instead continuing to permit managers to retain discretion over Pinterest's pay and leveling.  *See* PINS-220_0000661 (2020 Offer Process, explaining that final compensation decision authority lies with Senior Leaders or Budget Owners).

271.   A presentation at the August 15, 2019 Compensation Committee meeting attended by ███████████████████ discussed a revision to Pinterest's compensation structure and noted "[h]istorical inconsistency in programs and practices," *see* PINS-220_0000430, but failed to identify attaining equity or preventing discriminatory pay as goals. The Individual Defendants took no further steps to monitor whether compensation was fair.

272.   Further, the "Total Rewards Philosophy and Strategy" discussed at that meeting revealed that the compensation philosophy was to encourage and reward financial performance, but made no mention of tying compensation to legal compliance, diversity and inclusion, or employee retention, or and did not note that either ought to be aspects of the Company's compensation program.

273.   Similarly, the Compensation Committee met on Feb. 27, 2020 from 9:30 a.m. PST to 11:00 a.m. PST.  Directors ████████████████████ were in attendance.  The purpose of the meeting was to review and approve the principles and terms of the Company's executive compensation policy and the performance of the Company's executives.  At the meeting, Defendants ████████ ████████████ were provided with a document entitled Executive Compensation Philosophy (dated Dec. 18, 2019).  The Executive Compensation Philosophy noted that the objective of the Company's

compensation program was to drive achievement of financial performance, to motivate the leadership team, and to attract and retain top talent by "compensating competitively based on the individual's market value." Because the program states that there is "No differences in base pay" among executives, the equity provided to executives provides the main motivation to executives. No mention is contained in the document that a purpose of the compensation program is to ensure legal compliance by the executive; prevent discrimination, harassment, and retaliation; encourage retention of a diverse workforce; or that the company ties executive compensation in any way to the executive's compliance with the law, the Company's policies, and the company's Code of Business Conduct and Ethics.

**D.    Additional Allegations Regarding Ben Silbermann**

274.    In addition to the allegations identified in Section VI(A), Silbermann was aware of and did nothing to stop the discriminatory and retaliatory treatment of Ozoma and Banks. As explained above, he responded to Ozoma's concerns about how Pinterest handled the LiveAction doxxing by admitting that he was "personally concerned that when these risks were raised, we didn't take the right steps" and vowed to have his deputies look into the matter. But in reality, he did nothing. The Company continued to fail its employees by neglecting to timely obtain necessary physical security and undertake efforts to remove its employees' private information from some of the darkest corners of the Internet, and the debrief sessions following this incident were led by executives who were themselves complicit in the wrongdoing and defensively disregarded any criticism or lessons learned. Instead, the only steps he took were to discourage the Trust and Safety team from doing their job of blocking improper content because he was afraid of more controversy. Silbermann was also aware of the invasive and retaliatory investigation into the contractor pay leak.

275.    Silbermann was also aware that employees of color had serious concerns about discrimination at Pinterest because he was told so by employees and had access to pulse surveys which included employees' concerns about discrimination at the Company. But instead of taking action, he simply said he felt "sad".

276.    Silbermann's complicity with the discriminatory, harassing, and retaliatory treatment of Ozoma, Banks, and other people of color at Pinterest further breached his fiduciary duties to Pinterest.

277.     Indeed, in the aftermath of Ozoma, Banks, and Brougher's allegations, Silbermann admitted that in violation of his duties to the Company he failed to act, stating that he had learned that "parts of [Pinterest's] culture are broken . . . I didn't understand just how much work we have to do. That's not an excuse, that's a failure in leadership, and I'm truly sorry for letting you down." He also stated to Kara Swisher of *The New York Times* that he would start firing people for not adhering to a new, better culture – implicitly admitting that previously, discrimination was not seen as a problem worthy of a serious consequence.

### E.     Additional Allegations Regarding Evan Sharp

278.     In addition to the allegations identified in Section VI(A), as Confidential Witness 4 explained, Sharp was the executive sponsor for the Black employees' group and was told by Confidential Witness 4 that people of color at Pinterest did not trust the HR department, but he did not do any further investigation or make any meaningful changes.

279.     Additionally, Sharp had access to Company pulse surveys which included employees' concerns about discrimination at the Company.

280.     Sharp's failure to act in the face of knowing about claims of systemic employment discrimination breached his fiduciary duties to the Company, including by violating Pinterest's Code, which requires compliance with all applicable laws.

### F.     Todd Morgenfeld

281.     Defendant Morgenfeld perpetrated and allowed systemic discrimination at the Company. As explained above, Morgenfeld discriminated against Brougher on the basis of her gender, including giving a biased performance review that ignored Brougher's business accomplishments, circumventing her by making decisions with her subordinates, and refusing to speak to or work with Brougher after she raised concerns about him.

282.     Additionally, Morgenfeld had access to Company pulse surveys which included employees' widespread concerns about discrimination at the Company.

283.     Morgenfeld's misconduct breached his fiduciary duties to the Company, including by violating Pinterest's Code, which requires compliance with all applicable laws.

### G.     Conspiracy, Aiding and Abetting, and Concerted Activity

284.    At all relevant times, Individual Defendants were agents of the remaining Individual Defendants, and in doing the acts alleged herein, were acting within the course of scope of such agency. The Individual Defendants ratified and/or authorized the wrongful acts of each of the other Individual Defendants. The Individual Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this Complaint.

285.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of the improper acts, plans, schemes, and transactions that are the subject of this Complaint. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

286.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct, by perpetrating and being complicit in Pinterest executives' discrimination and retaliation.

287.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did cause the Company to be complicit in Pinterest executives' discrimination and retaliation. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

288.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations.

289.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by intentionally causing the Company to be complicit in executives' discrimination and retaliation. Because the actions described herein occurred under the authority of the

Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

290.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VII.    DAMAGE TO THE COMPANY

291.    Individual Defendants' actions have exposed the Company to substantial liability and severely damaged the Company's goodwill and reputation.

### A.    Costs to Defend and Resolve Legal Claims

292.    As a result of the Individual Defendants' misconduct, Pinterest engaged in a systemic unlawful pattern of race and gender discrimination and retaliation. Pinterest's conduct violated federal and state laws and regulations and operated to the detriment of the Company and its shareholders. State and federal government agencies have the authority to impose severe monetary penalties and other forms of sanctions should they find that Pinterest's conduct violated the laws with respect to which they have enforcement powers.

293.    Further, as a result of Defendants' wrongdoing related to discriminatory and retaliatory conduct, Pinterest has been named as a defendant in multiple cases, including Ozoma and Banks' actions with the California Department of Fair Employment and Housing and Brougher's lawsuit, *Brougher v. Pinterest, Inc., et al.*, No. CGC-20-58588 (Cal. Super. Ct. Aug. 11, 2020).

294.    These lawsuits have significant stakes; Pinterest settled with Brougher for $22.5 million. Ozoma and Banks settled their claims with Pinterest for undisclosed amounts.  Both have stated, however, that they believe their discriminatory leveling cost them hundreds of thousands of dollars.

295.    Thus as a result of Individual Defendants' actions, Pinterest has been forced to expend substantial sums including to defend these and other claims and lawsuits alleging similar claims of discrimination and retaliation; to resolve these and similar claims and lawsuits; and to implement any

corrective and/or remedial measures ordered by state or federal authorities or agreed to by virtue of a settlement or compromise.

296.     The Individual Defendants also caused Pinterest to file a false and misleading Proxy Statement with the SEC, exposing the Company to the risk of a shareholder lawsuit or regulatory action.

297.     Pinterest has already been damaged by having to pay defense costs and to resolve settlements, which it cannot recoup through any other mechanism other than the present derivative action.

**B.     Reputation, Goodwill, and Workplace Harm**

298.     Pinterest recognizes that its reputation and ability to attract and retain top talent are critical to its business success. Pinterest's Proxy Statement affirmed that the "business depends on a strong brand and reputation, and if we are unable to maintain and enhance our brand and reputation, our ability to expand our user and advertiser base will be impaired and our business, revenue and financial results could be harmed." Additionally, the Proxy stated that "[i]f our company culture changes, we may experience difficulties attracting and retaining personnel . . . and our business, revenue and financial results could be harmed."

299.     Defendants' unlawful conduct has already severely harmed the Company by injuring its reputation and causing the loss of talented and valuable employees who have quit over Defendants' unlawful and hypocritical conduct and Pinterest's refusal to take appropriate remedial action. The press coverage of Pinterest's discriminatory and retaliatory practices has shattered public perception of its workplace culture.

300.     As detailed above, complaints of discrimination were not news to Pinterest leadership when they broke publicly. Employees had attempted for years to alert the Company to problematic practices—through Company pulse surveys, complaints to HR, and direct conversations with senior leadership—but their concerns went unaddressed. In fact, rather than addressing reports of discrimination, Pinterest retaliated against employees who questioned the White, male-dominated status quo.

301.    Complaints about Pinterest's pervasive discrimination, and in particular, the Company's choice not to address reports of unequal treatment and instead to punish women and employees of color who spoke up about these issues led to reputational harm to Pinterest and significant loss of talent. Brougher wrote that, "Pinterest could not retain its employees from underrepresented groups, despite all the grand statements the executive leadership made [about improving diversity]."

302.    As the above discussion of Pinterest's most recent diversity report released in January 2020, reveals, the Company is unable to attract and retain top talent who are women and people of color.

303.    Additionally, as Confidential Witness 4 noted above, Pinterest failed to retain employees of color. Pinterest's People team had hired six Black employees between 2019 and 2020, and within a year, all but one left the Company, reflecting a mere 17% retention rate that would be costly to any company.

304.    Numerous former employees corroborated that discrimination and retaliation have pushed out talented employees and harmed the Company as a result.

305.    Confidential Witness 1 also believed that Pinterest's discriminatory treatment of Ozoma and Banks has been harmful to the Company. Pinterest does a Q&A session every Friday where employees can ask questions. For multiple weeks after Ozoma and Banks went public, employees kept asking questions about how they were treated and what the Company was doing about diversity and inclusion.

306.    Confidential Witness 2 thought Pinterest was harmed significantly by the loss of Ozoma and Banks. Both employees were incredibly talented and really cared about Pinterest and their work. It was the Company's loss. More broadly, Confidential Witness 2 explained that she had seen many ambitious, talented women leave the Company and go out fighting over pay inequity or due to frustration about lack of upward mobility.

307.    Pinterest's treatment of Ozoma, Confidential Witness 2's female subordinate, and the other member of the public relations team who was fired in connection with the contractor pay investigation cemented Confidential Witness 2's desire to leave the Company. Those events made clear

that Pinterest did not care about her and would not take care of her. Confidential Witness 2 explained that the turnover in the public policy, policy, and Trust and Safety teams was particularly harmful to the Company; those teams make sensitive, impactful decisions about content moderation that can have significant reputational and safety consequences for the Company, as the LiveAction incident makes clear. Employees with longer tenure have the context and experience from how the Company handled similar past situations that allows them to make better, more evidence-based decisions going forward. Additionally, newer employees often tried to increase their profile and demonstrate leadership by making changes – but that is not actually what you want in trust and safety, you want a consistent, uniform approach. Additionally, it was critical to have women of color on the Trust and Safety and Policy teams because they were more likely to have personal experience with exactly the sorts of discrimination that the Company was trying to keep off its platform. Losing experienced employees, particularly women of color, thus harmed the Company in the long term.

308.    The extensive public coverage of Pinterest's discriminatory and hypocritical culture has further damaged Pinterest's reputation and ability to recruit and retain talented employees. Women, people of color, and particularly women of color will be reluctant to enter a workplace where Company leadership has made very clear that White men are valued above all others, and that people who speak out against discrimination will be aggressively retaliated against.

309.    The harm to Pinterest's reputation was succinctly captured in a September 9, 2020 Fast Company article titled, "*Want to ditch Pinterest? Here are the best alternatives for visual inspiration – Creative inspiration without the workplace ethics violations*." The article summarized Ozoma, Banks, and Brougher's allegations against the Company, noting that "[t]he platform may appear wholesome, but working for Pinterest may be a whole different story" and directed readers to Pinterest's competitors.

310.    Further, thanks to Ozoma and Banks, Pinterest developed a best-in-industry reputation as a social media company at the forefront of combatting online misinformation and disinformation, particularly around health and vaccine content. These are timely and important issues, particularly in light of the current global pandemic and rising concern among advertisers about supporting social

media platforms that permit misinformation and disinformation to spread unchecked on social media. Pushing out Ozoma and Banks precisely when their talents were most needed is a huge loss to the Company and its ability to maximize the current political and social climate.

311.    In sum, Pinterest's business, goodwill, and reputation have been and will continue to be harmed by Defendants' decision to allow and perpetuate the Company's systemic violations of state and federal law and internal policies prohibiting discrimination and retaliation.

## VIII.    DERIVATIVE ALLEGATIONS

312.    Plaintiffs bring this action derivatively in the right and for the benefit of Pinterest to redress injuries suffered, and to be suffered, by Pinterest as a direct result of breach of fiduciary duties by Defendants. Pinterest is named as a Nominal Defendant solely in a derivative capacity.

313.    Plaintiffs will adequately and fairly represent the interests of Pinterest in enforcing and prosecuting its rights.

314.    Plaintiffs have been shareholders of Pinterest during the time of the wrongdoing complained of; have continuously been shareholders since then; are current shareholders of Pinterest; and will continue to hold shares of Pinterest stock through the duration of this action.

315.    Pinterest's Board consists of Jordan, Kilgore, Levine, Rajaram, Reynolds, Sharp, Silbermann, Wilson, Salaam Coleman Smith, and Andrea Wishom ("Demand Directors"). Plaintiffs have not made a demand on the Board because such demand would be futile, as discussed below.

## IX.    DEMAND FUTILITY ALLEGATIONS

### A.    Demand is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability

316.    A majority of Board members cannot impartially consider a demand because they face a substantial likelihood of liability as a result of participation or acquiescence in the discrimination and retaliation detailed above, which breached their fiduciary duties to the Company, its employees, and its shareholders.

317.    Pinterest's Board is currently comprised of ten directors. As discussed above, Section VI, eight of the ten directors – Silbermann, Levine, Jordan, Wilson, Reynolds, Kilgore, Rajaram, and Sharp – completely abdicated their fiduciary duties and so face a substantial likelihood of liability.

Pinterest's full Board in place in 2018 when Brougher was hired (including Defendants Silbermann, Levine, Jordan, Wilson, and Reynolds) and Kilgore (as a member of the Audit Committee) face a substantial likelihood of liability for approving and failing to remedy Brougher's discriminatory compensation. Defendants Silbermann, Levine, Jordan, Wilson, Reynolds, Kilgore, Rajaram, and Sharp were all aware of and complicit in Brougher's exclusion from Board meetings after she raised pay equity concerns. Individual Defendants on the Audit Committee and Compensation Committee Defendants additionally face a substantial likelihood of liability due to their breaches of fiduciary duties and Committee charters. The Director Defendants face a substantial likelihood of liability for causing the Company to issue a false and misleading Proxy Statement. Defendant Sharp additionally faces a substantial likelihood of liability for knowing of employees' complaints and mistrust of the Legal and HR departments but nonetheless failing to investigate and allowing retaliation against complainants.

318.    Accordingly, demand is excused as futile.

**B.    Demand is Excused Because the Board is Entirely Controlled by Defendants Silbermann, Sharp, Levine, and Jordan**

319.    By virtue of their ownership of over 62.07% of Pinterest's voting power, Defendants Silbermann, Sharp, Levine, and Jordan have complete voting control and veto power over the election of all directors, as well as virtually all other corporate matters involving a shareholder vote.

320.    Pinterest has issued two classes of stock: Class A common stock and Class B common stock. On matters requiring shareholder approval, such as the election of directors, the holders of the shares of Class A common stock and Class B common stock vote as a single class. Each share of Class A common stock is entitled to one vote, while each share of Class B common stock is entitled to *twenty* votes. Class B common stock was awarded to Pinterest's co-founders and major pre-IPO investors, including Silbermann, Sharp, Bessemer Venture Partners (represented on the Board by Levine), and Andreessen Horowitz (represented on the Board by Jordan).

321.    The Amendment 2 to Pinterest's S-1 Registration for the IPO (the "S-1") explained that "[a]ll shares of our common stock outstanding immediately prior to this offering, *including all shares held by our executive officers and directors*, will be reclassified into shares of Class B common stock immediately prior to the completion of this offering." The S-1 further explained that Class B holders

would control **92%** of the Company's voting power, meaning they had "the ability to control the outcome of matters submitted to our stockholders for approval, including the election of our directors and the approval of any change in control transaction."

322.     The S-1 also disclosed an Investor Rights Agreement between Silbermann, Bessemer, Andreessen Horowitz, and Sciarra, among others, with Jordan affiliated with Andreessen Horowitz and Levine with Bessemer Venture Partners.

323.     Under this dual-class voting structure, according to Pinterest's Proxy Statement of April 9, 2020, Defendants Silbermann, Sharp, Levine, and Jordan control a majority of Pinterest's total voting power because, as of March 31, 2020, they hold a total of 125,861,273 Class B shares – giving them voting control over **62.07%** of shares of Pinterest stock.

324.     Details of the voting control are set forth as follows:

| Name | Class B Shares | Percent of Class | Percent of Total Voting Power |
|---|---|---|---|
| Benjamin Silbermann | 50,246,508 | 27.47% | 24.77% |
| Evan Sharp | 9,774,358 | 5.34% | 4.82% |
| Bessemer Venture Partners entities | 38,647,781 | 21.13% | 19.05% |
| Andreessen Horowitz entities | 27,192,626 | 14.87% | 13.43% |
| | | **TOTAL:** | **62.07%** |

325.     Pinterest again acknowledged the impact of this domination in its Form 10-K dated February 6, 2020 ("2019 10-K"), "[t]he dual class structure of our common stock has the effect of concentrating voting control with those stockholders who held our capital stock prior to the completion of our initial public offering ("IPO") including our co-founders" and "other pre-IPO stockholders" which "*will limit or preclude your ability to influence corporate matters*."

326.     The 2019 10-K acknowledges that because of the dual-class voting structure, "for the foreseeable future, holders of our Class B common stock could have significant influence over the management and affairs of our company and over the outcome of all matters submitted to our stockholders for approval, including the election of directors and significant corporate transactions."

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT, NO. 3:20-CV-08331-WHA

327.    There is no mandatory sunset on the dual-class structure and even after leaving the Company, Pinterest's co-founders retain significant voting control. Pinterest's third co-founder, Sciarra, controls still controls 20.51% of voting power. Even if Silbermann or Sharp were terminated by the Company, they would "continue to have the ability to exercise significant voting power to the extent they were to retain their Class B common stock while our other existing holders disposed of their Class B common stock." As other Class B shareholders divest of their shares, it "already had and will continue to have the effect, over time, of increasing the relative voting power of those holders of Class B common stock who retain their shares in the long term."

328.    Indeed, Silbermann is the beneficiary of a highly unusual clause that allows his descendants to vote his Class B shares up to 540 days after his death, meaning he maintains significant control of the Company even from beyond the grave.

329.    Additionally, Jordan and Levine's control over the Board is further entrenched by their membership on Pinterest's Nominating and Corporate Governance Committee. Jordan and Levine are two of the three Committee members who consult with Board Chair Silbermann on searches for new Board directors – meaning Jordan and Levine have the power to rubberstamp Silbermann's director picks.

330.    Pinterest's dual-class voting structure and lack of a meaningful sunset provision has been widely criticized as preventing effective governance and oversight, including by the Council of Institutional Investors.[6] As *The New York Times* noted at the time of Pinterest's IPO, Pinterest's system of "super-voting shares undermines the system of accountability that has long been a pillar of public stock markets" and "can give insiders too much power and insulate executives who make poor decisions." Peter Eavis, Lyft and Pinterest Won't Be Giving Shareholders Much Say, *The New York Times* (Mar. 27, 2019). *See also* Lucian Bebchuk and Kobi Kastiel, The Perils of Pinterest's Dual-Class Structure, *Harvard Law School Forum on Corporate Governance* (Apr. 10, 2019).

---

[6] *See* Council of Institutional Investors, Letter to Outside Directors of Pinterest (Mar. 25, 2019), http://business.cch.com/srd/20190325CIILettertoPinterestonSunsets.pdf.

331.   Concerns about excess control in the hands of Silbermann, Sharp, Jordan, and Levine is well-placed, as it has resulted in a Board that is totally deferential to Silbermann and fails to exercise independent judgment or fulfill its duties to the Company.

332.   Prior to Pinterest's IPO, Brougher attended all Board meetings, and it was her "responsibility as the number two executive at the company to come prepared with ideas for increasing revenue and diversifying our customer base." Unlike in her prior roles where the Board members were active, engaged participants who asked probing questions, Pinterest's Board members were "cordial, nodding their heads at [Brougher's] proposals and rarely asking difficult questions." When Brougher asked Silbermann why the Board did not challenge them, Silberman had this revealing response: "*I chose them*."

333.   Although she attended every meeting prior to the IPO, not one Board member questioned why Brougher – the number-two at the Company – no longer attended Board meetings after the IPO. No one told Brougher why she was cut out of post-IPO Board meetings, and no one on the Board asked her what was going on.

334.   Nor did any Board member do any independent inquiry into her firing. No Board members reached out or asked her side of the story. This lack of diligence was wholly inconsistent with Brougher's experience at other major companies, where board members always inquired into the circumstances of an executive-level departure (let alone termination) and spoke to the departing executive.

335.   Due to the control and domination exercised by Silbermann, Sharp, Jordan, and Levine, the other Demand Directors are prevented from taking remedial action against Defendants because Silbermann, Sharp, Jordan, and Levine could easily fire any director they do not like and who would dare to take any legal action against them.

336.   Demand is therefore futile and excused.

**C.    Demand is Excused Because a Majority of the Board is Not Independent**

337.   At the outset, demand is futile as to Defendants Silbermann and Sharp because, as Pinterest admits, these "inside" demand directors lack independence. As stated in Pinterest's Proxy

Statement dated April 9, 2020, the Company analyzes director "independence under the listing rules of the New York Stock Exchange." Under its own independence standards, Defendants Silbermann and Sharp were deemed to not be independent.

338.    Additionally, Jordan and Levine are non-independent due to their long-standing and close relationships with Pinterest's co-founders, Silbermann and Sharp. In addition, Jordan and Levine's own professional reputations would be negatively impacted by a scandal involving Silbermann or Sharp. As discussed above, Pinterest was Jordan's first venture capital investment and first IPO, and both Jordan and Levine emphasize Silbermann and Sharp as the reason for their firm's major investments in Pinterest. Thus, Jordan and Levine are unable to analyze a potential lawsuit against Silbermann or Sharp in a disinterested and independent manner, because such a lawsuit would reflect negatively on them, too.[7]

339.    Further, the other Demand Directors' numerous interconnecting professional and social lives undermine their independence.

340.    Andreessen Horowitz and Rajaram have close ties. Andreessen Horowitz was an early investor in Caviar and currently invests in Doordash;[8] Rajaram is on DoorDash's executive team, where he leads Caviar. Marc Andreessen of Andreessen Horowitz and Rajaram currently serve together on Coinbase's Board of Directors.

341.    Ben Horowitz of Andreessen Horowitz and Wilson have served together on Okta's Board since 2015.

342.    Kilgore and Wishom currently serve together on the Board of Nextdoor.

343.    Additionally, many of the Director Defendants have overlapped at other Silicon Valley businesses. Rajaram, Sharp, and Sharp's wife all worked at Facebook during the same period.

---

[7] Additionally, Andreesen Horowitz's partners have repeatedly made racist public comments for which the has been criticized. At a January 2020 fireside chat at Pinterest, Ben Horowitz used the example of a violent prison shanking to make the point that people need to adapt to the culture around them. Pinterest employees were horrified with this thoughtless comparison of corporate culture to the challenges of prison life. A few years earlier, Marc Andreessen suggested India was better off under colonial rule.

[8] Andreessen Horowitz, *Investments*, https://a16z.com/investments/

Silbermann and Rajaram also overlapped at Google. Kilgore and Wilson overlapped at Amazon. Levine led Bessemer Venture's Series C investment in LinkedIn while Kilgore served on LinkedIn's Board.

344.   For these additional reasons, demand is excused as futile.

## X.   THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS OR, ALTERNATIVELY, WAS TOLLED

345.   The statute of limitations does not bar Plaintiffs' shareholder derivative action. Plaintiffs have brought this Complaint within the applicable statute of limitations.

346.   Alternatively, the statute of limitations was tolled during the Individual Defendants' adverse domination of Pinterest and the concealment by the Individual Defendants of their wrongful acts. Here, the Board was wholly under the adverse domination of Silbermann, Sharp, Jordan, and Levine, who collectively control almost two-thirds of the shareholder vote. Consequently, the Individual Defendants were "deemed to be in the same position as an incompetent person or a minor without legal capacity either to know or to act in relation to" the wrongful conduct. Moreover, Defendants concealed, and continue to conceal, their wrongful acts and this is a continuing conspiracy. The statute of limitations has therefore been tolled since defendants Silbermann, Jordan, and Levine's adversely dominated Pinterest. Plaintiffs did not and could not have discovered the Individual Defendants' liability until Ozoma and Banks' revelations on June 15, 2020.

## XI.   CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty Against All Individual Defendants and Does 1-30

347.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

348.   The Individual Defendants and Does 1-30 all owed and owe fiduciary duties to Pinterest. By reason of their fiduciary relationships, Individual Defendants specifically owed and owe Pinterest the highest obligation of good faith and loyalty in the administration of Pinterest's affairs, including assuring that Pinterest complied with state and federal laws governing, among other things, workplace discrimination on the basis of race and/or gender and retaliation against employees who alleged discrimination. The Board also had specific fiduciary duties as defined by the Company's corporate

governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Pinterest alleged herein.

349. Individual Defendants and Does 1-30 willfully ignored their obligations under state and federal law. Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

350. Individual Defendants and Does 1-30 consciously violated their corporate responsibilities by repeatedly failing to act, understand, stop, and remedy systemic discrimination and retaliation at Pinterest, despite numerous warnings and indicators, including among others the COO's pay equity complaint and her exclusion from pre-IPO fundraising and post-IPO Board meetings; ignoring a doxxing incident that a Black employee warned about; ignoring a high and regular volume of internal discrimination and retaliation claims; permitting individuals liable for misconduct to "investigate" their own misconduct; and, as a result of these failures, the filing of multiple legal actions against Pinterest for discrimination.

351. Individual Defendants and Does 1-30, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Pinterest in a manner consistent with the duties imposed upon them by law.

352. By committing the misconduct alleged herein, Individual Defendants and Does 1-30 breached their duties of good faith and loyalty in the management and administration of Pinterest's affairs and in the use and preservation of Pinterest's assets.

353. As a direct and proximate result of the Individual Defendants' and Does 1-30's conscious failure to perform their fiduciary obligations, Pinterest has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the costs of defending and resolving complaints and lawsuits against Pinterest.

354. As a result of the misconduct alleged herein, the Individual Defendants and Does 1-30 are liable to the Company.

**COUNT II**
**Waste of Corporate Assets Against All Individual Defendants and Does 1-30**

355.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

356.    By their actions alleged above, and by failing to properly consider the interests of Pinterest and its public shareholders by failing to conduct proper supervision, the Individual Defendants and Does 1-30 have caused the Company to waste valuable corporate assets by paying legal costs to defend Pinterest's unlawful actions.

357.    As a result of the waste of corporate assets, Pinterest has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

358.    The acts of Individual Defendants named herein, and each of them, and Does 1-30, were done maliciously, oppressively, and with intent to defraud, and Plaintiffs are entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

**COUNT III**
**Unjust Enrichment**
**Against All Individual Defendants and Does 1–30**

359.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

360.    By their wrongful acts and omissions, the Individual Defendants and Does 1-30 were unjustly enriched at the expense of, and to the detriment of, the Company.

361.    During the Relevant Period, the Individual Defendants and Does 1-30 either received annual stipends, bonuses, restricted stock units, or similar compensation from the Company that was tied to the financial performance of the Company or received compensation that was unjust in light of their bad faith conduct.

362.    Plaintiffs, as shareholders and representatives of the Company, seek restitution from the Individual Defendants and Does 1-30 and seek an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained due to their wrongful conduct and breach of their fiduciary duties.

363.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT IV
### Abuse of Control Against Individual Defendants Silbermann and Sharp

364.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

365.    By virtue of their positions and financial holdings at Pinterest, Defendants Silbermann and Sharp exercised control over Pinterest and its operations, and owed duties as controlling persons to Pinterest not to use their positions of control for their own personal interests and contrary to Pinterest's interests.

366.    Defendants Silbermann and Sharp's conduct alleged herein constitutes an abuse of their ability to control and influence Pinterest, for which they are legally responsible.

367.    As a result of Defendants Silbermann and Sharp's abuse of control, Pinterest has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

368.    Because the acts of Silbermann and Sharp were done maliciously, oppressively, and with intent to defraud, Plaintiffs on behalf of Pinterest is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

### COUNT IV
### Violations of Section 14(a) of the Exchange Act and Rule 14A-9 Against Director Defendants

369.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

370.    This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

371.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations that the [SEC] may prescribe as

necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

372.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statemen form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

373.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance by the Company of materially misleading written statements to shareholders that were contained in the 2019 Proxy Statement. The 2019 Proxy Statement contained a proposal to Pinterest's shareholders urging them to elect members of the Board and provide advisory approval of executive compensation. The Proxy Statement, however, misstated or failed to disclose the discriminatory nature of Brougher's compensation, lack of oversight and internal controls to prevent discriminatory compensation, and the true reasons for Brougher's departure from the Company. By reason of the conduct alleged in this Complaint, the Director Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of their wrongful conduct, Pinterest misled or deceived its shareholders by making misleading statements that were an essential link in shareholders heeding Pinterest's recommendation to elect certain members of the Current Board and provide advisory approval of executive compensation.

374.    The misleading information contained in the 2019 Proxy Statement was material to Pinterest's shareholders in determining whether or not to elect Jordan, Levine, and Rajaram, and provide advisory approval of executive compensation.

375.    The material misstatements and omissions in the Proxy Statement damaged the Company.

376.    Plaintiffs, on behalf of Pinterest, thereby seeks relief for damages inflicted upon the Company based on the misleading 2019 Proxy Statement in connection with the improper election of certain members of the Board and advisory approval of executive compensation

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief:

A.    An order deeming this action to be a proper derivative action and Plaintiffs to be proper and adequate derivative plaintiffs;

B.    An order declaring that demand on the current Board is excused because such demand would be futile;

C.    An order declaring that the Individual Defendants breached their fiduciary duties to the Company;

D.    An order declaring that the Individual Defendants committed corporate waste;

E.    An order declaring that the Individual Defendants were unjustly enriched;

F.    An order declaring that Silbermann and Sharp abused their control;

G.    An order declaring that Director Defendants violated Section 14(a) of the Exchange Act by filing a materially false and misleading Proxy Statement;

H.    An award against all of the Defendants, jointly and severally, and in favor of the Company for the amount of all damages sustained by Pinterest as a result of Individual Defendants' breaches of fiduciary duties, abuse of control, waste of corporate assets, unjust enrichment, and violations of the federal securities laws law, including any and all damages compensable by statute and/or law;

I.    An order directing the Company to take necessary actions to end the systemic pattern of race- and gender-based discrimination, including by establishing retrospective and prospective remedies with accountability to third parties and reforming and enhancing the Company's governance and internal controls and procedures to comply with applicable laws and to protect Pinterest, its employees, and its shareholders from repeating the harms described herein;

J.      An award to Pinterest of restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation unjustly obtained by Defendants;

K.      An award to Plaintiffs for the costs and expenses incurred in this action, including but not limited to reasonable attorneys' fees; experts' fees; consultants' fees'; and other costs and expenses; and

L.      For such other and further relief as this Court may deem just and proper.

## XIII.   JURY DEMAND

377.    Plaintiffs demands a trial by jury on all issues so triable.

Date: February 26,2021                 Respectfully submitted,

/s/ _____

**COHEN MILSTEIN SELLERS & TOLL PLLC**
JULIE GOLDSMITH REISER (*pro hac vice*)
jreiser@cohenmilstein.com
MOLLY BOWEN (*pro hac vice*)
mbowen@cohenmilstein.com
LYZETTE WALLACE (*pro hac vice*)
lwallace@cohenmilstein.com
1100 New York Ave. NW, 5th Floor
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

LAURA POSNER (*pro hac vice*)
lposner@cohenmilstein.com
88 Pine St., 14th Floor
New York, NY 10005
Telephone:   (212) 838-7797
Facsimile:   (212) 838-7745

*Interim Lead Counsel and Attorneys for Plaintiff*
*Employees' Retirement System of Rhode Island*

**RENNE PUBLIC LAW GROUP**
LOUISE RENNE (SBN #36508)
lrenne@publiclawgroup.com
RUTH BOND (SBN #214582)

rbond@publiclawgroup.com
STEVEN CIKES (SBN #235413)
scikes@publiclawgroup.com
ANASTASIA BONDARCHUK (SBN #309091)
abondarchuk@publiclawgroup.com
350 Sansome St., Suite 300
San Francisco, CA 94104
Telephone:   (415) 848-7200
Facsimile:    (415) 848-7230

***Interim Liaison Counsel and Attorneys for Plaintiff
Employees' Retirement System of Rhode Island***

**WEISSLAW LLP**
JOSEPH H. WEISS (*pro hac vice*)
jweiss@weisslawllp.com
DAVID C. KATZ (*pro hac vice*)
dkatz@weisslawllp.com
JOSHUA M. RUBIN (*pro hac vice*)
jrubin@weisslawllp.com
KELLY K. MORAN (*pro hac vice*)
kmoran@weisslawllp.com
1500 Broadway, 16th Floor
New York, NY 10036
Telephone: (212) 682-3025
Facsimile:  (212) 682-3010

JOEL E. ELKINS (SBN 256020)
jelkins@weisslawllp.com
9100 Wilshire Boulevard, #725 E
Beverly Hills, CA 90210
Telephone: (310) 208-2800
Facsimile:  (310) 209-2348

***Executive Committee Member and Attorneys for
Plaintiff Stephen Bushansky***

**BOTTINI & BOTTINI, INC.**
FRANCIS A. BOTTINI, JR. (SBN 175783)
fbottini@bottinilaw.com
ALBERT Y. CHANG (SBN 296065)
achang@bottinilaw.com
ANNE BESTE (SBN 326881)
abeste@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile:  (858) 914-2002

***Executive Committee Member and Attorneys for
Plaintiff Sal Toronto***

## VERIFICATION

I, Amy L. Crane, verify and declare under penalty of perjury that the following is true and correct:

1.      I am General Counsel of the Employees' Retirement System of Rhode Island ("ERSRI") and am authorized to execute this verification on behalf of ERSRI.

2.      I have reviewed the Verified Shareholder Derivative Consolidated Complaint ("Complaint") prepared on behalf of ERSRI, and I authorize its filing.

3.      I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As for the allegations to which I do not have personal knowledge, I rely on our counsel and their investigation and for that reason believe them to be true.

4.      I further declare that ERSRI is a current shareholder and has been a shareholder of the common stock of Pinterest, Inc. since June 26, 2020, during the time period in which the events alleged and complained of in the Complaint were occurring.

Dated:  2/26/21

Amy L. Crane

2839080 v1

## **<u>VERIFICATION</u>**

I, Stephen Bushansky, hereby verify that I am a shareholder of Pinterest, Inc. ("Pinterest" or the "Company") and am ready, willing, and able to pursue this shareholder derivative action on behalf of Pinterest.  I have continuously held shares of the Company since its Initial Public Offering and at all times relevant in the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Abuse of Control, Unjust Enrichment, and Violations of Federal Securities Laws (the "Complaint").  I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true.  Having received a copy of the Complaint, and having reviewed it with my counsel, I hereby authorize its filing.

*stephen bushansky*
stephen bushansky (Feb 26, 2021 10:21 EST)

Stephen Bushansky