**RENNE PUBLIC LAW GROUP**
LOUISE RENNE (SBN #36508)
lrenne@publiclawgroup.com
RUTH M. BOND (SBN #214582)
rbond@publiclawgroup.com
STEVE CIKES (SBN #235413)
scikes@publiclawgroup.com
ANASTASIA BONDARCHUK (SBN #309091)
abondarchuk@publiclawgroup.com
350 Sansome St., Suite 300
San Francisco, CA 94104
Telephone: (415) 848-7200
Facsimile: (415) 848-7230

*Counsel for Plaintiffs*
[Additional Counsel Listed on Signature Page]

**COHEN MILSTEIN SELLERS & TOLL PLLC**
JULIE GOLDSMITH REISER (*pro hac vice*)
jreiser@cohenmilstein.com
MOLLY BOWEN (*pro hac vice*)
mbowen@cohenmilstein.com
LYZETTE WALLACE (*pro hac vice*)
lwallace@cohenmilstein.com
1100 New York Ave. NW, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

LAURA POSNER (*pro hac vice*)
lposner@cohenmilstein.com
88 Pine St., 14th Floor
New York, NY 10005
Telephone: (212) 220-2925

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re Pinterest Derivative Litigation* | Lead Case No. 3:20-cv-08331-WHA<br><br>**PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF PROPOSED SETTLEMENT**<br><br>Date : January 13, 2022<br>Time: 8:00am<br>Courtroom 12, 19th Floor<br>The Honorable William Alsup |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION...................................................................1

ISSUES TO BE DECIDED.....................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .........................................1

I.   INTRODUCTION ..........................................................................................1

II.  BACKGROUND .............................................................................................3

    A.   Summary of Allegations ........................................................................3

    B.   Procedural History .................................................................................5

III. SETTLEMENT DISCUSSIONS AND TERMS.............................................6

IV.  THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ...............10

    A.   The Standards for Approval of Derivative Settlements................................10

    B.   The Relevant Factors Strongly Support Preliminary Approval ...................11

        1.   The Settlement Was Negotiated at Arm's-Length with the Active Assistance and Oversight of Judge Spero ....................................................11

        2.   The Settlement Was Negotiated After Substantial Investigation by Counsel with Extensive Experience in Complex Derivative Litigation as well as Employment Discrimination Litigation ................................................12

        3.   The Settlement Confers Substantial Benefits on Pinterest....................15

        4.   The Strength of Plaintiffs' Claims Weighs in Favor of Preliminary Approval.....16

        5.   The Risk, Complexity, Expense, and Likely Duration of the Litigation Favors Settlement ....................................................17

        6.   The Board's Sound Exercise of Business Judgment in Approving the Settlement Weighs Heavily in Favor of Preliminary Approval.............................20

V.   THE PROPOSED NOTICE TO SHAREHOLDERS SHOULD BE APPROVED .............21

VI.  CONCLUSION .............................................................................................22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*In re Apollo Grp., Inc. Secs. Litig.*,

   2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008) ......................................................20

*In re Apple Computer, Inc. Deriv. Litig.*,

   2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) ...................................................................15

*In re Apple Inc. Device Performance Litig.*,

   No. 5:18-md-02827-EJD, 2021 WL 1022867 (N.D. Cal. Mar. 17, 2021) ...........................11

*Berkey Photo, Inc. v. Eastman Kodak Co.*,

   603 F.2d 263 (2d Cir. 1979) ...........................................................................................20

*In re Caremark Int'l. Inc. Deriv. Litig.*,

   698 A.2d 959 (Del. Ch. 1996)........................................................................................17

*Churchill Vill., LLC v. Gen. Elec.*,

   361 F.3d 566 (9th Cir. 2004) ..........................................................................................21

*Cohn v. Nelson*,

   375 F. Supp. 2d 844 (E.D. Mo. 2005) ........................................................................ 15, 17

*Ebarle v. Lifelock, Inc.*,

   2016 U.S. Dist. LEXIS 6698 (N.D. Cal. Jan. 20, 2016)......................................................12

*Four in One Co. v. S.K. Foods, L.P.*,

   No. 2:08-cv-3017 KJM EFB, 2014 WL 4078232 (E.D. Cal. Aug. 13, 2014).......................19

*Garcia v. Schlumberger Lift Solutions*,

   No. 1:18-cv-01261-DAD JLT, 2020 WL 6886383 (E.D. Cal. Nov. 23, 2020).....................11

*Hanlon v. Chrysler Corp.*,

   150 F.3d 1011 (9th Cir. 1998) ........................................................................................10

*Hefler v. Wells Fargo & Co.*,

   No. 16-cv-05479-JST, 2018 WL 4207245 (N.D. Cal. Sept. 4, 2018)..................................11

*In re Hewlett-Packard Co. S'holder Deriv. Litig.*,

    716 F. Appx. 603 (9th Cir. 2017) ........................................................................10

*Lloyd v. Gupta*,

    2016 U.S. Dist. LEXIS 96166 (N.D. Cal. July 22, 2016) ................................. 10, 11

*Lunsford v. Woodforest Nat'l Bank*,

    No. 1:12-cv-103-CAP, 2014 WL 12740375 (N.D. Ga. May 19, 2014) ................................20

*Maher v. Zapata Corp.*,

    714 F.2d 436 (5th Cir. 1983) ........................................................................15

*Mills v. Elec. Auto-Lite Co.*,

    396 U.S. 375 (1970) ........................................................................15

*Nat'l Rural Telecomms. Coop v. DIRECTV, Inc.*,

    221 F.R.D. 523 (C.D. Cal. 2004) ........................................................................14

*In re NVIDIA Corp. Deriv. Litig.*,

    No. C-06-06110-SBA (JCS), 2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ................. 10, 15

*Officers for Just. v. Civil Serv. Comm'n*,

    688 F.2d 615 (9th Cir. 1982) ................................................................ 10, 16, 17, 20

*In re Omnivision Techs., Inc.*,

    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ........................................................................14

*In re OSI Sys., Inc. Deriv. Litig.*,

    2017 U.S. Dist. LEXIS 221033 (C.D. Cal. May 2, 2017) ........................................................................15

*In re Pac. Enters. Sec. Litig.*,

    47 F.3d 373 (9th Cir. 1995) ................................................................ 10, 14, 18

*Rodriquez v. West Publ'g Corp.*,

    2007 U.S. Dist. LEXIS 74849 (C.D. Cal. Sept. 10, 2007) ........................................................................14

*Rudi v. Wexner, et al.*,

    Case No. 2:20-cv-03068-MHW-EPD (S.D. Oh. Aug. 25, 2021) ........................................14

*Satchell v. Fed. Express Corp.*,

    No. C03-2659 SI, 2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ........................................12

Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement

*Unitrin, Inc. v. Am. Gen. Corp.*,

   651 A.2d 1361 (Del. 1995) ....................................................................21

*In re Walt Disney Co. Deriv. Litig.*,

   907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)............................18

*In Re Wynn Resorts, Ltd. Derivative Litigation*,

   Case No. A-18-769630-B (Nev. Dist. Ct. Clark Cnty.) ........................................13

*Zapata Corp. v. Maldonado*,

   430 A.2d 779 (Del. 1981) ....................................................................20

**Statutes**

8 Del. C. § 220 ................................................................................3

Del. Code § 102(b)(7) ........................................................................18

Securities Exchange Act of 1934 Section 14(a) ...............................................5

**Other Authorities**

Federal Rule of Civil Procedure 23.1........................................................ 1, 21, 22

Federal Rules of Civil Procedure Rule 23.1(c)...............................................10

## NOTICE OF MOTION AND MOTION

1.     PLEASE TAKE NOTICE that on January 13, 2022 at 8:00am before the Honorable William Alsup, 450 Golden Gate Avenue, San Francisco, California, Interim Lead Plaintiff Employees' Retirement System of Rhode Island ("ERSRI"), along with Interim Executive Committee Plaintiffs Stephen Bushansky and Sal Toronto, and Plaintiff Howard Petretta (together, "Plaintiffs"), will move the Court for an Order Preliminarily Approving the Proposed Settlement in this action pursuant to Federal Rule of Civil Procedure 23.1. This motion is based on the accompanying Memorandum of Points and Authorities, the Declaration of Louise Renne ("Renne Declaration") and the documents attached thereto including the Stipulation of Settlement ("Stipulation") attached as Exhibit 1 to the Renne Declaration, the Notice of Pendency and Proposed Settlement of Derivative Actions attached as Exhibit 2 to the Renne Declaration, the Summary Notice of Pendency and Proposed Settlement of Derivative Actions attached as Exhibit 3 to the Renne Declaration, and the [Proposed] Order Granting Plaintiffs' Unopposed Motion for Preliminary Approval of Proposed Settlement, as well as the pleadings and records on file, and such other matters as may be presented to the Court.

## ISSUES TO BE DECIDED

1.     Should the proposed Settlement set forth in the Stipulation be preliminarily approved as fair, reasonable, and adequate?

2.     Should the Court approve the form and method of providing notice to Pinterest, Inc. shareholders?

3.     Should the Court set a Settlement Hearing, along with deadlines for Plaintiffs' Counsel to file and serve the motion for final approval of the proposed Settlement, and for counsel to file and serve any motions for any award of attorneys' fees and expenses?

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Plaintiffs are pleased to present for preliminary approval the Settlement[1] of this

---

[1] Unless otherwise noted, all capitalized terms have the same meaning as defined in the Stipulation, all internal citations and quotation marks have been omitted, and all emphasis has been added.

consolidated derivative action on behalf of Pinterest, Inc. ("Pinterest" or the "Company"), which was reached under the supervision of the Honorable Joseph C. Spero, appointed by this Court to mediate the claims. The proposed Settlement calls for sustained efforts by Pinterest that will put diversity, equity, and inclusion ("DEI") at the forefront of its internal goals and business operations. Additionally, it will resolve this highly contested, complex derivative action while delivering long-term meaningful benefits to Pinterest and its stockholders. Through vigorous negotiations (including multiple formal mediation sessions supervised by Judge Spero, dozens of working group meetings, presentations from the counsel for the Pinterest Special Committee to the Plaintiffs, and the exchange of numerous demands and counteroffers), the parties, with significant involvement of and oversight by Interim Lead Plaintiff ERSRI, have agreed upon a robust suite of corporate governance reforms (the "Reforms"). Funded by a $50 million commitment, the Reforms will serve as a benchmark for other companies that are formalizing Board oversight over workplace policies and procedures, including with respect to business initiatives seeking to improve inclusion and belonging within a corporation and for internet users more broadly.

The agreed-to Reforms are directly responsive to the allegations in the Complaint and span all levels of the Company, from workplace practices to Board level oversight and engagement in workplace culture. Most of the Reforms will be in effect for at least five years. Significantly, the Reforms incorporate DEI into Pinterest's business goals. The Reforms also require regular assessments of pay equity and transparency around the results; release individuals who made race or gender discrimination claims from non-disclosure agreements related to the facts and circumstances of their experience; create executive accountability for DEI culture and business goals; invest in an Inclusive Product Program to focus on improving the user experience by making it more inclusive; establish processes and training to make the hiring processes more equitable; and improve employee safety. In addition, Pinterest will allocate $50 million in funding for the creation, implementation, and maintenance of these Reforms, to be expended over a period no longer than ten years.

Before engaging in negotiations, Plaintiffs were informed by their counsel's extensive

experience and investigation, including the review of non-public documents produced in response to Plaintiffs' books-and-records demands pursuant to 8 Del. C. § 220 ("Section 220"), interviews of numerous former Pinterest employees, and the preparation and filing of a consolidated complaint and opposition to Defendants' motions to dismiss. Thereafter, once negotiations were permitted by the Court, Plaintiffs' Counsel further educated themselves through dozens of meetings with Defendants' counsel and counsel for the Special Committee. With Judge Spero's oversight and facilitation as Special Master, the parties candidly and forcefully exchanged views about the strengths and weaknesses of the case throughout the mediation process. The parties exchanged multiple offers and counter-offers, reaching accord on numerous terms. Ultimately, Judge Spero issued a mediator's recommendation on the remaining areas of contention, which was accepted by the parties. The mediated resolution of this action was hard-fought, arm's-length, and resulted in valuable reforms that will inure to the benefit of Pinterest and its stockholders for years to come.

The Settlement is all the more substantial because it is backed by a $50 million commitment, thereby reducing the likelihood that the Company will face lawsuits, attendant financial or reputational harm regarding such misconduct, or these types of breach-of-fiduciary-duty claims in the future.

Accordingly, Plaintiffs respectfully request that the Court (1) grant preliminary approval of the proposed Settlement as within the range of what is fair, reasonable, and adequate, (2) approve the form of notice to Pinterest's shareholders, and (3) schedule a Settlement Hearing at which the Court will consider final approval of the Settlement, any application for any award of attorneys' fees and expenses, and entry of a final judgment.

## II.   BACKGROUND

### A.   Summary of Allegations

Pinterest has long acknowledged that workplace diversity and inclusion is central to its business and that its success depends on "building a product that reflects our diverse population" of users. ¶¶66-75.[2] Plaintiffs alleged that, despite this recognition, Pinterest's tone at the top and

_____

[2] All references to "¶_" are to the Verified Shareholder Derivative Consolidated Complaint for

"broken" culture devalued and discriminated against women and people of color by bringing them into the Company at lower levels than their White male counterparts, paying them unfairly, limiting their roles, and minimizing their contributions. ¶245.

Pinterest's discriminatory practices were publicly disclosed when two Black female members of Pinterest's public policy team came forward to publicly criticize the Company's treatment of employees. ¶¶155-156. Ifeoma Ozoma ("Ozoma") and Aerica Shimizu Banks ("Banks") were hired as the second and third members of Pinterest's public policy team. ¶¶90-91, 103. The Complaint alleges that both were paid substantially less than their White male colleague (¶¶105-106). Additionally, after the Company enacted a policy to block content from an extremist organization, Ozoma and Banks warned a doxxing attack was imminent, but the Company ignored them. ¶¶112-133. Defendant Ben Silbermann ("Silbermann"), Co-Founder, President, and Chief Executive Officer ("CEO") of Pinterest, conceded to Ozoma that he was "personally concerned that when these risks were raised, we didn't take the right steps." ¶128. In July 2019, Ozoma filed a complaint alleging discrimination and retaliation; Banks filed a complaint in January 2020. ¶¶135, 152.

The Complaint alleges that pay disparities and retaliation also impacted Francoise Brougher ("Brougher"), the Company's first Chief Operating Officer ("COO") who was hired by Silbermann with the Board's approval due to her IPO experience. ¶¶79, 175. Plaintiffs allege that Silbermann and four other named Defendants sitting on the Board at that time (Levine, Jordan, Wilson, and Reynolds) approved a compensation package for Brougher that underpaid her relative to Chief Financial Officer ("CFO") Todd Morgenfeld ("Morgenfeld"), a man who was her closest peer. ¶¶179-180. Despite Brougher's success in doubling ad revenue (¶176), the Complaint also alleges that she was the subject of retaliation after challenging her discriminatory compensation. ¶¶184, 187, 242, 332. Plaintiffs alleged that, in March 2020, Silbermann fired Brougher and that no Board member spoke to Brougher about her termination. ¶¶180-195. On August 11, 2020, Brougher sued Pinterest for discrimination and retaliation, and the Company settled Brougher's

---

Breach of Fiduciary Duty, Waste of Corporate Assets, Abuse of Control, Unjust Enrichment, and Violations of Federal Securities Laws ("Complaint") (ECF No. 65).

lawsuit within months. ¶232.

Plaintiffs allege that the Board knew of these discriminatory and retaliatory practices, including because a majority of the Director Defendants approved Brougher's discriminatory compensation package, witnessed her exclusion from Board meetings, and knew of her termination. ¶179. Further, Plaintiffs allege that Board committees received information revealing the matters at issue in this derivative action but did not address those problems. ¶¶259, 266-267. Plaintiffs allege that the Board's failure to monitor and intervene in the face of known illegal conduct and to ensure that adequate systems were in place to prevent discrimination and protect employees from retaliation damaged the Company and was in breach of their fiduciary duties. Plaintiffs further allege that the failure to accurately describe the Board's governance procedures and the termination of Brougher in the Company's 2020 Proxy Statement violated Section 14(a) of the Securities Exchange Act of 1934.

**B.    Procedural History**

Prior to filing a lawsuit, each plaintiff served a books-and-records demand on the Company pursuant to Section 220 and received and reviewed relevant documents. Early briefing occurred to consolidate the *ERSRI*, *Toronto*, and *Bushansky* cases and establish an interim leadership structure for those plaintiffs and their counsel. *See* ECF Nos. 18, 28, 33, 38, 39, 40, 41, 43, 46, 49. The consolidated Complaint was filed on February 26, 2021. ECF No. 54. Defendants filed a motion to dismiss and request for judicial notice of documents in support of that motion on April 22, 2021. ECF Nos. 69-72. ERSRI, Toronto, and Bushansky opposed those motions on May 27, 2021. ECF Nos. 73-74. Defendants' reply in support of those motions and oral argument was stayed pending mediation, and on June 1, 2021, the parties were referred by this Court to the Northern District's ADR program under the auspices of Magistrate Judge Spero, acting as Special Master. ECF No. 76.

On July 14, 2021, plaintiff Howard Petretta filed a related action in this Court, No. 3:21-cv-05385-SK, which was consolidated on October 6, 2021. *Id.*, Clerk Entry on Oct. 6, 2021.

## III.   SETTLEMENT DISCUSSIONS AND TERMS

The Court appointed Judge Spero to act as Special Master and oversee the parties' efforts to resolve this action. Plaintiffs participated in formal mediation conferences before Judge Spero on June 28, 2021, and September 13, 2021. Prior to those conferences, Plaintiffs provided to Judge Spero detailed mediation statements addressing liability and damages. In between the conferences, the parties exchanged numerous demands and counter-offers for resolution of the action, met in working groups dozens of times, spoke with Judge Spero both separately and collectively (including on October 4, 2021), and met with counsel for the Special Committee. These efforts allowed the parties to reach agreement on numerous, but not all, terms of settlement. When the parties could not reach agreement on those remaining terms, Judge Spero issued a mediator's recommendation, which the parties accepted.

At no point have the parties discussed attorney's fees.

The agreed-upon Settlement includes expansive corporate governance reforms, reaching all levels of the Company. The Reforms are reflected in full in Exhibit A to the Stipulation, attached as Renne Declaration, Exhibit 1. Particularly significant Reforms include the following:

***Release of Non-Disclosure Agreements***: Through the Settlement, Plaintiffs obtained Pinterest's agreement to not enforce non-disclosure agreements for individuals who made claims of race or gender discrimination, permitting those individuals to discuss the underlying circumstances and reporting process. *Id.* at (IV)(1). This reform is responsive to a principal concern raised by Ms. Ozoma and Ms. Banks, who first brought the problems at Pinterest to light, and is a significant transparency measure that will allow current and former employees to tell their stories without fear of legal consequence and ensure shareholders that prior misconduct has not been hidden through concealment measures.

***Board Oversight***: A central premise of this case is that Pinterest's Board abdicated its oversight responsibilities and tacitly endorsed illegal discrimination and retaliation at the Company. The Settlement includes multiple terms to significantly enhance the Board's access to information and oversight of these key issues, including a Board member serving as co-sponsor in DEI work at Pinterest along with the CEO, thereby providing the Board with direct insight into

the status of the work, progress, and challenges; the Talent Development and Compensation Committee ("TDCC") overseeing coaching of the Executive Team on promoting a respectful and inclusive workplace by RHR International — an outside organization jointly selected by Plaintiffs and Defendants; and the Board or a committee overseeing and conducting due diligence related to any departure of a member of the Executive Leadership Team. Renne Decl., Exhibit 1 (Stipulation), Exhibit A at (II)(1), (II)(2), (II)(4).

The Reforms also require Pinterest's Internal Audit function to evaluate progress on the implementation of measurable DEI reforms, with audit reports presented to the Board's Audit Committee on a periodic basis as the audits progress and summary to the full Board on an annual basis. *Id.* at (II)(6). This is the first settlement of its kind to make DEI an audited function, recognizing the importance and potential risk of the issue if not rigorously monitored.

Additionally, to ensure that the Board is receiving accurate and candid information, the Reforms require that the Global Head of Inclusion & Diversity and Chief People Officer to communicate directly with the TDCC in sessions that the CEO does not attend to discuss Pinterest's progress on DEI goals, impediments to achieving those goals, and whether members of Pinterest's Executive Leadership Team have served as champions of DEI work or impediments to their work. *Id.* at (II)(3). The TDCC will also receive at least twice-annual reports from Pinterest's outside Ombuds Office. *Id.* at (III)(1).

***Pay Equity and Transparency***: The Reforms include measures to evaluate pay equity and transparency surrounding those results. These, too, were key issues identified in the Complaint. First, Pinterest will conduct audits for pay equity across gender and racial categories every other year, and take any steps needed to maintain this equity. This audit will examine ratings, promotion, and compensation. Pinterest will use Secretariat Economists (an outside organization jointly selected by Plaintiffs and Defendants) to perform the review and be guided by the audit information in deciding what, if any, corrective action to take. *Id.* at (XIII)(1).

Second, to give employees clearer insight into their compensation compared to other employees in similar roles, current employees will have electronic access to the company organization chart, and to job level information for employees throughout the Company.

Employees will also have access to compensation ranges for all levels within their job family. *Id.* at (XIII)(9). So that shareholders have visibility into the Company's progress on pay equity, Pinterest's diversity report will describe progress made in implementation of pay equity, as well as DEI goals. *Id.* at (IV)(2).

*Executive Accountability for DEI Culture and Business Goals*: To ensure that executives are making meaningful and measurable progress, the Reforms require each member of the Executive Leadership Team to develop DEI goals with respect to (1) people/culture and (2) DEI-related business initiatives. So that those goals reflect best practices, the executives will develop them in consultation with the Chief People Officer and the Global Head of Inclusion & Diversity. Each member of the Executive Leadership Team will revisit her initiatives and efforts on a yearly basis and amend them as needed. *Id.* at (VI)(1). Additionally, Pinterest will strengthen its process for including DEI people/culture and DEI business initiatives and efforts in every manager's performance evaluation. Annual evaluations will assess managers' progress in creating an inclusive workplace culture, with each manager's evaluation including the manager's reflection upon their own efforts. *Id.* at (VI)(3).

*Inclusive Product Program*: To truly embrace DEI as a component of workplace culture that attracts and retains employees, companies also must adopt DEI goals in their business model. Pinterest is making this commitment by fostering an Inclusive Product Program ("IPP") to promote diversity and inclusion in its content and by exploring opportunities to build a more inclusive product by applying diverse data. At least twenty different Pinterest employees from across the Company will contribute to and be considered part of the Inclusive Product Team, which will be tasked with identifying a pipeline of project opportunities for using Pinterest to promote diversity and inclusion. *Id.*, Appendix C, §§4-6.

The Head of Inclusive Product will meet at least annually with the Inclusion Advisory Council and executives regarding product inclusion initiatives. She also will inform the TDCC about the Inclusive Product Team's efforts and initiatives. *Id.*, Appendix C, §§7, 8, 13. Two paid internships or apprenticeships will be offered every year to individuals from backgrounds traditionally underrepresented in technology; recruitment for these positions will take place at,

for example, Historically Black Colleges and Universities and Hispanic-Serving Institutions. *Id.*, Appendix C, §12. The Company's commitment in the Reforms to reflect the diversity of its customer base will benefit Pinterest and its users. This is the first derivative settlement of its kind that incorporates terms focused on DEI goals tied to the company's *business* and not just its workplace ecosystem.

*Making Hiring Processes More Equitable*: The Reforms include a number of changes to make workplace policies and procedures more equitable, particularly with respect to the recruiting and hiring processes. The Company will ensure that the interview and post-interview evaluation process is standardized across candidates interviewing for equivalent positions with the aim of reducing the risk of bias in the interview process. *Id.* at (XIII)(4). Additionally, any individual participating in an interview process must first complete training on inclusive hiring practices, including on the different forms of bias that might impact the hiring process and, to the extent practicable, the Company will include diverse employees in the panels that interview job candidates. *Id.* at (XIII)(5). Finally, the Reforms update Pinterest's Diverse Slate Policy to ensure that if a business unit is failing to regularly interview a diverse slate of candidates, the head of that organization is required to work with the Chief People Officer and Chief Diversity Officer to evaluate whether improvements need to be made to its recruiting process. *Id.* at (XIII)(6). Together, these measures will encourage the Company to fairly measure candidates against one another, thus increasing the likelihood that women and people of color will be successful in the hiring process.

*Improve Employee Safety*: The Company's attention to doxxing, which posed both online and potentially real-life threat to the safety of Pinterest employees, is another aspect of the Reforms arising from allegations in the Complaint. Among other things, the Reforms update the Company's policies to expressly prohibit doxxing. In the event of a possible doxxing incident, the Reforms provide that the Company's response shall include, where appropriate, utilizing an internal escalation and alert protocol, offering employees targeted by doxxing attacks online presence curation services, and using a specialized third-party vendor to help remove the abusive content, where feasible. The Company will also consider whether a public statement of support

is appropriate (with the targeted employee's consent). *Id.* at (X)(1).

**Funding Commitment**: These Reforms are directly responsive to the issues raised by this litigation and are backed up by Pinterest's $50 million funding commitment to the creation, implementation, and maintenance of the Reforms to be expended over a period of up to ten years. The substantial funding being dedicated to the Reforms and the long-term nature of the commitment demonstrate the intent of the Settlement to effect far-reaching and enduring positive changes that will make Pinterest more diverse, equitable, and inclusive both as a company and as a product.

## IV.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

### A.   The Standards for Approval of Derivative Settlements

Under Rule 23.1(c) of the Federal Rules of Civil Procedure, "[a] derivative action may be settled … only with the court's approval." There is "a strong judicial policy" that favors settlement in complex cases, such as derivative litigation, which is "notably difficult and unpredictable." *See In re Hewlett-Packard Co. S'holder Deriv. Litig.,* 716 F. Appx. 603, 605 (9th Cir. 2017); *see also In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *In re NVIDIA Corp. Deriv. Litig.*, No. C-06-06110-SBA (JCS), 2008 WL 5382544, at \*2 (N.D. Cal. Dec. 22, 2008) ("Because shareholder derivative actions are notoriously difficult and unpredictable … settlements are favored.").

In assessing whether to approve a derivative action settlement, courts consider whether the settlement is "fair, reasonable and adequate," *Officers for Just. v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982); *accord Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998), in light of: "the strength of the plaintiffs' case, the risk, expense, complexity, and likely duration of further litigation, the amount offered in settlement, the stage of the proceedings, the experience and views of counsel, and the reaction of class members to the proposed settlement." *Hewlett-Packard*, 716 F. Appx. at 605; *see also Pac. Enters.*, 47 F.3d at 377; *Lloyd v. Gupta*, 2016 U.S. Dist. LEXIS 96166, at \*16 (N.D. Cal. July 22, 2016). Here, those factors all support preliminary approval of the Settlement.

On a motion for preliminary approval, the Court assesses whether "the settlement of the

claims on the agreed upon terms is within the range of possible approval." *NVIDIA*, 2008 WL 5382544, at *2. "[I]n the context of a derivative action settled on behalf of the class of all shareholders, this requires consideration, in particular, of whether the settlement is the result of arm's-length negotiations in which plaintiffs' counsel has effectively represented the interest of the shareholder class, and whether the substantive terms of the settlement are in the interests of the Company and its shareholders relative to the likely rewards of litigation." *Lloyd*, 2016 U.S. Dist. LEXIS 96166, at *11.

### B.   The Relevant Factors Strongly Support Preliminary Approval

#### 1.   The Settlement Was Negotiated at Arm's-Length with the Active Assistance and Oversight of Judge Spero

As discussed, the Settlement is the result of many months of vigorous, arm's-length negotiations among experienced, well-informed counsel. The negotiations were overseen and facilitated by Judge Spero, who presided over two days of formal mediation and numerous phone calls after being appointed by this Court to serve as Special Master, as well as the informal negotiations and exchange of information by the parties between the formal mediation sessions. The ultimate resolution was the result of a mediator's proposal. The involvement of a Magistrate Judge serving as a mediator is strong evidence of the integrity of the settlement negotiations, as is the parties' acceptance of a mediator's proposal. *See, e.g.*, *In re Apple Inc. Device Performance Litig.*, No. 5:18-md-02827-EJD, 2021 WL 1022867, at *10 (N.D. Cal. Mar. 17, 2021) (highlighting that the settlement was reached "only after extensive arm's-length negotiations between experienced counsel, including several in-person mediation sessions and additional negotiations facilitated by [the mediator]" and noting that the fact that the settlement was based upon the mediator's proposal "demonstrates non-collusive conduct"); *Garcia v. Schlumberger Lift Solutions*, No. 1:18-cv-01261-DAD JLT, 2020 WL 6886383, at *13 (E.D. Cal. Nov. 23, 2020) ("The Court notes that the settlement was achieved after a mediation. Moreover, the parties chose to accept the mediator's proposal, meaning this settlement was one that the third-party mediator proposed, rather than an amount determined through the negotiations of the parties… This suggests the lack of collusion between the negotiating parties."); *Hefler v. Wells Fargo & Co.*, No. 16-cv-

05479-JST, 2018 WL 4207245, at *9 (N.D. Cal. Sept. 4, 2018) ("[I]n light of the fact that the Settlement was reached after the parties engaged in motion practice and participated in multiple days of formal mediation, the Court concludes that the negotiations and agreement were non-collusive."); *Ebarle v. Lifelock, Inc.*, 2016 U.S. Dist. LEXIS 6698, at *18 (N.D. Cal. Jan. 20, 2016) (holding that acceptance of a mediator's proposal following mediation sessions "strongly suggests the absence of collusion or bad faith"); *Satchell v. Fed. Express Corp.*, No. C03-2659 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) (granting preliminary approval and holding that "[t]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive").

> ### 2. The Settlement Was Negotiated After Substantial Investigation by Counsel with Extensive Experience in Complex Derivative Litigation as well as Employment Discrimination Litigation

Plaintiffs' counsel has determined that the Settlement confers significant benefits on Pinterest and that it is fair, reasonable, and in the best interests of Pinterest and its shareholders. Plaintiffs' counsel reached this conclusion after reviewing and analyzing data from many other sources specific to this matter, including, but not limited to: (1) Pinterest's public filings with the SEC, press releases, announcements, transcripts of investor conference calls, and news articles; and (2) securities analyst, business, and financial media reports about Pinterest. Plaintiffs' counsel have also (1) researched the applicable law with respect to the claims asserted (or which could be asserted) in the stockholder derivative actions and the potential defenses thereto; (2) researched, drafted, and filed complaints and sent inspection demands; (3) interviewed former employees; (4) reviewed documents produced in response to Section 220 demands; (5) consulted with two leading experts on workplace DEI and anti-discrimination, Professor Lori Nishiura Mackenzie of Stanford Graduate School of Business and Professor Joanna L. Grossman of SMU Dedman School of Law; (6) prepared detailed mediation statements; (7) reviewed documents and information provided in advance of the mediation sessions and during settlement negotiations, including by counsel to the Special Committee, which made a presentation to Plaintiffs' counsel of the Special Committee's investigation process and findings; (8) participated in settlement conferences held via Zoom on June 28, 2021, and September 13, 2021; and (9) engaged in months-long settlement discussions

with Defendants' counsel. Thus, Plaintiffs' counsel was able to fully assess the strengths and weaknesses of the claims asserted in the action.

Further, the arm's-length negotiations of the Settlement were conducted on both sides by highly qualified counsel experienced in shareholder derivative litigation and civil rights litigation. As set forth below, Renne Public Law Group (the Interim Liaison Counsel), Cohen Milstein (the Interim Lead Counsel), and WeissLaw and Bottini & Bottini (the Interim Executive Committee Counsel) have extensive experience in shareholder derivative litigation and civil rights litigation.

Interim Liaison Counsel Louise Renne, founding partner of Renne Public Law Group, is a renowned civil rights litigator, having served for sixteen years (1986–2001) as the City Attorney for the City and County of San Francisco. In her role as City Attorney, she was responsible for instituting an active affirmative litigation practice resulting in a number of high-profile cases including successful litigation against the Olympic Club alleging discrimination against women and persons of color in its membership practices, among other lawsuits advancing the public interest.

Interim Lead Counsel Cohen Milstein is one of the nation's largest plaintiffs' law firms and has successfully prosecuted scores of securities, financial fraud, and derivative lawsuits, including precedent-setting shareholder derivative actions involving allegations of harassment and discrimination. For example, in the *In Re Wynn Resorts, Ltd. Derivative Litigation*, Case No. A-18-769630-B (Nev. Dist. Ct. Clark Cnty.), Ms. Reiser and Laura Posner (counsel in this matter for Cohen Milstein) secured the first – and, to date, only – demand futility ruling that board members faced a substantial likelihood of liability for being complicit in allowing a CEO to sexually harass employees. The case ultimately settled for monetary relief and substantial governance reforms. Cohen Milstein and Bottini & Bottini also recently served as court-appointed Co-Lead Counsel in *In re Alphabet Inc. S'holder Derivative Litigation*, Lead Case No. 19CV341522 (Cal. Super. Ct., Cnty. of Santa Clara), which resulted in a settlement that eliminated the use of mandatory arbitration in cases alleging sexual harassment and discrimination, established a DEI Council, and made a major financial commitment over ten years for workplace initiatives designed to eliminate sexual harassment and discrimination. Ms. Renne and Mr. Weiss served on the Executive

Committee in the case. In addition, Ms. Reiser and Ms. Posner as Counsel for the Oregon Attorney General recently secured a settlement in a derivative case on behalf of L Brands, resolving allegations that L Brands' officers and directors breached their fiduciary duties by maintaining ties with alleged sex offender and pedophile Jeffrey Epstein and fostering a culture of discrimination and misogyny at the company. The settlement strengthened Board governance and oversight, established DEI Councils, and revamped internal policies. Preliminary approval of that settlement has been granted. *Rudi v. Wexner, et al.*, Case No. 2:20-cv-03068-MHW-EPD (S.D. Oh. Aug. 25, 2021).

Likewise, Interim Executive Committee Counsel WeissLaw and Bottini & Bottini both have a track record of significant success in derivative and representative litigation.

Accordingly, Plaintiffs' Counsel are well-suited to assess the merits of this case and the Settlement relative to the risks of continued litigation. Additionally, Defendants are represented by a highly regarded, experienced defense firm, which ensures that Pinterest and the Individual Defendants were well-advised and knowledgeable about the strengths and weaknesses of their defenses and could act in a well-informed manner as well.

Counsel for each of the parties has carefully weighed the terms of the proposed Settlement and considered its adequacy and fairness in light of the relevant litigation risks and have determined that the Settlement is in the best interests of their respective clients. This determination weighs strongly in favor of preliminary approval of the proposed Settlement. *See, e.g.*, *Pac. Enters.*, 47 F.3d at 378 ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation."); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) ("The recommendations of plaintiffs' counsel should be given a presumption of reasonableness."); *Rodriquez v. West Publ'g Corp.*, 2007 U.S. Dist. LEXIS 74849, at \*\*45-46 (C.D. Cal. Sept. 10, 2007) ("In assessing the adequacy of the terms of a settlement, the trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties"); *Nat'l Rural Telecomms. Coop v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation").

Further, the Settlement is supported by all Plaintiffs, including Interim Lead Plaintiff ERSRI. ERSRI protects and oversees more than $8.5 billion in Rhode Island public assets, including retirement funds held in trust for hundreds of thousands of Rhode Island teachers, police, firefighters, nurses, and other public employees. ERSRI's General Counsel, Amy Crane, was closely involved in the litigation, including attending formal mediation sessions and meetings with the experts retained in this case. Guided by their counsel's expertise, Plaintiffs believe the Settlement is in the best interests of Pinterest and its current shareholders.

### 3.    The Settlement Confers Substantial Benefits on Pinterest

"The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *In re OSI Sys., Inc. Deriv. Litig.*, 2017 U.S. Dist. LEXIS 221033, at *5-6 (C.D. Cal. May 2, 2017); *see also In re Apple Computer, Inc. Deriv. Litig.*, 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008).

As the United States Supreme Court has held, "a corporation may receive a substantial benefit" from "corporate therapeutics" that "furnish a benefit to all shareholders," "regardless of whether the benefit is pecuniary in nature." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395-96 (1970). Courts widely recognize the substantial economic value of corporate governance and oversight reforms tailored to address the specific oversight and controls lapses that led to or permitted the alleged wrongdoing. *See NVIDIA*, 2008 WL 5382544, at *3 ("[S]trong corporate governance is fundamental to the economic well-being and success of a corporation. Indeed, [c]ourts have recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies."); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005) ("Courts have recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies."). In fact, the real, long-term economic value of such reforms can far outweigh any likely monetary recovery. *See Maher v. Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983) ("the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor."); *Cohn*, 375 F. Supp. 2d at 853 (corporate governance reforms "achieved

independently of any monetary benefits … are even more worthwhile").

The proposed Settlement provides comprehensive reforms of Pinterest's DEI policies that reach all of its officers, employees, and directors, reaching even former employees to release them from previously negotiated non-disclosure agreements. The negotiated policy reforms are directly aimed at: preventing discrimination, harassment, and retaliation; improving Pinterest's policies to ensure that they operate in an equitable and fair manner for women and people of color working for the Company; promoting the hiring, progression, and retention of historically underrepresented talent at Pinterest; fostering respectful, equitable, and inclusive workplace cultures; and enhancing internal controls and corporate governance practices so that, among other things, the Board and Company officers may adequately monitor the Company's DEI goals. The Settlement goes a step further in advancing these same goals as business imperatives that matter for Pinterest as a product and for its users.

Furthermore, these Reforms will be funded with a $50 million commitment by Pinterest over the course of ten years. These commitments confer a substantial benefit on Pinterest and its stockholders. Significantly, Plaintiffs worked closely with two leading experts on workplace DEI and anti-discrimination, Professor Lori Nishiura Mackenzie of Stanford Graduate School of Business and Professor Joanna L. Grossman of SMU Dedman School of Law, to design Reforms that were directly responsive to the allegations in the Complaint, tailored to the specifics of the alleged misconduct, and consistent with best practices and current research on creating equity in corporate culture.

### 4. The Strength of Plaintiffs' Claims Weighs in Favor of Preliminary Approval

The law is well established that in evaluating a proposed settlement, "the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits." *Officers for Just.*, 688 F.2d at 625. "The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Id.* Plaintiffs believed and continue to believe their claims are strong on the merits. Plaintiffs' in-depth investigation confirmed their belief in the merit of the claims, but also brought into focus the substantial

complexities, risks, expense, and delay that would be entailed in any attempt to try to improve upon the substantial benefits guaranteed by the Settlement through further litigation. Plaintiffs also recognize that further litigation of the complex issues presented in this action would be accompanied by great cost, delay, and uncertainty for all parties involved, including Pinterest. Moreover, throughout this action, Defendants vigorously defended the claims with the assistance of experienced and well-regarded law firms. Accordingly, as detailed in the next section, Plaintiffs considered the substantial risk, expense, and complexity of prolonged litigation, as well as formidable hurdles to securing and recovering any judgment in Pinterest's favor. In agreeing to settle the case, Plaintiffs and Plaintiffs' counsel seriously considered the case's specific risks and circumstances, including the high and difficult burden of proving the Individual Defendants' breaches of fiduciary duty and violations of federal proxy laws under applicable law and the evidentiary challenge posed by this action.

> 5.   **The Risk, Complexity, Expense, and Likely Duration of the Litigation Favors Settlement**

"In assessing the Settlement, this Court must balance the benefits accorded to [the company] and its stockholders, and the immediacy and certainty of a substantial recovery for them, against the continuing risks of litigation." *See Cohn*, 375 F. Supp. 2d at 855; s*ee also generally Officers for Just.*, 688 F.2d at 624 ("the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes'").

Plaintiffs faced significant risks and challenges if they litigated the case. First, Plaintiffs would have to overcome Defendants' motions to dismiss by demonstrating the futility of making a demand on the Board through particularized facts demonstrating that the Board faced a substantial likelihood of liability for utterly failing to carry out their duty of oversight. This so-called *Caremark* claim is widely recognized as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l. Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). Creating further risk, to date there is only one decision rejecting a motion to dismiss on the basis of demand futility in the context of a case involving Title VII violations and that case involved sexual harassment, not discrimination, as alleged here. This

1    case thus presented novel issues in an already challenging area of the law.

2         Defendants asserted that Plaintiffs would be unable to show that the Board lacked

3    independence or disinterest and thus demand futility could not be established as to a majority of

4    the Board of Directors. Indeed, Defendants argued that the operative standard for demonstrating a

5    failure of oversight—the utter failure to implement and maintain internal controls—was

6    undermined by the fact that Pinterest had internal control reporting processes and that the Audit

7    Committee monitored employee claims of discrimination and retaliation at each meeting during

8    the relevant time period. Defendants also argued that Plaintiffs could not establish demand futility

9    by showing that the directors faced a substantial likelihood of liability because, according to them,

10    there were no red flags of improper conduct upon which a substantial likelihood of liability could

11    be based. Finally, Defendants argued that Pinterest's outside directors are independent, and that

12    Plaintiffs could not establish their lack of independence from the controlling shareholders.

13         Even if Plaintiffs were to prevail at the pleading stage, stockholder derivative litigation is

14    notably difficult and notoriously uncertain. *See Pac. Enters.*, 47 F.3d at 378 (noting that the odds

15    of winning the derivative lawsuit were "extremely small"). Significant questions would remain

16    about whether Plaintiffs could secure evidence sufficient to overcome motions for summary

17    judgment predicated on the "business judgment rule," which affords directors the presumption that

18    they acted on an informed basis and in the good faith belief that the actions taken were in the best

19    interest of the company. *See, e.g., In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 746-47 (Del.

20    Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). Plaintiffs would also have to overcome the exculpatory

21    provision in Pinterest's Articles of Incorporation adopted pursuant to 8 Del. Code § 102(b)(7),

22    which forecloses the recovery of monetary damages from directors unless the directors' actions

23    involve a breach of the duty of loyalty, bad faith, intentional misconduct, a knowing violation of

24    law, or an improper self-serving transaction. While Plaintiffs continue to believe their claims were

25    strong on the merits, they faced a difficult burden of proving a breach of the fiduciary duty of

26    loyalty.

27         If the litigation proceeded, Pinterest's Board would likely also choose to establish a Special

28    Litigation Committee. A Special Litigation Committee may ultimately move to dismiss the action

if it determines that pursuing the claims is not in the best interest of the committee, creating additional uncertainty about the outcome of the case. Additionally, a Special Litigation Committee could seek a stay of litigation during the pendency of its investigation, causing further delay in any resolution of this action and preventing the implementation of important corporate governance and workplace reforms at Pinterest.

Plaintiffs carefully considered the risks of establishing liability here. While Plaintiffs strongly believed that they could establish that Brougher was the victim of discrimination through, among other things, the disparate pay she received vis-à-vis her male colleague, and that the Board's approval of those disparate pay packages was in breach of its fiduciary duties, Plaintiffs had to also consider that those pay packages were approved before the Company's IPO, when Plaintiffs were not shareholders. As a result, Defendants argued in their motion to dismiss that Plaintiffs have no standing to challenge those, and other, pre-IPO acts. (ECF No. 69, at 5). Moreover, Defendants have argued that the settlement with Brougher, or for that matter any settlement the Company has entered into regarding claims of discrimination, harassment or retaliation, was done without any admission of fault and would not be competent evidence of liability. ECF No. 69, at 17.

Further, the litigation would be extremely complex, costly, and of substantial duration. Though Plaintiffs received and reviewed a substantial number of internal documents reflecting the Board's and its Committees' consideration of matters relating to the practices alleged to be discriminatory, harassing, and retaliatory, additional document discovery would need to be completed. Dozens of depositions of witnesses would have to be taken concerning complex facts bearing on the Individual Defendants' decision-making, and oversight of the Company's internal practices and public disclosures.

The challenges involved in proving damages are equally daunting. *See Four in One Co. v. S.K. Foods, L.P.*, No. 2:08-cv-3017 KJM EFB, 2014 WL 4078232, at *13 (E.D. Cal. Aug. 13, 2014) (noting the "risks of continuing to litigate the action include determining damages, which is an 'expert-intensive uncertain process [] often involving conflicting testimony,' and the possibility a jury could find either no damages or a fraction of the damages contended."). Although Pinterest

settled Brougher's discrimination claims, resulting in the largest individual settlement of a discrimination claim, Defendants have vigorously contested whether that amount could be recovered at all in this action, arguing that Plaintiffs lack standing and that the Company did not suffer financial harm. Moreover, even if successful at trial, Plaintiffs may not have been successful in compelling Pinterest to adopt many of the Reforms, let alone to commit to $50 million in funding.

In addition, victory at trial is no guarantee that the judgment would not be reversed on appeal. *See, e.g.*, *In re Apollo Grp., Inc. Secs. Litig.*, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008), *rev'd & remanded*, 2010 U.S. App. LEXIS 14478 (9th Cir. June 23, 2010) (holding evidence insufficient to support jury verdict for shareholders of $277 million); *Berkey Photo, Inc. v. Eastman Kodak Co*., 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial).

Finally, continued litigation of this case would mean ongoing distraction for Pinterest's management and employees and that the important corporate governance and workplace policy and procedure reforms achieved through this Settlement would not occur. In the derivative context where shareholders are stepping into the shoes of the Company's leadership to right a wrong and prevent its re-occurrence, these reforms are critical to protecting the Company. Continued litigation would mean, at minimum, delay in implementing necessary reforms.

Close consideration of all the risks and circumstances of continuing the action supports the value and wisdom of the proposed Settlement. The Settlement eliminates these and other risks, including the very real risk of smaller recovery or no recovery at all after years of litigation, while providing Pinterest now with substantial benefits geared at curbing the behavior that gave rise to this litigation. *See Officers for Just.*, 688 F.2d at 625.

6. **The Board's Sound Exercise of Business Judgment in Approving the Settlement Weighs Heavily in Favor of Preliminary Approval**

The Pinterest Board, assisted by independent counsel with substantial experience in Delaware corporate law, approved the Settlement as fair, reasonable, and adequate, and in Pinterest's and its stockholders' best interests. This exercise of business judgment warrants judicial deference. *See generally Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981); *see also,*

*e.g.*, *Lunsford v. Woodforest Nat'l Bank*, No. 1:12-cv-103-CAP, 2014 WL 12740375, at *4 (N.D. Ga. May 19, 2014) (in evaluating proposed settlement a court "will not substitute its business judgment for that of the parties"); *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1386 (Del. 1995) ("courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness").

*   *   *

In sum, Plaintiffs and Plaintiffs' counsel have undertaken significant efforts to ensure the Settlement is in the best interest of Pinterest and its current shareholders. Given the substantial relief obtained for the Company, the proposed Settlement is fair, reasonable, and adequate, and should be preliminarily approved by the Court.

## V.    THE PROPOSED NOTICE TO SHAREHOLDERS SHOULD BE APPROVED

Plaintiffs request that the Notice of Proposed Settlement of Derivative Action and of Settlement Hearing (the "Notice") be approved by the Court as sufficient notice to Pinterest's shareholders of the proposed Settlement pursuant to Federal Rule of Civil Procedure 23.1, and that the Notice be posted on Pinterest's Investor Relations website and Interim Lead Plaintiff's Counsel's website, and the Summary Notice of Pendency and Proposed Settlement of Derivative Actions ("Summary Notice") be published in *Investor's Business Daily*, within seventeen (17) days of an order granting preliminary approval of the Settlement. *See* Renne Decl. Exs. 2, 3.

"Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). Here, the proposed Notice is accurate and informative. It provides information on the terms and provisions of the Settlement; the benefits that the Settlement provides for the Company; the date, time, and place of the final approval hearing; the procedure and deadlines for submitting comments, objections and requests for information; and any fee and expense award that counsel for any Plaintiff anticipates requesting from the Court of two times their lodestar and reasonable expenses incurred in the course of litigation, not to exceed a total of $5,380,000. In particular, the Notice explains that each shareholder will be given the opportunity to submit objections. Counsel propose submitting reply

papers at least seven (7) days before the Settlement Hearing, in further support of the Settlement, including any request for fees and expenses, and addressing the objections, if any.

## VI.   CONCLUSION

The proposed Settlement is fair, reasonable, and adequate. Thus, for the reasons set forth above, and consistent with Fed. R. Civ. P. 23.1, Plaintiffs respectfully request that this Court:

1.      Find that the proposed Settlement as set forth in the Stipulation is within the range of possible approval;

2.       Enter the [Proposed] Order Preliminarily Approving the terms of the Stipulation filed with this motion;

3.      Schedule a Settlement Hearing, approximately sixty (60) days from the date notice is given at which: (a) the Parties will seek final approval of the terms of the Settlement, as set forth in the Stipulation; (b) the Court will consider comments and/or objections regarding the proposed Settlement; and (c) the Court will consider any request for an award of attorneys' fees and expenses;

4.      Approve the form of Notice attached as Exhibit 2 to the Renne Declaration and order its dissemination via posting on Pinterest's Investor Relations website and Interim Lead Plaintiff's Counsel's website, and approve the form of Summary Notice attached as Exhibit 3 to the Renne Declaration and order its publication in *Investor's Business Daily*, within seventeen (17) days of the date of the Preliminary Approval Order;

5.      Set deadlines for submission of Plaintiffs' Motion for Final Settlement Approval, any application for any Fee & Expense Award, and supporting papers, at least thirty-five (35) days in advance of the Settlement Hearing; for filing and service of objections to the Settlement, if any, at least twenty-one (21) days in advance of the Settlement Hearing; and for filing of Plaintiffs' reply in support of Settlement, which shall include a response to any objections, at least seven (7) days before the Settlement Hearing;

6.      Enjoin and stay the commencement and prosecution of any and all actions and proceedings related to the derivative litigation, excluding those proceedings within the derivative action necessary to obtain final approval of the Settlement embodied in the Stipulation, during the

1    pendency of the settlement proceedings and until further ordered by this Court;

2        7.      Maintain continuing jurisdiction for purposes of the settlement proceedings to

3    ensure the effectuation thereof for the benefit of Pinterest's shareholders; and

4        8.      Grant such other relief as this Court deems appropriate.

5    Dated: November 24, 2021               Respectfully submitted,

6

7                                    By:   /s/ Steve Cikes

8                                          **RENNE PUBLIC LAW GROUP**
                                           LOUISE RENNE (SBN #36508)
9                                          lrenne@publiclawgroup.com
                                           RUTH M. BOND (SBN #214582)
10                                         rbond@publiclawgroup.com
                                           STEVE CIKES (SBN #235413)
11                                         scikes@publiclawgroup.com
                                           ANASTASIA BONDARCHUK (SBN #309091)
12                                         abondarchuk@publiclawgroup.com
                                           350 Sansome St., Suite 300
13                                         San Francisco, CA 94104
                                           Telephone: (415) 848-7200
14                                         Facsimile: (415) 848-7230

15                                         *Counsel for Interim Lead Plaintiff the Employees'*
                                           *Retirement System of Rhode Island and Interim Liaison*
16                                         *Counsel*

17                                         **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                           JULIE GOLDSMITH REISER (*pro hac vice*)
18                                         jreiser@cohenmilstein.com
                                           MOLLY BOWEN (*pro hac vice*)
19                                         mbowen@cohenmilstein.com
                                           LYZETTE WALLACE (*pro hac vice*)
20                                         lwallace@cohenmilstein.com
                                           1100 New York Ave. NW, 5th Floor
21                                         Washington, DC 20005
                                           Telephone: (202) 408-4600
22                                         Facsimile: (202) 408-4699

23                                         LAURA POSNER (*pro hac vice*)
                                           lposner@cohenmilstein.com
24                                         88 Pine St., 14th Floor
                                           New York, NY 10005
25                                         Telephone: (212) 220-2925

26                                         *Counsel for Interim Lead Plaintiff the Employees'*
                                           *Retirement System of Rhode Island and Interim Lead*
27                                         *Counsel*

28                                         **WEISSLAW LLP**
                                           JOEL E. ELKINS (SBN 256020)

jelkins@weisslawllp.com
9100 Wilshire Boulevard, #725 E
Beverly Hills, CA 90210
Telephone: (310) 208-2800
Facsimile: (310) 209-2348

JOSEPH H. WEISS (*pro hac vice*)
jweiss@weisslawllp.com
DAVID C. KATZ (*pro hac vice*)
dkatz@weisslawllp.com
JOSHUA M. RUBIN (*pro hac vice*)
jrubin@weisslawllp.com
KELLY K. MORAN (*pro hac vice*)
kmoran@weisslawllp.com
1500 Broadway, 16th Floor
New York, NY 10036
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

*Counsel for Plaintiff Stephen Bushansky and Interim
Executive Committee Counsel*

**BOTTINI & BOTTINI, INC**.
FRANCIS A. BOTTINI, JR. (SBN 175783)
fbottini@bottinilaw.com
ALBERT Y. CHANG (SBN 296065)
achang@bottinilaw.com
ANNE BESTE (SBN 326881)
abeste@bottinilaw.com
YURY A. KOLESNIKOV (SBN 271173)
ykolesnikov@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

*Counsel for Plaintiff Sal Toronto and Interim Executive
Committee Counsel*

**ROBBINS LLP**
BRIAN J. ROBBINS (190264)
brobbins@robbinsllp.com
GREGORY E. DEL GAIZO (247319)
gdelgaizo@robbinsllp.com
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

*Counsel for Plaintiff Howard Petretta*