UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ***IN RE PINTEREST DERIVATIVE LITIGATION*** | No. C 20-08331-WHA<br>No. C 20-08438-WHA<br>No. C 20-09390-WHA<br>No. C 21-05385-WHA<br><br>(Consolidated) |
| This Document Relates to:<br><br>ALL ACTIONS. | **ORDER RE MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT IN SHAREHOLDER DERIVATIVE SUIT** |

**INTRODUCTION**

Plaintiffs in this shareholder derivative suit move, unopposed, for preliminary approval of a settlement. For the reasons that follow, preliminary approval of the settlement is **GRANTED**.

**STATEMENT**

This order describes the facts as alleged in the consolidated amended complaint in some detail as no prior order has done so. The lawsuit, brought by shareholders of Pinterest stock, arises out of allegations of widespread race and sex discrimination at defendant Pinterest, Inc. The catalyst for the suit came in large part from nonparties Ifeoma Ozoma and Aerica Shimizu Banks. They were hired as the second and third members, respectively, of Pinterest's public-policy team. The complaint identifies both Ozoma and Banks as Black women (and Ozoma

also as Japanese). As alleged, both complained internally about the discrimination they experienced as Black women while working for Pinterest. One such instance occurred just after Pinterest rolled out a policy against a particular extremist organization. Afterward, Pinterest employees' identities and internal Slack conversations were leaked to a reactionary website. Ozoma and Banks warned the company about the risk that political extremists might dox employees. The company allegedly ignored Banks and Ozoma's well-founded concerns. Ultimately, the reactionary website, it's alleged, released a video with Ozoma's photo, address, and phone number. The video also incorrectly blamed Ozoma for Pinterest's stance on the extremist group. The video's comments section allegedly featured numerous racist comments directed at her. The company allegedly ignored both Banks and Ozoma's concerns. Rape and death threats also followed. Other female employees were doxxed. When Ozoma asked Pinterest about options for her protection, she allegedly received no response and was forced to hire her own security. Ozoma filed her own lawsuit regarding discrimination and retaliation in July 2019; Banks filed a similar suit regarding poor treatment and inequitable pay in January 2020. Both suits settled for unknown amounts (Consol. Amd. Compl. ¶¶ 95, 103, 113–118, 124–126, 130, 135, 152, 171, 225, 294).

Then, in June 2020, both Banks and Ozoma publicly criticized Pinterest for issuing a public statement in support of the Black Lives Matter movement shortly after the murder of George Floyd. Specifically, both then-employees publicly called the statement hypocritical given their experiences and efforts to achieve equal pay and leveling (internal company scores reflecting employees' baseline experience, which determines one's salary) (*id*. ¶¶ 8, 93, 154–62).

Allegations also include claims that Pinterest underpaid Francoise Brougher, the company's first COO, and a Black woman. That is, it's alleged that she was underpaid and received less favorable backloaded equity grants as compared to her white male peer even though Brougher allegedly grew revenues from $500 million to $1.1 billion in about two years, among other accomplishments. After she complained, the complaint alleges, Pinterest's co-founder, president, and CEO Benjamin Silberman retaliated by firing her, but the board sat idly

by. Brougher sued in state court in August 2020 and the case quickly settled for $22.5 million. Various other female employees, Black employees, and employees of color are named in the consolidated amended complaint as confidential witnesses and describe allegations of discrimination small and large (*id*. ¶¶ 1, 173–79, 184–89, 232, 242, 332).

Central to all allegations lies the contention that Silbermann permitted a toxic culture of "yes-men" around him, while sidelining female employees and employees of color. Pinterest's board of directors allegedly knew of this reality but failed to act (*id*. ¶ 13).

In response to Banks and Ozoma's public statements, on June 28, 2020, members of the board formed a special committee to investigate and address claims of systemic racial and gender discrimination at the company. Between June and December 2020, it conducted 350 interviews with then-current and past employees, among other steps (Br. 7).

Shareholder Stephen Bushansky filed the first of four actions ultimately consolidated here, on November 25, 2020 (*Bushansky v. Silbermann*, No. 3:20-cv-08331-WHA). Next, on November 30, 2020, Employees' Retirement System of Rhode Island (ERSRI) filed suit (*ERSRI v. Silbermann*, No. C 20-8438-WHA) (Dkt. No. 1, *see* 28).

Then, "in December 2020," the Special Committee proposed corporate governance changes, to which "Plaintiffs' efforts contributed," according to the stipulation of settlement (Renne Decl. Exh. 1 §1.4).

As for the remaining consolidated suits, Sal Toronto, Trustee of the Elliemaria Toronto ESA, filed on December 29, 2020 (*Toronto v. Silberman*, No. C 20-9390-WHA). Those three cases were related and then consolidated. Plaintiffs filed the consolidated amended complaint in February 2021. Defendants moved to dismiss, and plaintiffs opposed. Then, by stipulation, a prior order herein stayed the suit on June 1, 2021, and referred the parties to Judge Joseph C. Spero for settlement discussions. On July 14, 2021, Howard Petretta filed a separate shareholder derivative suit (*Petretta v. Silbermann*, No. C 21-5385-WHA). A prior order consolidated it with our previously-consolidated derivative suit in October 2021 (Dkt. Nos. 28, 39, 49, 54, 69, 73, 76, 82, 83, 85, 86; Consol. Amd. Compl. ¶¶ 135, 152).

The suit names as individual defendants Pinterest's top executives and board members: Silbermann, Evan Sharp, Jeffrey Jordan, Jeremy Levine, Gokul Rajaram, Fredric Reynolds, Michelle Wilson, Leslie Kilgore, and Todd Morgenfeld. The complaint alleges that these individual officers breached their fiduciary duties to the Company by deliberately ignoring or approving actions that discriminated against employees of color and female employees.

Plaintiffs sue on behalf of themselves and derivatively on behalf of Pinterest and all "current Pinterest Stockholders," which the stipulation of settlement defines as anyone owning Pinterest common stock as of the "date of the execution of this Stipulation," *i.e.*, November 23, 2021, "excluding the Individual Defendants, the current officers and directors of Pinterest, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which the Individual Defendants have or had a controlling interest" (Renne Decl. Exh. § I(c)).

In sum, the complaint centers on the theory that the board, which itself lacked diversity, knew about the discrimination and retaliation practices in part because a majority of the directors approved Brougher's compensation package, witnessed that she was not invited to board meetings, and knew about her termination; plus, they failed to intervene to prevent such conduct. Finally, the complaint alleges that the failure to accurately describe the board's governance procedures and Brougher's termination in the company's 2020 Proxy Statement violated Section 14(a) of the Securities Exchange Act of 1934 (Consol. Amd. Compl ¶¶ 15, 86, 197–206, 239).

This order follows briefing, a supplemental filing, and oral argument.

**ANALYSIS**

Federal Rule of Civil Procedure 23.1 provides that a shareholder derivative action "shall not be dismissed or compromised without the approval of the court." Under Federal Rule of Civil Procedure 23(e), a district court must decide if a proposed settlement is "fundamentally fair, adequate, and reasonable." *In re Pacific Enters Sec. Litig.*, 47 F.3d 373, 377 (9th Cir.1995) (cleaned up) (applying Rule 23(e) to shareholder-derivative settlements). Above all, "[t]he principal factor to be considered in determining the fairness of a settlement concluding a

shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *In re Apple Computer, Inc. Derivative Litig.*, 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008) (Judge Jeremy Fogel) (quoting *Shlensky v. Dorsey,* 574 F.2d 131, 147 (3d Cir. 1978)). A district court may weigh a variety of factors as the particular facts of a case demand. Some factors include: the amount offered in settlement; the strength of plaintiff's case; the stage of the proceedings; and the expense and complexity of further litigation. *See Linney v. Cellular Ak. P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998). Furthermore, our court of appeals favors arms-length negotiations. *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (noting lack of "fraud, overreach, or collusion"). The scope of releases factor into the fairness of a settlement, as do discussions of attorney's costs and fees. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011).

This proposed settlement measures up.

*First*, the settlement's proposed "corporate therapeutics" would afford nonnegligible benefits to the corporation. *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395–96 (1970). "Settlements involving nonmonetary provisions merit careful scrutiny to ensure that these provisions have actual value to the class." *In re Hewlett-Packard Co. S'holder Derivative Litig.*, 716 F. App'x 603, 607 (9th Cir. 2017) (quoting Rule 23 Advisory Committee) (applying notes on class action settlements to shareholder derivative settlements) (cleaned up). Furthermore,

> The vast majority of shareholder litigation settles for no monetary recovery to the shareholder class. Why? Because non-pecuniary relief nevertheless entitles plaintiffs' counsel to recover their fees from the corporate defendant under the "corporate benefit" doctrine . . . Having struck this Faustian bargain, attorneys now churn a mass of filings and settlements, the ultimate result of which is overcompensation of attorneys (on both sides) and systematic under-compensation of the plaintiff class.

Sean J. Griffith, *Correcting Corporate Benefit: How to Fix Shareholder Litigation by Shifting the Doctrine on Fees*, 56 B.C. L. Rev. 1, 2 (2015), https://lawdigitalcommons.bc.edu/bclr/vol56/iss1/2.

5

Plaintiffs worked with Professor Lori Nishiura Mackenzie of the Stanford Graduate School of Business and Professor Joanna L. Grossman of SMU Dedman School of Law to "develop demands" (Br. at 16).

This order pauses to note that both sides submitted supplemental briefs, which agree that the governance recommendations herein have not replicated those of the special committee (Dkt. Nos. 106, 107). Plaintiffs contend that they worked closely with the board's special committee to make solely "additive" or brand-new recommendations, which bears out in the documents submitted (Dkt. No. 106). Certain of the settlement recommendations have already been implemented, *e.g.*, hiring a Global Head of Inclusion and Diversity (*see id.* §§ II.3, II.8, II.9, V.2, V.3). The Court has also reviewed the public notice of the special committee's recommendations, which, Pinterest states, were adopted on November 25, 2020 (Dkt. No. 107 ¶ 1). The public recommendations permit this order to assess the added value that this settlement would offer to Pinterest. With the exception of recommendations (some now adopted) to hire full-time investigators, create an ombuds office to receive complaints, outsource the "Pulse survey," and mandate unconscious bias training, the special committee's recommendations appeared general, nonbinding, and timid. The recommendations did not include a dedicated budget for diversity, equity, and inclusion (DEI) provisions. They did not set specifics as to recommended goals, instead using terms like "enhance" and "establish guidelines" without further specification (or by giving few broad examples). Plaintiffs' chart comparing the special committee's recommendations with those proposed herein appears accurate and reveals that many provisions are brand new and have expanded upon special committee ideas (Dkt. No. 106-1).

The settlement provisions could represent meaningful changes to corporate governance if actually funded and faithfully executed. In general, the agreement would make the DEI goals into "business imperatives" and give the board of directors power to oversee DEI accomplishments, improving chances for meaningful change (Br. at 16). Specific therapeutics touted include:

**Duration and funding:** Notably, the changes would apply for "no less than five years" from approval, with $50,000 of funding over "up to 10 years" (Renne Decl. Exh. 1 § I(1)). *See, e.g., In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008) (Judge Saundra Brown Armstrong) (crediting a $15.8 million benefit). The agreement does not, however, require actually spending any portion of the amount, nor does it address reversion of unspent portions of the $50 million. This makes it a weak therapeutic.

**Release of non-disclosure agreements:** The agreement includes a commitment not to enforce non-disclosure agreements (NDAs), "for those individuals who *made* claims of race or gender discrimination," "so long as they only discuss the underlying facts and circumstances of incidents and reporting process" (*id.* § IV(1)). In the settlement's favor, the underlying facts and circumstances are the most critical component of a person's experience. Weighing against it, the agreement does not state how many have been required to sign NDAs beyond those noted in the complaint, and thus omits the scale of the provision's effect. Importantly, our agreement could have, but did not, require direct notice to employees who signed NDAs that they may speak freely about their experiences. This possibly nulls the benefit of an agreement not to enforce the NDAs, since it requires someone to assume the risk believing that legal consequences would follow. This is a disappointment to the Court, which now urges the parties to reconsider, but does not require it.

Furthermore, the relief is retrospective only. Plaintiffs' counsel, however, represented at the hearing that Pinterest separately agreed to stop requiring NDAs in such situations. Since the special committee recommendations did not so require, a prior order solicited a sworn statement from Pinterest on this score. Pinterest has provided that sworn statement establishing that what counsel said is true, that Pinterest has decided prospectively not to require *any* NDAs in harassment or discrimination suits and will not change its policy back to requiring the same so long as it remains consistent with the law (Dkt. 114).

**Board oversight:** A board member would serve with the CEO as co-sponsor of DEI work (cooperating with RHR International), and the board or a committee will be involved in "overseeing and conducting due diligence" for any executive leadership team member being

7

fired. Additionally, DEI measurables would be internally audited annually and Pinterest would submit results to the board annually as well, making the agreement the "first settlement of its kind to make DEI an audited function." This would elevate DEI to the level of priority usually occupied by financials, which could help to ensure that DEI changes do not fall behind the radiator. On the other hand, executive-level employees would mostly benefit from this provision to increase oversight over terminations. The board remains quite removed from the day-to-day experience of Pinterest employees. On balance, acknowledging DEI as a risk factor to the corporation favors settlement (Br. at 7; Renne Decl. Exh. 1 § II).

**Pay equity and transparency:** Pinterest would bi-annually audit pay equity (across sex and race categories); the organization Secretariat Economists would consult on pay equity; employees would have access to a company organization chart, "job-level information for employees throughout the company," and access to *compensation* information for their family of jobs (*id.* §§ XIII(1–9)). If employees believed their pay lagged, they could more readily seek equitable compensation. If taken seriously, consultants could bring sunshine to this issue.

**Executive accountability for DEI culture and business goals:** Each executive leader at Pinterest would develop "DEI" goals with the chief people officer and global head of inclusion and diversity (the latter already hired). Performance evaluations for managers would weigh their progress in creating an inclusive workplace culture. If executed, these provisions could help to make Pinterest's DEI goals matter to each aspect of its business and prevent discrimination both subtle and explicit. This order recommends, however, that the company set its benchmarks for inclusivity and equity as reflected in the experiences of those affected by the allegations in our complaint, *e.g.* among female employees as well as employees of color (among others, including nonbinary, and transgender employees). Pinterest's perceived inclusivity and equity for these employees is more valuable to solving the specific problems at issue in this suit. Employee Pulse surveys should permit (privately) sorting responses by these demographic groups, so long as the initial opportunity to provide demographic information remains voluntary (*id.* § VI(3)).

**"Inclusive Product Program":** The team managing this project would work at "identifying a pipeline of project opportunities for using Pinterest to promote diversity and inclusion" (Br. 8). Additionally, "Two paid internships or apprenticeships will be offered every year to individuals from backgrounds traditionally underrepresented in technology; recruitment for these positions will take place at, for example, Historically Black Colleges and Universities and Hispanic-Serving Institutions" (*id*. at 9). Defendants aver that this recruitment has already begun to some extent. This recommendation did little to change a preexisting recommendation by the special committee, and funding could strengthen its staying power — if Pinterest actually spends the money (*see* Renne Decl. Appendix C; Renne Decl. Exh. 1 §§4-6, 7–8, 12–13).

**Equity in hiring:** Pinterest would standardize interview evaluations to avoid inequitable hiring practices. The agreement would require that the company look to hire from a "diverse slate" of applicants, with limited exceptions. If a business unit fails regularly to interview a diverse slate of candidates, then the "head of that organization" would be required to meet with the chief people and chief diversity officers to amp up this recruiting (Renne Decl. Exh. 1 § XIII(6)).

**Improve employee safety:** Pinterest would impose policies to prohibit doxxing. If doxxing occurred, the company would provide affected employees with online "presence curation services" and the services of a third-party vendor to help remove the abusive content "where feasible" (*id.* § X(1)).

These changes appear potentially meaningful and support settlement. Particularly important provisions include the efforts to make pay transparent by "family" to employees, forgo enforcing past NDAs, and build in board oversight of DEI efforts.

*Second*, the strength of plaintiffs' case, and *third*, the risk, expense, and complexity of the case, favor settlement. Counsel for plaintiffs conclude that prevailing would prove a large task. A selection of the hurdles follow.

Defendants' motion to dismiss remains pending. It argues in part that plaintiffs lacked standing for certain acts. At a motion to dismiss, plaintiffs would be required to defeat

9

1  "demand futility," *i.e.*, that the board would not have acted on the issues raised in the suit if plaintiffs had raised those issues to it. Moreover, the complaint has pleaded a *Caremark* claim, *i.e.*, that the board members "failed to act" to prevent discriminatory conduct, but not that the board directly discriminated. *See In re Caremark Int'l. Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). A theory of disregard or willful ignorance is (for obvious reasons) more challenging to win than those involving direct misconduct. According to the settling parties, no *Caremark* claim has survived a motion to dismiss when premised on race discrimination under Title VII. Additionally, defendants challenged standing as to the employment and pay decisions regarding Brougher, as those events preceded plaintiffs' tenure as shareholders (Renne Decl. Exh. 1 at 17, 19).

In addition, the "business judgment rule" would provide defendants with a presumption, which plaintiffs would be required to overcome, that board members act in the company's best interest. *Towers v. Iger*, 912 F.3d 523, 528 (9th Cir. 2018) (Dkt. No. 69 at 5). In light of the presumption, plaintiffs are required to have pleaded with particularity that at least half of the board could not have acted with "disinterest" in the challenged practices. *Id*. at 529. Defendants argue that no red flags gave board members a chance to act at the time.

Furthermore, defendants argued, "Pinterest's Certificate of Incorporation exculpates directors of liability for all breaches but of the duty of loyalty," thus requiring plaintiffs to show scienter as to each individual defendant, in order to overcome a presumption that each officer was "faithful" to her fiduciary duty (Dkt. No. 69 at 7). *See also In re Facebook, Inc. S'holder Derivative Priv. Litig.*, 367 F. Supp. 3d 1108, 1123 (N.D. Cal. 2019) (Judge Haywood S. Gilliam, Jr.). This is a steep burden.

Finally, plaintiffs considered that Pinterest's board may choose to establish a "Special Litigation Committee" empowered ultimately to recommend against pursuing litigation. *In re Pac. Enterprises Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) (confirming this possibility weighs in favor of settlement). The relative weakness of plaintiffs' case, complexity, and likelihood that extensive and costly litigation poses a substantial risk to plaintiffs all favor settlement.

*Fourth*, the extent of discovery and the stage of the proceedings are preliminary. Plaintiffs' counsel inspected records that Pinterest produced in response to "books-and-records inspections demands" (Renne Decl. Exh. 1 § III). Only one motion has been filed and remains partially briefed. Vigorous discovery might well develop strong facts warranting strong relief. Counsel are arguably giving up too soon. This weighs against settlement.

*Fifth*, the experience and views of counsel support the settlement. Plaintiffs are represented by various experienced counsel, particularly Louise Renne (Interim Liaison Counsel), who ranks as highly experienced. The Court places great faith in the word of Attorney Renne and trusts her judgment. But for her strong endorsement, the Court might have qualms about the true efficacy of this deal. Furthermore, counsel say all plaintiffs support the settlement.

*Sixth*, no governmental entity participated in the suit, so this factor is neutral.

*Seventh,* the settlement lacks signs of a sweetheart deal. Judge Spero's role presiding over two full-day negotiations and ultimately proposing a mediator's proposal offers an aura of fair resolution. The parties spent months negotiating in between. Nonetheless, mediation deals in the art of the possible. It does not guarantee a just outcome.

*Eighth*, the scope of release favors approval. The settlement agrees to release all claims, including those not known of by the shareholders and which would affect their decision to settle, in effect waiving their rights under California Civil Code Section 1542. To the credit of the stipulation, the release does not include any claims arising out of actions taken after the date of the stipulation, November 23, 2021 (n. 3).

*Ninth*, the proposed attorney's fees rank as "disproportionate." *In re Bluetooth*, 654 F.3d at 947. "A 'multiplier' is a number, such as 1.5 or 2, by which the base lodestar figure is multiplied in order to increase (or decrease) the award of attorneys' fees on the basis of such factors as the risk involved and the length of the proceedings." *Staton v. Boeing Co.,* 327 F.3d 938, 968 (9th Cir. 2003). "It would be unusual not to apply a risk multiplier when (1) the attorneys reasonably take a case with the expectation that they will receive a risk enhancement if they prevail, (2) their hourly rates do not reflect that risk, and (3) there is evidence that the

11

case was indeed risky." *Gutierrez v. Wells Fargo Bank, N.A.*, 2015 WL 2438274, at *7 (N.D. Cal. May 21, 2015). Plaintiffs' counsel, Cohen Milstein Sellers & Toll PLLC, Renne Public Law Group, Weisslaw LLP, Bottini & Bottini, Inc., and Robbins LLP propose to notify shareholders that they anticipate requesting from the Court *two times their lodestar* plus reasonable expenses incurred in the course of litigation, not to exceed a total of $5,380,000. All this, it is claimed, is warranted by the series of corporate rehabilitation measures that counsel "accomplished" for the company, though the board's special committee had already completed its (extensive) work before all these actions were filed. For instance, the committee interviewed 350 current and former employees. Indeed, the special committee made recommendations, unanimously adopted, months before the filing of the consolidated amended complaint and prior to the filing of two out of the four lawsuits consolidated here. In their favor, the comparison of the special committee's recommendations versus those included herein reveals that the agreement's terms add to the special committee's recommendations. The agreement also would provide novel and potentially concrete changes. The record before us does not support plaintiffs' contention that they contributed to the *special committee's* recommendations, however.

*Tenth*, the parties appear to have avoided any clear-sailing agreement. Nor does the proposal yet involve enhancement awards for plaintiffs. Nevertheless, with respect to a percentage cross check, "[s]pecial circumstances," namely the special committee's investigation and recommendations, means that this suit is likely to warrant a small multiplier if any. *In re Bluetooth*, 654 F.3d at 942. The timing of any payment will be decided at final approval (*cf*. Renne Decl. Exh. 1 § 3.3).

*Eleventh*, the sufficiency of the notice to shareholders seems reasonable. It details the settlement, the governance changes, and the events that precipitated them, including the work of the special committee. The summary notice also appears, while pared-down, adequate. The method of distribution and requirements by those who would object, however, fall short. Preliminarily, while plaintiffs' brief requests approval of the proposed process for notifying shareholders notice, the language proposing the process appears in the proposed order and

12

proposed final judgment — not the stipulation. The former offers: "Pinterest shall cause the Notice and Stipulation to be posted on its investor relations website until the Judgment becomes Final and shall publish the Summary Notice in *Investor's Business Daily*"(*id*. § 2.1–2.2; Dkt. No. 99-2 Exh. D ¶ 5, Exh. E ¶ 3).

The best practicable notice to shareholders would also include *first-class* mail and e-mail notice to shareholders. If physical mail is returned undeliverable, the sender will perform a "skip trace" to identify forwarding address(es). The exterior of the envelope for the mailing notice shall state "Important Shareholder Derivative Action Settlement Notice" and shall state that it is "From the United States District Court, Northern District of California, Honorable William Alsup, 450 Golden Gate Avenue, San Francisco, CA 94102," with the return address directing service to the sender. (Please note the absence of middle initial.) The statement shall be printed somewhere on the envelope such that the Court's mailing address could not possibly be mistaken for the *shareholder's* mailing address. This issue has recently arisen in other cases and resulted in the Court receiving notices in error. The sender must take care to avoid this.

As for objectors, "The proposed process to object to the settlement agreement or to the attorney's fee or incentive awards requires shareholders to both file the objection and supporting documentation with the Court and serve copies of the objection and supporting documentation by hand delivery or first-class mail to [four] separate sets of counsel of record." *In re Galena Biopharma, Inc. Derivative Litig.*, 2016 WL 10843665, at *1 (D. Or. Jan. 28, 2016) (Judge Michael H. Simon) (Renne Decl. Exh. B ¶¶ 33–35). This is a gimmick to make it onerous and burdensome to object. This order rejects the proposal, just as *Galena* did. ECF notifications will alert counsel; there is no need to require service. Rather than the burdensome requirements proposed by the stipulation, objectors shall merely be required to indicate with their written objection (filed with the Court) (*id*. ¶ 33):

> (i) the objector's name, address, and telephone number (and, if represented, that of his, her, or its counsel), along with a representation as to whether the objector intends to appear at the settlement hearing;
>
> (ii) a statement that the objector owned shares of Pinterest common stock as of November 23, 2021, and continues to hold common

13

        stock in Pinterest;

        (iii) a statement of the objections to any matters before the Court, as well as all documents or writings the objector desires the Court to consider; and

        (iv) if the objector has indicated that he, she, or it intends to appear at the settlement hearing, the identities of any witnesses the objector may call to testify and any exhibits the objector intends to introduce into evidence.

As for miscellaneous provisions, the parties "will request" that eventual judgment "contain a finding that during the course of the Federal Consolidated Action, the Settling Parties complied with the applicable rules of the State of California, State of Delaware, and Federal Rules of Civil Procedure (including, but not limited to, Federal Rule of Civil Procedure 11)" (*id.* § 6.3). This would involve a rubber stamp approving conduct that never came before the Court for actual review — for instance, the motion to dismiss has been stayed and so no substantive issues of law related to the pleadings have necessitated review. Additionally, plaintiffs will join motions to dismiss or otherwise oppose later lawsuits filed out of these facts, an agreement that this order finds acceptable. The parties stipulate to Judge Spero resolving disputes, but for now the undersigned will retain authority over disputes (*id*. §§ 6.4, 6.6).

## CONCLUSION

The proposed settlement ranking as adequate at this stage, preliminary approval is **GRANTED** subject to final approval.

All proceedings and deadlines save those involving settlement are **STAYED** and the associated trial and hearing dates are **VACATED**. The form of notice is hereby **APPROVED**. The plan of distribution and objection procedures are **APPROVED** to the extent stated above. As stated at the hearing, the Court preliminarily intends to institute a phased plan for payment of attorney's fees. This means that the Court would order that some percentage of the attorney's fees awarded at final approval would be distributed at final approval. The Court would then retain jurisdiction. Plaintiffs' counsel would remain in the case and make periodic reports to the Court about the progress on accomplishing the goals of the settlement agreement. After a period to be determined, the Court will evaluate the progress and decide whether to approve some or all of the remaining fees.

The approved notice of settlement must be sent via email (for shareholders whose email addresses are known) and via first-class mail (for all) to shareholders by **MARCH 2, 2022.** Both Pinterest and plaintiffs' counsel shall post the notice and stipulation to their respective websites by this date.

1. Shareholders' objections to the proposed settlement are due **APRIL 15, 2022**.
2. Any motion(s) for fees and expenses is due **APRIL 21, 2022.** Any responses are due **MAY 5, 2022,** and any replies are due **MAY 10, 2022.**
3. The parties' replies to the objections are due **MAY 2, 2022**.
4. The parties shall move for final approval by **MAY 5, 2022**.
5. The parties' declarations attesting to the provision of service are due **MAY 21, 2022**.
6. Class members' objections to attorneys' fees and costs motions are due **MAY 24, 2022**.
7. The final approval fairness hearing shall take place at **8:00 A.M. ON MAY 26, 2022**.

**IT IS SO ORDERED.**

Dated: February 16, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

15