**RENNE PUBLIC LAW GROUP**
LOUISE RENNE (SBN #36508)
lrenne@publiclawgroup.com
RUTH M. BOND (SBN #214582)
rbond@publiclawgroup.com
STEVEN CIKES (SBN #235413)
scikes@publiclawgroup.com
ANASTASIA BONDARCHUK (SBN #309091)
abondarchuk@publiclawgroup.com
350 Sansome St., Suite 300
San Francisco, CA 94104
Telephone: (415) 848-7200
Facsimile: (415) 848-7230

*Counsel for Plaintiffs*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
JULIE GOLDSMITH REISER (*pro hac vice*)
jreiser@cohenmilstein.com
MOLLY BOWEN (*pro hac vice*)
mbowen@cohenmilstein.com
LYZETTE WALLACE (*pro hac vice*)
lwallace@cohenmilstein.com
1100 New York Ave. NW, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

LAURA POSNER (*pro hac vice*)
lposner@cohenmilstein.com
88 Pine St., 14th Floor
New York, NY 10005
Telephone: (212) 220-2925

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| *In re Pinterest Derivative Litigation* | Lead Case No. 3:20-cv-08331-WHA<br><br>**PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**<br><br>Date:  May 26, 2022<br>Time:  8:00 a.m.<br>Judge:  Honorable William Alsup<br>Courtroom:  12, 19th Floor |

**TABLE OF CONTENTS**

STATEMENT OF THE ISSUES TO BE DECIDED.....................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..............................................................2

   I.    PRELIMINARY STATEMENT ........................................................................................2

   II.   ARGUMENT ......................................................................................................................4

      A.    Standard of Review ..............................................................................................4

      B.    The Requested Fee is Reasonable ........................................................................6

      C.    Plaintiffs' Counsel's Expenses are Reasonable and Should be Approved .................24

   III.  CONCLUSION ................................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Activision Blizzard, Inc. S'holder Litig.*,
124 A.3d 1025 (Del. Ch. 2015)................................................................5, 21

*In re Alphabet Shareholder Derivative Litig.*,
Case No. 19-cv-341522 (Cal. Sup. Ct. Santa Clara Cty.)......................................21

*Ams. Mining Corp. v. Theriault*,
51 A.3d 1213 (Del. 2012) ...................................................6, 19, 21, 23

*In re Bluetooth Headset Prod. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ..................................................................21

*In re Brocade Sec. Litig.*,
No. 05-cv-2042, slip op. (N.D. Cal. Jan. 26, 2009) ......................................19

*Buccellato v. AT&T Operations, Inc.*,
No. 10-cv-00463, 2011 WL 3348055 (N.D. Cal. June 30, 2011)...........................19

*In re: Cathode Ray Tube Antitrust Litig.*,
Case No. C-07-5944, 2016 WL 4126533 ..................................................6

*In re Clear Channel Outdoor Holdings Inc. Derivative Litig.*,
C.A. No. 7315 (Del. Ch. Sept. 9, 2013)..................................................20

*Cryer v. Franklin Resources, Inc.*,
No. 16-cv-04265 (N.D. Cal. Oct. 4, 2019) (slip op. ) (J. Wilken) ...........................7

*DeStefano v. Zynga, Inc.*,
No. 12-cv-04007, 2016 WL 537946 (N.D. Cal. Feb. 11, 2016) .............................23

*In re Digex Inc. S'holders Litig.*,
C.A. No. 18336- (Del. Ch. Apr. 6, 2001) ..................................................19

*Dow Jones & Co. v. Shields*,
No. 184, 1991, 1992 WL 44907 (Del. Ch. Jan. 10, 1992)....................................16

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
No. 02-cv-01486, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) ...........................17

*In re Emerson Radio S'holder Derivative Litig.*,
No. C.A. 3392, 2011 WL 1135006 (Del. Ch. Mar. 28, 2011) ...............................23

*Feldman v. Donegal Grp., Inc.*,
C.A. No. 18786 (Del. Ch. Aug. 8, 2001) ..................................................5

*Feuer v. Thompson*,
No. 10-cv-00279, 2013 WL 2950667 (N.D. Cal. June 14, 2013)...........................................4

*In re Genentech, Inc. S'holders Litig.*,
C.A. No. 3911 (Del. Ch. July 9, 2009) ......................................................................19

*In re Google, Inc. S'holder Deriv. Litig.*,
Case No. C-11-4248 (N.D. Cal.)...................................................................................6

*Harris v. Marhoefer*,
24 F.3d 16 (9th Cir. 1994) .........................................................................................25

*IP Telesis Inc. v. Velocity Networks Inc.*,
No. 11-cv-09950-, 2013 WL 12126105 (C.D. Cal. Feb. 8, 2013) ............................18

*Irving Firemen's Relief and Retirement Fund v. Page et al.*,
Civ. No. 2019-0355 (Del. Ch. Dec. 23, 2020) (Order) .......................................7, 14

*Johnson v. Hui*,
811 F. Supp. 479 (N.D. Cal. 1991) .............................................................................18

*Kindt v. Lund*,
No. C.A. 17751, 2003 WL 21453879 (Del. Ch. May 30, 2003) ...............................18

*Knight v. Red Door Salons, Inc.*,
No. 08-01520, 2009 WL 248367 (N.D. Cal. Feb. 2, 2009) ......................................23

*Loring v. City of Scottsdale, Ariz.*,
721 F.2d 274 (9th Cir.1983) .........................................................................................5

*In re Lucent Tech., Inc. Sec. Litig.*,
327 F. Supp. 2d 426 (D.N.J. 2004) ............................................................................24

*In re News Corp. S'holder Deriv. Litig.*,
C.A. No. 6285 (Del. Ch. June 26, 2013)....................................................................14

*In re Oclaro, Inc. Deriv. Litig.*,
Case No. C-11-3176, 2014 WL 4684993 (N.D. Cal. Sept. 19, 2014) ......................18

*Omnivision*,
559 F. Supp. 2d at 1048. Here, the Notice of Pendency and Proposed
Settlement of Stockholder Derivative Actions (the "Notice")........................ *passim*

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015) ........................................................................................7

*In re Pacific Enters. Sec. Litig.*,
47 F.3d 373 (9th Cir. 1995) ........................................................................................17

*Paul, Johnson, Alston & Hunt v. Graulty*,
886 F.2d 268 (9th Cir. 1989) ........................................................................................7

*Pension and Investments*
(March 25, 2022) ..................................................................9

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Stumpf*,
No. 11-2369, 2012 WL 12920191 (N.D. Cal. May 17, 2012)...............................18

*Police Ret. Sys. of St. Louis v. Granite Constr., Inc.*,
No. 19-04744, 2022 WL 816473 (N.D. Cal. Mar. 17, 2022) (Alsup, J.)...............................21

*Ret. Sys. v. Murdoch et al.*,
No. 2017-0833 (Del. Ch. Nov. 20, 2017) (Order) ..................................................7

*Roberti v. OSI Sys., Inc.*,
No. 13-cv-09174, 2015 WL 8329916 (C.D. Cal. Dec. 8, 2015)...............................21

*Rodman v. Safeway*,
Case No. 11-cv-03003, 2018 WL 4030558 (N.D. Cal. Aug. 22, 2018) ...............................6

*Ryan v. Gifford*,
No. 2213, 2009 WL 18143 (Del. Ch. Jan. 2, 2009) ..................................................17

*In re Sauer-Danfoss Inc. S'holders Litig.*,
65 A.3d 1116 (Del. Ch. 2011)..................................................19

*Sciabacucchi v. Salzberg*,
No. C.A. 2017-0931, 2019 WL 2913272 (Del. Ch. July 8, 2019)...............................19

*Six Mexican Workers v. Ariz. Citrus Growers*,
904 F.2d 1301 (9th Cir.1990) ..................................................5

*Smith & Wesson Holding Corp. v. Golden*,
4 F. Supp. 3d 317 (D. Mass. 2014), *aff'd*, 778 F.3d 217 (1st Cir. 2015)...............................18

*Sugarland Indus., Inc. v. Thomas*,
420 A.2d 142 (Del. 1980) ..................................................5, 21, 23

*In re Veeco Instruments Inc. Sec. Litig.*,
No. 05-md-01695, 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ...............................24

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002) ..................................................19

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prod. Liab. Litig.*,
No. 15-md-02672, 2017 WL 1047834, (N.D. Cal. Mar. 17, 2017)...............................21

*In re Wash. Pub. Power Supply Sys. Sec. Litig*,
19 F.3d 1291 ..................................................17

*Wixon v. Wyndham Resort Dev. Corp.*,
No. 07-CV-02361, 2010 WL 3630124 (N.D. Cal. Sep. 14, 2010) ...............................5

Motion for Attorneys' Fees & Reimbursement of Litigation Expenses

*In Re Wynn Resorts, Ltd. Derivative Litig.*,
   Case No. A-18-769630-B (Nev. Dist. Ct. Clark Cty.) ............................................21

*In re Yahoo! Inc. S'holder Derivative Litig.*,
   153 F. Supp. 3d 1107 (N.D. Cal. 2015) .......................................................17

**Statutes**

Cohen Milstein Sellers & Toll PLLC, Renne Public Law Group, Bottini &
   Bottini, Inc., and Weiss Law........................................................................1

Delaware General Corporation Law Section 220 ............................................3, 14, 22

**Other Authorities**

Devaluing Women, *N.Y. Times* Dec. 3, 2017 ...............................................13

*https://www.pionline.com/esg/shareholders-seeing-success-push-racial-equity-audits* (March 25, 2022)...............................................................................9

PSLRA. H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N.
   730 (1995)...............................................................................................24

Motion for Attorneys' Fees & Reimbursement of Litigation Expenses

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on May 26, 2022, at 8:00 a.m., or as soon thereafter as this motion may be heard, either in person or by telephone or video conference as directed by the Court, Interim Lead Plaintiff Employees' Retirement System of Rhode Island, along with Interim Executive Committee Plaintiffs Sal Toronto and Stephen Bushansky (collectively, "Plaintiffs"), will and hereby do move for an order before the Honorable William Alsup, United States District Judge of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California 94102, awarding Plaintiffs' Counsel attorneys' fees and reimbursement of litigation expenses.

This motion is supported by the accompanying memorandum of points of authorities, the Stipulation and Agreement of Settlement dated November 23, 2021 (the "Stipulation") and Exhibits thereto (ECF No. 99-2); the accompanying Joint Declaration of Julie Goldsmith Reiser and Louise Renne in Support of Plaintiffs' Motion for Final Approval of Settlement and Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Reiser-Renne Decl." or "Reiser-Renne Declaration"); the exhibits to the Reiser-Renne Declaration including the Declaration of Professor Joanna L. Grossman regarding the importance of the Settlement terms in improving Pinterest's corporate culture ("Grossman Decl."), the Declaration of Amy Crane, General Counsel of the Employees' Retirement System of Rhode Island, Interim Lead Plaintiff (Amy L. Crane Decl.) regarding ERSRI's support for the Settlement and request for fees and expenses, and declarations of each Plaintiffs' Counsel firm regarding their respective request for fees and expenses; all pleadings on file in this case; and such other matters as the Court may consider.

## STATEMENT OF THE ISSUES TO BE DECIDED

1.  Whether the Court should approve as fair and reasonable Plaintiffs' application for an award of attorneys' fees for Plaintiffs' Counsel.[1]

---

[1] "Plaintiffs' Counsel" are Cohen Milstein Sellers & Toll PLLC, Renne Public Law Group, Bottini & Bottini, Inc., and Weiss Law LLP.  Unless otherwise defined, all capitalized terms have the meanings set forth in the Stipulation.  All citations to "¶ __" are to Exhibit A of the Reiser-Renne Decl.  Unless otherwise noted, citations and quotation marks are omitted, and emphasis is added.

2.      Whether the Court should approve as fair and reasonable Plaintiffs' application for reimbursement of litigation expenses incurred by Plaintiffs' Counsel.

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs and Interim Lead Counsel, on behalf of Plaintiffs' Counsel in this Action, respectfully submit this memorandum of law in support of their motion for (a) an award of attorneys' fees for Plaintiffs' Counsel in the amount of $5,373,079 for Plaintiffs' Counsel's role in securing substantial corporate governance and workplace reforms, as well as $50 million in mandatory funding for the creation, implementation, and annual maintenance of the reforms noted herein, to be expended over a period no longer than ten years after final approval of the settlement; and (b) reimbursement of $47,047.58 in litigation expenses that were reasonably and necessarily incurred by Plaintiffs' Counsel in prosecuting and resolving this Action.

## I.      PRELIMINARY STATEMENT

The proposed Settlement, which provides for the adoption of robust corporate governance reforms designed to substantially change and improve Pinterest's corporate culture and a $50 million mandatory funding commitment to implement the reforms, is a historic result for Pinterest, Inc. ("Pinterest" or the "Company") and its stockholders. The Settlement represents a successful outcome, reflecting the Company's and Plaintiffs' steadfast commitment to provide an inclusive, equitable environment for the Company's employees and users.  The Settlement requires every level of Pinterest to put diversity, equity, and inclusion ("DEI") at the forefront of its internal practices and business goals.  It will provide substantial benefits to the Company and its stockholders, while also serving as a benchmark for other companies to institutionalize Board oversight over workplace policies and to improve inclusion and representation for internet users more broadly.

Pursuant to the Settlement, Pinterest is required to spend $50 million to advance these mandates — a substantial and meaningful funding commitment that will greatly benefit Pinterest's employees and, ultimately, shareholders.  Even if Plaintiffs had continued litigating the case rather than agreeing to settle, and had achieved the best possible verdict and judgment, Plaintiffs estimate that, at most, they would have only been able to obtain a judgment for half the amount of money

that Pinterest is required to spend on the Settlement reforms.   Additionally, any judgment recovered at trial would have no guarantee that it be used to advance DEI goals or reform the Company's admittedly broken culture. Faced with this trade-off, Plaintiffs felt strongly that swifter progress for employees, backed by a meaningful financial obligation, warranted settling rather than continuing to litigate through judgment.

The corporate governance reforms and funding commitment would not exist absent the skill, tenacity, and effective advocacy of Plaintiffs' Counsel, who litigated this Action on a fully contingent basis against highly experienced defense counsel.   The Settlement was reached after nearly a year of litigation, including extensive and hard-fought settlement negotiations, which required Plaintiffs' Counsel to dedicate a significant amount of time and resources to the Action.

As detailed in the accompanying Reiser-Renne Declaration, Plaintiffs' Counsel vigorously pursued this litigation from the outset by, among other things, (i) conducting an extensive investigation into the claims, including interviews of 16 witnesses; (ii) propounding demands for relevant documents pursuant to Section 220 of the Delaware General Corporation Law; (iii) reviewing and analyzing those documents; (iv) drafting highly detailed complaints; (v) researching and briefing an opposition to Defendants' motion to dismiss the complaint; (vi) engaging in vigorous, arm's-length settlement negotiations, including multiple formal mediation sessions supervised by the Honorable Joseph C. Spero, dozens of working group meetings, presentations from counsel for the Pinterest Special Committee, and the exchange of numerous demands and counteroffers; and (vii) researching, preparing, and negotiating the corporate governance reforms, with the significant assistance of experts.

The Settlement achieved through Plaintiffs' Counsel's efforts is a particularly favorable result considering the significant risks in the case.   As discussed in detail in the Reiser-Renne Declaration and below, among other things, there was a serious risk that Plaintiffs would not be able to achieve any recovery at all.

As compensation for their significant efforts on behalf of Pinterest and its stockholders, and the risks of non-payment they faced in bringing the Action on a contingent basis, Plaintiffs' Counsel seek attorneys' fees in the amount of $5,373,079.  This amount represents 10.75% of the

$50 million funding commitment alone, without considering the value of the corporate governance reforms.  As discussed below, a fee request in that range is well-supported by Delaware precedent and the "benchmark" percentage awarded in the Ninth Circuit for contingency-fee litigation.  The requested fees also represent only a modest multiplier of 2.0 on Plaintiffs' Counsel's lodestar.  The requested fees have the full support of all Plaintiffs in this Action, including Interim Lead Plaintiff ERSRI. *See* Reiser-Renne Decl., Ex. 2, Amy L. Crane Decl. They have endorsed the requested fees as reasonable in light of the results achieved in the Action, the quality of counsel's work, and the risks of the litigation. *Id*.

In accordance with the Preliminary Approval Order, an extensive Notice program was conducted.  The Notice advised Pinterest stockholders that Plaintiffs' Counsel would apply for an award of attorneys' fees not to exceed two times their lodestar and for reasonable expenses incurred in the litigation.  *See* Notice, attached as Exhibit B-1 to the Stipulation, at 15. The fee request conforms with the Notice. While the deadline for stockholders to object to the requested attorneys' fees and expenses has not yet passed, to date no objections have been made.

In light of the excellent recovery obtained, the time and effort devoted by Plaintiffs' Counsel to the Action, the skill, quality, and expertise required, the wholly contingent nature of the representation, the considerable risks Plaintiffs' Counsel undertook, and the reaction of Pinterest stockholders, Plaintiffs' Counsel respectfully submit that the requested fee award is reasonable and should be approved by the Court.  The expenses incurred by Plaintiffs' Counsel are modest, reasonable in amount, and were necessarily incurred in the successful prosecution of the Action.  Reimbursement of expenses should also be approved.

## II.   ARGUMENT

### A.   Standard of Review

Because "Delaware law govern[ed] the [substantive] claims, it also governs the fee award." *Feuer v. Thompson*, No. 10-cv-00279, 2013 WL 2950667, at *2 (N.D. Cal. June 14, 2013) (derivative action) (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) ("Because Washington law governed the claim, it also governs the award of fees.")).  There is little substantive difference between Delaware law and Ninth Circuit law on this issue.

There are two general approaches used to determine attorney fee awards in derivative suits. First, in a case such as this one where the litigation results in a "common fund" that benefits the general class of shareholders, courts may allocate a percentage of the total fund as the fee award. *See, e.g., Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.1990); *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149 (Del. 1980). Where, as here, a settlement results in required funding to implement governance reforms, courts have recognized that attorneys' fees are warranted under the substantial benefit theory. *Wixon v. Wyndham Resort Dev. Corp.*, No. 07-CV-02361, 2010 WL 3630124 at *3 (N.D. Cal. Sep. 14, 2010) (quoting *In re NVIDIA Corp. Derivative Litig.*, Case No. 06-CV-06110, 2009 U.S. Dist. LEXIS 24973, at *11 (N.D. Cal. Mar. 18, 2009)). The second approach is called the "lodestar" approach in which the fee is determined based on the time spent by derivative counsel. *See Loring v. City of Scottsdale, Ariz.*, 721 F.2d 274, 275-76 (9th Cir.1983) (*citing Lindy Bros. Builders, Inc. Of Phila. V. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir.1973)). Either method, depending on the circumstances, can be used to determine a reasonable fee. *See Six Mexican Workers*, 904 F.2d at 1311.

Similarly, Delaware courts determine the amount of a fee award "based upon a percentage of the benefit" when "the benefit is quantifiable." *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1070 (Del. Ch. 2015); *see also* Reiser-Renne Decl., Ex. 7, *Feldman v. Donegal Grp., Inc.*, C.A. No. 18786 at 29 (Del. Ch. Aug. 8, 2001) (Transcript) (fee award determined "on a percentage of the benefit basis" when the benefit "is capable of some realistic financial valuation").

Delaware considers the five so-called *Sugarland* factors in determining a fee award: "1) the results achieved; 2) the time and effort of counsel; 3) the relative complexities of the litigation; 4) any contingency factor; and 5) the standing and ability of counsel involved." *Id*. at 1070 (citing *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1254 (Del. 2012)). These overlap with and parallel the factors considered by courts applying federal law in this Circuit: 1) the results achieved; 2) the risks of litigation; 3) the skill required and the quality of work; 4) the contingent nature of the fee and the financial burden carried by the plaintiffs; 5) awards made in similar cases; 6) the

stockholders' reaction; and, 7) a lodestar cross-check.  *See Omnivision*, 559 F. Supp. 2d 1036 at 1046–48 (N.D. Cal. 2008) (citing *Vizcaino*, 290 F.3d at 1048–51).

Under any of these methodologies, Plaintiffs' Counsel's fee request is fair and reasonable.

**B.     The Requested Fee is Reasonable**

**1.     The Results Achieved**

"Delaware courts have assigned the greatest weight to the benefit achieved in litigation." *Theriault*, 51 A.3d at 1254. Courts in this Circuit similarly focus most closely on the benefit achieved. *See Rodman v. Safeway*, Case No. 11-cv-03003, 2018 WL 4030558, at *3 (N.D. Cal. Aug. 22, 2018) (awarding 28% for attorneys' fees for "exceptional results"); *In re: Cathode Ray Tube Antitrust Litig.*, Case No. C-07-5944, 2016 WL 4126533 at *4 ("[o]utstanding results merit a higher fee"); *Omnivision*, 559 F. Supp. 2d at 1046 (settlement's "substantial achievement" supported a 28% fee award). Through the Settlement, Plaintiffs conferred a substantial benefit on Pinterest. The required $50 million funding commitment independently supports the requested fee award and is further supported by the additional benefits conferred upon Pinterest by the negotiated corporate governance reforms.

**a.     Plaintiffs Secured a Mandatory $50 Million Funding Commitment**

The starting point for measuring the benefit conferred is the Settlement's requirement that Pinterest spend $50 million on the Agreement's governance reforms.  The governance measures are designed to minimize the risk of reputational damages, regulatory fines, and consumer backlash tied to complaints of systemic discrimination.  The requested fee is reasonable when viewed as either a percentage of such benefits or on a lodestar basis. For example, in a derivative action involving Google where corporate therapeutics were agreed upon, the Hon. Phyllis Hamilton approved a fee representing more than a 3.0 multiplier and slightly less than 20% of the amount Google agreed to spend on funding a user-safety initiative.  *See* Reiser-Renne Decl., Ex. 8, *In re Google, Inc. S'holder Deriv. Litig.*, Case No. C-11-4248 (N.D. Cal.), Jan. 21, 2015 Transcript at pp. 12-13 ("The amount [of the fees] is satisfactory even though that it exceeds the lodestar by I think three times, it is only a fraction less than twenty percent of the amount that Google was going to be paying to fund the user-safety initiative. So when you look at it from that perspective, it

seems to be reasonable as well”).

Further, in the Ninth Circuit, 25% is the “benchmark” award for attorneys’ fees. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 273 (9th Cir. 1989); *Cryer v. Franklin Resources, Inc.*, No. 16-cv-04265 (N.D. Cal. Oct. 4, 2019) (slip op. at 3) (J. Wilken).  Similarly, Delaware courts routinely issue attorneys’ fee awards of a substantially higher percentage of the benefit conferred and with higher multipliers than sought here, particularly in complex derivative cases where violations of Title VII are at issue. *See* Reiser-Renne Decl., Ex. 2, *Irving Firemen’s Relief and Retirement Fund v. Page, et al.*, No. 2019-0355 (Del. Ch. Dec. 23, 2020) (Order) (awarding attorneys’ fee of $11.3 million, constituting 3.9 multiplier); *City of Monroe Emps.’ Ret. Sys. v. Murdoch et al.*, No. 2017-0833 (Del. Ch. Nov. 20, 2017) (“Twenty-First Century Fox”) (Order) (fee award of 25% on settlement of $90 million plus corporate governance, where action settled before motion to dismiss).  Plaintiffs’ Counsel’s request here is well supported by existing precedent because Plaintiffs seek a fee of 10.75% of the funding commitment, which amounts to a 2.0 multiplier, as approved by Interim Lead Plaintiff ERSRI.

### a. Plaintiffs Obtained Substantial Corporate Governance Reforms that Provide a Lasting Benefit to Pinterest and its Stockholders

1. The Court should also credit the significant benefit conferred on Pinterest and its stockholders by the agreed-upon governance reforms. The reforms are specifically designed to address the conduct and problems at issue in this case. They will improve Board oversight and reduce the risk of future compliance failures at Pinterest, while promoting confidence in Pinterest’s workforce and customer base to generate loyalty from the former and increase revenue from the latter. The most significant reforms include: creating board-level accountability for corporate culture and full implementation of the Settlement terms, requiring external audits, strengthening an external ombuds office, standardizing the hiring processes to reduce bias, and institutionalizing a team that will ensure representation exists in Pinterest’s product. *See* Reiser-Renne Decl. ¶ 6. Plaintiffs’ expert, Professor Grossman, opined:

Motion for Attorneys’ Fees & Reimbursement of Litigation Expenses

"The Agreement places responsibility at the board level for ensuring that dozens of reforms are implemented effectively; creates mechanisms for ensuring that equal employment opportunity practices are established and maintained; makes changes necessary to promote an egalitarian culture in which misconduct can be identified, challenged, and redressed without triggering retaliation; and, imposes a variety of mandatory assessments that will ensure steady progress throughout the period covered by the Agreement. In my opinion, the Agreement puts Pinterest at the forefront of recognized best practices for creating meaningful change in corporate culture.  The Settlement reflects Pinterest's ambition to change its culture through leadership, DEI initiatives, pay equity assessments, and external accountability.  As detailed more below, the settlement includes the right blend of components to ensure a shift in the Company's workplace culture from exclusivity to inclusivity." *See* Reiser-Renne Decl., Ex. 1, Grossman Decl. ¶ 3.

The following briefly expands on the most significant reforms.

### (1)      Board Oversight

The Settlement requires Pinterest's Board to actively manage and oversee efforts to improve Pinterest's culture.   This was a necessary addition to the Special Committee Recommendations, which designated the current CEO as the leader of DEI efforts with minimal oversight. The settlement empowers external organizations to assess progress towards DEI goals and report findings to the Board.  For example, the Talent, Development, and Compensation Committee will oversee coaching of the Executive Team, participate in the Inclusion Advisory Council, receive updates on the Inclusive Product Program, and be involved in due diligence and potentially exit interviews with departing members of the Executive Leadership Team. Settlement Stipulation, Ex. A at (II)(1)(II)(2), (II)(4).   Notably, this is the only settlement that Plaintiffs' Counsel are aware of in which a Board member will serve as a co-sponsor for DEI work with a CEO; this partnership will help establish a tone at the top and communicate that Pinterest is a workplace where all employees can thrive.  Settlement Stipulation, Ex. A at (II)(3).  *See* ¶ 51.

Pinterest's Internal Audit team will evaluate progress on the implementation of measurable DEI reforms and present those reports to the Board's Audit Committee as well as the full Board. Settlement Stipulation, Ex. A at (II)(6).  This requires the Board to be knowledgeable about and accountable for implementation of the Settlement's terms.  As the Court acknowledged in the Preliminary Approval Order, "[o]n balance, acknowledging DEI as a risk factor to the corporation favors settlement."  ECF No. 115 at 8.  For example, the Audit Committee must ensure that $50

million is spent on Settlement reforms over ten years.

The Special Committee encouraged executives to support DEI efforts, yet the Settlement creates a concrete requirement that DEI people/culture and DEI business initiatives be included in every manager's performance evaluation and considered a core competency for their positions.  As a result, managers will be evaluated on their progress in creating an inclusive culture, and must reflect on their own efforts to develop an inclusive atmosphere and seek to incorporate these values in their business initiatives too.  Settlement Stipulation, Ex. A at (VI)(3).  *See* ¶ 53.

### (2)    Pay Equity and Transparency

Pay equity audits and transparency are additional reform measures designed to hold Pinterest accountable for making fair and equitable employment decisions.  A third-party, Secretariat Economists, will examine Pinterest's employment data across gender and race categories every other year, considering performance ratings, promotion and compensation and recommending steps to take to maintain equity.  Settlement Stipulation, Ex. A at (XIII)(1).  As described above, Plaintiffs believe that the Board, understanding the potential for a material risk and its obligations under the Settlement, will ensure that the outside consultant conducts a robust analysis of pay equity and achieves results the Board will be proud to share with stockholders.[2] Additionally, to promote transparency and empower employees to ask questions or raise concerns about perceived inequities, employees will have access to the company organization chart and job level information.  Settlement Stipulation, Ex. A at (XIII)(9).  *See* ¶ 54.

### (3)    Executive Accountability for DEI Culture and Business Goals

Each member of the Executive Leadership Team will develop people/culture and DEI-related business initiatives. To ensure the goals embody best practices and are tailored to Pinterest's specific culture and needs, these goals will be developed in consultation with the Chief

---

[2] Institutional investors supporting race equity audits include: Norges Bank Investment Management, which manages the 12.34 trillion Norwegian kroner ($1.37 trillion) Government Pension Fund Global; the $319.8 billion California State Teachers' Retirement System; the $274.7 billion New York City Retirement Systems; and the $251.7 billion State Board of Administration of Florida.  *See* Hazel Bradford, "Shareholders seeing success with push for race equity audits," *Pension and Investments* (March 25, 2022) *https://www.pionline.com/esg/shareholders-seeing-success-push-racial-equity-audits* (March 25, 2022).

Motion for Attorneys' Fees & Reimbursement of Litigation Expenses

People Officer and the Global Head of Inclusion & Diversity.  Each Executive Leadership Team member will revisit her initiatives and efforts annually to reflect on her progress.  Additionally, Pinterest will strengthen annual evaluations to assess managers' efforts in creating an inclusive workplace culture and require managers to reflect on their own efforts.  Settlement Stipulation, Ex. A at (VI)(1-3).  Plaintiffs' Counsel concurs with the Court's views on considering the views of protected classes of people in their responses to Pulse Surveys and in their use of the external ombuds program.  As part of their post-settlement efforts, Plaintiffs' Counsel recommend receiving the aggregated outcomes from these sources on an annual basis, including with data and information representative of the views of women and people of color, among other protected groups. *See* ¶ 57.

The Settlement's focus on incorporating DEI into Pinterest's business goals is also embodied in the Inclusive Product Program, which requires Pinterest to incorporate diversity, representation, and inclusion in its product offering.  To Plaintiffs' Counsel's knowledge, it is the only business-oriented DEI requirement that has been negotiated as part of a derivative settlement. The Inclusive Product Program and team will work to de-bias computer algorithms to ensure that Pinterest users see images that look like they do.  As part of this commitment, Pinterest will form a team of 20, which will be tasked with identifying a pipeline of project opportunities and, in consultation with the civil rights groups that are participating in the Inclusion Advisory Council, to take on projects to foster inclusion online.  The Preliminary Approval Order focused on the aspect of the Inclusive Product Program settlement term that involves the addition of two paid internships or apprenticeships every year to individuals from backgrounds traditionally underrepresented in technology and concluded that this recommendation "did little" to go beyond the Special Committee's recommendations. Plaintiffs, however, would like to draw the Court's attention to the additional features of the Inclusive Product Program required as a result of the Settlement, including elevating the stature of the program and its Head through at-least-annual meetings between the Head of Inclusive Product and the IAC and with the TDCC; requiring coordination among the Head of Inclusive Product, Global Head of Inclusion and Diversity, and Head of Social Impact and Philanthropy to evaluate opportunities for Pinterest to use its products

Motion for Attorneys' Fees & Reimbursement of Litigation Expenses

to promote diversity and inclusion; requiring that the Head of Inclusive Product be provided funding to retain experts and advisors; and requiring annual training for members of the Inclusive Product Team on topics related to DEI and/or behavioral science that inform their work.  *See* ¶ 58.

Notably, to the Court's concern that the Inclusive Product Program was similar to the Special Committee Recommendations, Plaintiffs' Counsel note that they interviewed WilmerHale with respect to potential settlement terms and ascertained that the Inclusive Product Program was not part of the Special Committee's review nor was it an area the Special Committee chose to investigate.  The Special Committee did not make any recommendations related to incorporating DEI into Pinterest's business model or product.  Based on work with Plaintiffs' Counsel's experts, Plaintiffs determined that this provision significantly strengthened the Settlement by integrating DEI goals throughout Pinterest's ecosystem and underscoring the business imperative of making a product that is inclusive and represents all internet users.  *See* ¶ 59.

### (4)     Anti-Doxxing Policy

The Settlement expressly prohibits doxxing and requires the Company to respond to doxxing through an internal escalation and alert protocol, with assistance from a specialized third-party vendor to remove abusive content where feasible.  Settlement Stipulation, Ex. A at (X)(1). *See* ¶ 60. This provision is directly responsive to the issues giving rise to the Complaint – a key safety concern that prompted Ifeoma Ozoma's posts about her experience at Pinterest as not valuing Black lives.

### (5)     Making Hiring Processes More Equitable

The Settlement institutes a number of policy changes that will make the hiring and interview process more equitable, including standardizing evaluations, ensuring a diverse slate of candidates and interviewers, and creating a coaching program with the Chief People Officer and Chief Diversity Officer to evaluate whether improvements need to be made in the recruiting process if a business unit does not regularly interview a diverse slate of candidate.  Settlement Stipulation, Ex. A at (XIII) (4-6). *See* ¶ 61. The goal of these reforms is to increase representation of women and people of color in Pinterest's employee base.

1

### (6)        Non-Enforcement of Non-Disclosure Agreements

2      The Settlement requires Pinterest to not enforce non-disclosure agreements with

3  individuals who made race or gender discrimination claims, permitting those individuals to discuss

4  the underlying circumstances and reporting process they experienced.  Settlement Stipulation, Ex.

5  A at (IV)(1). This reform is directly responsive to concerns raised by Ms. Ozoma and Ms. Banks

6  who made the courageous choice to violate their NDAs to tell their stories, thereby exposing

7  weaknesses in Pinterest's culture to its shareholders and the public. Although Pinterest did not

8  agree to modify the terms of the Settlement to provide direct notice to those affected, as set forth

9  in Plaintiffs' Supplemental Submission, this Settlement provision was widely publicized and

10  current or former employees, particularly in the tech field, who would be inclined to break their

11  NDA will likely be aware of this term and their ability to now share the facts and circumstances

12  of their claims without fear of enforcement by Pinterest. *See* ¶ 62.

13      ### (7)        $50 Million Funding Requirement

14      The anchor for these reforms is a $50 million, multi-year funding requirement.  This is not

15  an abstract or suggested goal. As part of the Settlement, Pinterest is ***required*** to spend $50 million

16  for the creation, implementation, and maintenance of the agreed reforms.  This requirement

17  ensures that there are adequate resources to implement these reforms, and that these reforms will

18  remain in place for a sufficient duration to create lasting improvements at Pinterest. *See* ¶ 64.  This

19  substantial term of the Settlement puts teeth into the reforms and eliminates any possibility that

20  Pinterest could half-heartedly adopt the reforms without safeguarding funding to implement and

21  maintain the reforms.

22      In sum, the Settlement requires Pinterest to improve its corporate culture over a period of

23  five years through the myriad changes and support systems that place active oversight over the

24  Settlement terms with the Board. As two noted commentators have written, "corporate governance

25  is about making sure that the right questions get asked and the right checks and balances are in

26  place…" Robert A.G. Monks and Nell Minow, Corporate Governance, xxiv (5th ed. 2011). This

27  Settlement will move Pinterest to a paradigm of active oversight and engagement around corporate

28  culture, DEI efforts, and the employee experience and aligns Pinterest and its leadership with the

best standards for effective corporate governance.

It is well-established that companies suffer in significant and measurable ways when women and people of colors' ideas are discounted and their talent ignored. Sallie Krawcheck, The Cost of Devaluing Women, *N.Y. Times* Dec. 3, 2017 at SR 2.  "Companies with more diversity, and particularly more women in leadership, offer higher returns on capital, lower risk and greater innovation than firms without such leadership."  In light of this and other research, State Street, the second-largest asset manager in the world, identified "corporate culture" as its chief engagement priority.[3]  Consumers also prefer companies that treat their employees equitably. These factors lead to the inexorable conclusion that Pinterest's directors have a fiduciary duty to oversee efforts to promote race and gender equity in their workforce and among their user base to protect the Company's long-term value.

The Settlement, therefore, provides a significant benefit to Pinterest in its ability to demonstrate strong corporate governance. Empirical studies demonstrate that investors will pay a premium for companies with strong corporate governance because investors believe those companies to be better run.  *See* McKinsey Investor Opinion Survey (June 2000) (reporting that investors would be willing to pay 18.3% more for better run companies). The McKinsey report concluded: "Although it remains difficult to measure the impact on market prices of the premiums investors say they are willing to pay for well-governed companies, the amounts they are prepared to pay leave little doubt that good governance does matter." A separate study that evaluated companies on their environmental, social and governance performance found investors willing to pay a premium of 6.1% for a one-standard deviation improvement. George Serafeim, Public Sentiment and the Price of Corporate Sustainability, 76 Fin. Analysts. J. 26 (2020). Here, even assuming a 1% increase in Pinterest's stock price, that premium would add just over $148 million to Pinterest's market capitalization, bringing substantial shareholder value.  Thus, the Settlement will yield stronger legal compliance, a healthier culture, and a correspondingly better reputation

---

[3] Likewise, prominent law firms like Covington & Burling, WilmerHale, and Morgan Lewis have incorporated "cultural audits" into their employment practices as necessary components demonstrating a commitment to institutional well-being and social responsibility.

Motion for Attorneys' Fees & Reimbursement of Litigation Expenses

1   with stakeholders and users, all of which will inure to Pinterest's and its stockholders' benefit.

2       Delaware courts have awarded fees based on similar cases where they have concluded that

3   the substantial value of governance reforms justify a fee in the $5 to $11 million range.  S*ee* Reiser-

4   Renne Decl., Ex. 10, *In re News Corp. S'holder Deriv. Litig.*, C.A. No. 6285, at 76 (Del. Ch. June

5   26, 2013) (Transcript) (finding substantial corporate governance improvements alone as

6   "justifying a fee of perhaps six to $10 million or even more after considering the future savings

7   that good conduct might bring"); *see also* Reiser-Renne Decl., Ex. 2 *Irving Firemen's Relief and*

8   *Retirement Fund v. Page et al*., Civ. No. 2019-0355 (Del. Ch. Dec. 23, 2020) (Order) (awarding

9   $11.3 million fee for similar governance reforms with a funding commitment).

10      **c.  The Substantial Risks of Litigation Support the Requested Fee**

11      The fee is further justified by the substantial risks Plaintiffs faced in the Action, including

12   those related to demand futility, establishing breach of fiduciary duty, scienter, and damages, as

13   well as the risk that Pinterest's Board of Directors might establish a Special Litigation Committee

14   ("SLC") that would seek to takeover and terminate this litigation. ¶¶ 9, 75, 77.  The Settlement

15   resulted from Plaintiffs' Counsel's thorough investigation of the claims, including demands

16   pursuant to Delaware General Corporation Law Section 220 for relevant documents; drafting a

17   highly detailed consolidated complaint after conducting interviews with 16 former employees;

18   researching and opposing Defendants' motion to dismiss; and engaging in vigorous, arm's-length

19   settlement negotiations spanning several months.  ¶¶ _20 30, 46, 69, 70, 94, 95.

20      This case was always primarily about alleged unlawful discrimination and disparate

21   treatment, not money.  Plaintiffs were clear from the start that their primary objective in this case

22   was to reform Pinterest's corporate culture and advance DEI initiatives.  Potential recoverable

23   damages were fairly modest and included both payments already incurred and future payments

24   that may be incurred. Pinterest's payments to date incurred include: (i) the $22.5 million settlement

25   paid to former executive Francoise Brougher in 2020 and undisclosed settlement amounts paid to

26   former employees Ms. Ozoma and Ms. Banks; (ii) legal fees associated with Pinterest's internal

27   investigation and the work of the Special Committee; and (iii) harm to reputation and good will.

28   A much more substantial and long-term risk to Pinterest was that, absent the ground-breaking

Motion for Attorneys' Fees & Reimbursement of Litigation Expenses

reforms achieved by this Settlement, Pinterest employees would quit in protest and/or that Pinterest would be substantially hindered in future employee recruitment efforts, as women and underrepresented communities would be deterred from applying to work at Pinterest for fear of discrimination.  Indeed, Pinterest was subject to a massive employee walkout shortly after Ms. Ozoma and Ms. Bank's revelations and Ms. Brougher's lawsuit, demonstrating the extent to which current Pinterest employees value DEI issues and fair treatment of employees.

A failure to be able to recruit the best talent in the industry could cause substantial economic harm to Pinterest for years to come and jeopardize its results compared to competitors. The reforms achieved by the Settlement, and the $50 million funding commitment which guarantees a meaningful, sustained commitment to the reforms, will help prevent those harms – all of which could have dwarfed the costs of the Brougher settlement and internal investigation.

It is well known that derivative actions are notoriously difficult given the high hurdles shareholders must surmount and the substantial discretion and presumptions afforded in directors' favor (and, as in this case, a Special Committee appointed to investigate the alleged wrongdoing). A few examples from the case demonstrate the point.

*First*, throughout this litigation, Defendants argued that Plaintiffs had to demonstrate that Defendants utterly failed to implement and maintain internal controls and that Plaintiffs failed to do so, arguing that the Audit Committee monitored employee claims of discrimination and retaliation at each meeting during the relevant time period.  They also countered that Plaintiffs could not establish that the directors faced a substantial likelihood of liability because there were no red flags of improper conduct.  Finally, Defendants contested whether Plaintiffs could establish the outside directors' lack of independence from the controlling shareholders.  *See* ¶ 74.

While the Court understandably expressed its view that further and more robust discovery efforts could have "developed strong facts warranting relief," those facts would not be pertinent to Plaintiffs' ability to establish demand futility.  Rather, Plaintiffs could have lost that motion and the Special Committee would have rested on its laurels by only implementing the December 2020 recommendations, with little Board or executive accountability for truly changing Pinterest's corporate culture.  Moreover, as set forth herein, even if Plaintiffs were to have successfully tried

Motion for Attorneys' Fees & Reimbursement of Litigation Expenses

this case through judgment, Plaintiffs would not have been able to achieve corporate governance reforms, nor would Pinterest be required to spend $50 million in funds on DEI efforts.  *See* ¶ 75.

**Second,** even if Plaintiffs could establish liability, damages would have been difficult to prove.  Whether the amounts in the settlements — amounting to less than $25 million — constitute damages to the Company that the Defendants are liable for was also hotly contested.  In addition, the major source of damages Plaintiffs would have claimed — loss in value of Pinterest's brand — would have been difficult to establish and subject to significant uncertainty.  *See* ¶ 76.

**Third**, there also was a significant risk that the Special Committee would reconstitute itself into an SLC and seek dismissal of the case on grounds that pursuing a shareholder derivative action was not in the Company's best interests.  *See* ¶ 77.  Delaware law makes it exceedingly difficult to challenge the findings and litigation decisions made by SLCs.

**Fourth**, there would be a major collectability issue for any judgment substantially above the $50 million funding commitment, given the amount of Directors & Officers insurance held by Pinterest and the difficulty obtaining and collecting a personal judgment against directors.  Pinterest's bylaws and certificate of incorporation require the Company to indemnify directors for all conduct except for bad faith and self-dealing, and the mere entry of a judgment does not create a presumption of bad faith.  Thus, even if a judgment were entered against one or more directors for breach of fiduciary duty, further proceedings would be required to establish whether Pinterest might still be required to indemnify the director(s).  Because this is a derivative action, there would be no benefit to Pinterest in obtaining a cash judgment that Pinterest was required to indemnify.

In light of these circumstances, both the funding commitment and the immediate action on corporate governance reforms obtained are substantial achievements on behalf of Pinterest and weigh in favor of granting the requested fee of 10.75% of the value of the $50 million funding commitment.

### 2.     The Contingent Nature and Substantial Risks of the Litigation Support the Fee Request

The contingent nature of the representation is the "second most important factor." *Dow Jones & Co. v. Shields*, No. 184, 1991, 1992 WL 44907, at *2 (Del. Ch. Jan. 10, 1992). "[A]n

attorney may be entitled to a much larger fee when the compensation is contingent than when it is fixed on an hourly or contractual basis." *Ryan v. Gifford*, No. 2213, 2009 WL 18143, at *13 (Del. Ch. Jan. 2, 2009). The Ninth Circuit has confirmed that a fair and reasonable fee must include consideration of the contingent nature of the fee and the obstacles surmounted:

> Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose.

*In re Wash. Pub. Power Supply Sys. Sec. Litig*, 19 F.3d 1291 at 1299; *see also Omnivision*, 559 F. Supp. 2d at 1047; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig*., No. 02-cv-01486, 2007 WL 2416513, at *1 (N.D. Cal. Aug. 16, 2007).

Here, Plaintiffs' Counsel received no compensation during this litigation, invested 3,602 hours for a total lodestar of approximately $2,686,539.50, and incurred expenses totaling $47,047.58. ¶¶ 88, 90,99. Any fee award and expense reimbursement have always been at risk and contingent on the result achieved and on this Court's discretion in awarding fees and expenses.

"[D]erivative lawsuits are rarely successful*." In re Pacific Enters. Sec. Litig*., 47 F.3d 373, 378 (9th Cir. 1995). And this derivative lawsuit was harder than most. As the Court recognized, Plaintiffs brought "a director oversight theory" —  *i.e*., a *Caremark* claim. ECF No. 85 at 15-16. This is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Yahoo! Inc. S'holder Derivative Litig*., 153 F. Supp. 3d 1107, 1121 (N.D. Cal. 2015).  In the three decades since *Caremark* was decided, there have been legions of decisions dismissing *Caremark* claims. Until last year, the Delaware Supreme Court had never upheld a *Caremark* claim.

Despite the most vigorous and competent efforts, success in contingent litigation is never guaranteed. These cases are not always settled, nor are cases always successful.  Hard, diligent work by skilled counsel over several years is required to develop facts and theories to prosecute a case or persuade defendants to settle on favorable terms.

As discussed in greater detail in the Reiser-Renne Declaration, there were many substantial challenges to succeeding in this litigation.  At the outset of the case, there was a significant risk

that the case would be dismissed on demand futility grounds. As this Court is aware, it is very difficult to plead demand futility in a *Caremark* action, as it requires pleading scienter to overcome Pinterest's exculpation clause, which protects directors from monetary damages for a breach of the duty of care. Defendants might have raised demand futility again at summary judgment and at trial. *See, e.g., Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Stumpf*, No. 11-2369, 2012 WL 12920191, at *1 & n. 1 (N.D. Cal. May 17, 2012) (disagreeing with plaintiffs' argument that "the individual defendants cannot relitigate the issue of demand futility on summary judgment"); *In re Oclaro, Inc. Deriv. Litig.*, Case No. C-11-3176, 2014 WL 4684993, at *2 (N.D. Cal. Sept. 19, 2014) (difficulty in establishing demand futility "would arise in both motion practice and at trial" and the "powerful presumption created by the business judgment rule would pose an additional hurdle to the derivative plaintiffs' fiduciary duty claims").

Plaintiffs also faced the real and significant risk that the SLC would take over the action and move to terminate it. Under Delaware law, a properly appointed and constituted SLC, after a proper investigation and consistent with the Court's view of fairness, can take over and terminate a derivative action. *See, e.g., Sarnacki ex re;. Smith & Wesson Holding Corp. v. Golden*, 4 F. Supp. 3d 317, 322 (D. Mass. 2014) (applying Delaware law and dismissing derivative action based upon SLC's determination that it was not in the best interests of the corporation to pursue the claims), *aff'd*, 778 F.3d 217 (1st Cir. 2015); *IP Telesis Inc. v. Velocity Networks Inc.*, No. 11-cv-09950-, 2013 WL 12126105 (C.D. Cal. Feb. 8, 2013) (same); *Kindt v. Lund*, No. C.A. 17751, 2003 WL 21453879 (Del. Ch. May 30, 2003) (same); *Johnson v. Hui*, 811 F. Supp. 479, 483 (N.D. Cal. 1991) (same).

Moreover, Defendants may well have argued that they properly relied on compliance experts, internal audit, and counsel in discharging their duties overseeing Pinterest. A finder of fact could find that the Board did not do a good job of oversight, but that these failings were not sufficient to prove a breach of duty of loyalty. Similarly, Defendants sharply disputed that their conduct caused any damages, again pointing to the mechanisms and committees at Pinterest for compliance, and their reliance on them. So while Plaintiffs' Counsel believed in the merits of Plaintiffs' claims, there would be many challenges in establishing all of these elements and a

substantial risk that Plaintiffs might not be able to do so. These arguments could have materially reduced the amount of recoverable damages and adversely affected any potential recovery. These substantial risks facing Plaintiffs' Counsel further support the requested fee.

### 3.   Plaintiffs' Counsel Invested Significant Time and Effort

In cases where attorneys' fees are sought based on a percentage of the common fund, courts in this Circuit frequently employ a lodestar crosscheck to assess the reasonableness of the fees sought. *See, e.g.*, *Vizcaino*, 290 F.3d at 1050 ("[W]hile the primary basis of the fee award remains the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given percentage award.").  In the Ninth Circuit, "multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Id.* at 1051 n.6 (28% fee award represented a multiplier of 3.65); *see also Buccellato v. AT&T Operations, Inc.*, No. 10-cv-00463, 2011 WL 3348055, at *2 (N.D. Cal. June 30, 2011) (awarded 4.3 lodestar multiplier as part of a 25% fee award); *In re Brocade Sec. Litig.*, No. 05-cv-2042, slip op. at 13 (N.D. Cal. Jan. 26, 2009) (awarding 25% of $160 million common fund, representing a 3.5 multiplier).

Delaware has repeatedly "reject[ed] the lodestar methodology," *Theriault*, 51 A.3d at 1257, preferring "instead to focus on the benefit conferred." *Sciabacucchi v. Salzberg*, No. C.A. 2017-0931, 2019 WL 2913272, at *6 (Del. Ch. July 8, 2019) (approving fee award reflecting implied rate of $11,262.26 per hour for non-monetary relief). Nonetheless, as in federal court, Delaware considers the time and effort expended by counsel as a "cross-check to guard against windfalls, particularly in therapeutic benefit cases." *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1136 (Del. Ch. 2011). When cross-checking against lodestar, Delaware courts often approve awards with high lodestar multipliers. In *Theriault*, the Delaware Supreme Court affirmed a fee award of $304 million, which represented a multiplier of 87 times lodestar, in concluding that the "extraordinary benefit that was achieved in this case merits a very substantial award of attorneys' fees." 51 A.2d at 1255.  *See also* Reiser-Renne Decl., Ex. 11, *In re Genentech, Inc. S'holders Litig.*, C.A. No. 3911 (Del. Ch. July 9, 2009) (Transcript) (fee award of $24.5 million, which translated into an 11.3 multiplier); Reiser-Renne Decl., Ex. 12, *In re Digex Inc. S'holders Litig.*, C.A. No. 18336- at 141-47 (Del. Ch. Apr. 6, 2001) (Transcript) (9 multiplier); Reiser-Renne Decl.,

Ex. 13, *In re Clear Channel Outdoor Holdings Inc. Derivative Litig.*, C.A. No. 7315 (Del. Ch. Sept. 9, 2013) (Transcript) (approving a $6 million fee award, representing a 10.5 multiplier).

As set forth in the Reiser-Renne Declaration and accompanying declarations of each Plaintiffs' Counsel firm submitted herewith, Plaintiffs' Counsel has expended a total of 3,602 hours over the course of investigation, litigation, and negotiation of the monetary payment and governance reforms reflected in the Settlement. ¶ 88, 90; *see also* Reiser-Renne Declaration, Ex. 3, Declaration of Julie Goldsmith Reiser; Ex. 4, Declaration of Louise H. Renne; Ex. 5, Declaration of Joshua Rubin; and Ex. 6, Declaration of Francis A. Bottini, Jr.[4] Plaintiffs' Counsel's lodestar, derived by multiplying the hours spent on the litigation by each attorney and professional by their current hourly rates, is $2,686,539.50. ¶ 88, 90. The time for preparation of the fee and expense application was excluded from the lodestar. Accordingly, the requested fee of 10.75% of the cash recovery, net of expenses, which equates to approximately $5,373,079, represents a multiplier of approximately 2.0 of Plaintiffs' Counsel's lodestar. This is squarely within the multiplier range of one to four frequently used as a crosscheck and, thus, is reasonable given the contingent nature of this litigation and the excellent results achieved. *See In re Alphabet Inc. S'holder Derivative Litig.*, Lead Case No. 19CV341522, slip op. at 4 (Cal. Super. Ct., Cnty. of Santa Clara Feb. 5, 2021) (awarding $29 million in attorneys' fees in a derivative action, amounting to a 2.9 multiplier on counsel's lodestar, and observing that the multiplier was "reasonable given the contingent nature of the action and substantial risk of non-recovery; the novelty and complexity of the issues; and the excellent result achieved for shareholders"). Additionally, it comports with the lodestar multiplier cap of 2.0 negotiated by Interim Lead Plaintiff ERSRI. *See* Reiser-Renne Decl., Ex. 2, Amy L. Crane Decl. ¶13.

Given the extraordinary results achieved in untested and risky shareholder derivative waters, Plaintiffs' Counsel's 3,602 hours support the reasonableness of the fee request. Director and partners' rates are $900–$1,135 per hour, associates' rates range from $475–$640 per hour, and paralegals' rates range from $310–$380 per hour. ¶ 88. These are "reasonable hourly rate[s]

---

[4] The time incurred by each set of Plaintiffs' Counsel has been individually reported by such firms, as forth in the attached declarations of Plaintiffs' Counsel. *See* Reiser-Renne Decl., Exs. 3-6.

20

for the region and for the experience of the lawyer." *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011); *see also Police Ret. Sys. of St. Louis v. Granite Constr., Inc.*, No. 19-04744, 2022 WL 816473, at *9  (N.D. Cal. Mar. 17, 2022) (Alsup, J.) (approving hourly rates for plaintiff's counsel in a securities case of between $175 to $1,325 and a multiplier of 2.81, stating "This order accepts the claimed rates as generally tracking the going rate for those with the same levels of skill and experience in our geographic region.")*; In re Volkswagen* "*Clean Diesel" Mktg., Sales Practices, and Prod. Liab. Litig.*, No. 15-md-02672, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (lodestar cross-check supported the reasonableness of the requested fee award where blended average hourly billing rate is $529 and billing rates range from $275 to $1600 for partners, $150 to $790 for associates, and $80 to $490 for paralegals); *Roberti v. OSI Sys., Inc.*, No. 13-cv-09174, 2015 WL 8329916, at *7 (C.D. Cal. Dec. 8, 2015) (approving rates between $525 to $975).

### 4.      The Skill Required and Quality of Work Performed Support the Fee Request

The fourth and fifth *Sugarland* factors (caliber of counsel and complexity of the litigation) are often considered together. "All else equal, litigation that is challenging and complex supports a higher fee award." *Activision*, 124 A.3d at 1072; *see also Theriault*, 51 A.3d at 1256 (complexity of the case "supports a substantial award of attorneys' fees").

Here, Plaintiffs' Counsel are among the most experienced and skilled practitioners in the corporate and securities litigation fields, and the firms have long and successful track records in derivative and securities cases throughout the country.  Cohen Milstein secured the first (and only) demand futility ruling that board members faced a substantial likelihood of liability for being complicit in allowing a chief executive officer ("CEO") to sexually harass employees in the *In Re Wynn Resorts, Ltd. Derivative Litig.*, Case No. A-18-769630-B (Nev. Dist. Ct. Clark Cty.), which ultimately settled for $90 million, including the value of substantial governance reforms. In addition, all firms on Plaintiffs' Executive Committee obtained a ground-breaking settlement in similar derivative action, *In re Alphabet Shareholder Derivative Litig.*, Case No. 19-cv-341522 (Cal. Sup. Ct. Santa Clara Cty.). The Alphabet settlement included historic governance reforms, sweeping revisions to Google's employment policies and practices, and other measures to ensure

workplace equity and improve board oversight, including establishing a Diversity, Equity, Inclusion Advisory Council comprised of outside experts and Alphabet executives, including Chief Executive Officer Sundar Pichai.  For the Court's convenience, Plaintiffs' Counsel's resumes are attached as Exhibits 3-A, 4-A, 5-A, and 6-A to the Reiser-Renne Declaration. Plaintiffs' Counsel's reputation as experienced counsel in complex cases facilitated Plaintiffs' ability to vigorously negotiate the Settlement against Defendants' high-caliber counsel.

Plaintiffs' Counsel's persistent advocacy and insistence on certain key governance terms is directly responsible for the breadth of this Agreement. It should be noted that in stockholder derivative cases, plaintiffs are denied any formal discovery until after they survive a motion to dismiss.  Thus, to increase the chance of success, it is imperative for plaintiffs' counsel to engage in substantial work and investigation *before* filing suit, lest the case be quickly dismissed.  Thus, the substantial work that was done here by Plaintiffs' Counsel pre-filing was absolutely crucial and a key part of the successful resolution of the Action.  As Delaware law strongly encourages, Plaintiffs' Counsel thoroughly investigated the claims **before** they filed suit, including time-consuming and substantial stockholder inspection demands for relevant documents pursuant to Section 220 of the Delaware General Corporation Law and interviews with former employees to better understand the concerns raised by Ms. Ozoma, Ms. Banks, and Ms. Brougher. Plaintiffs' Counsel used the information gleaned from their investigation to plead highly detailed complaints that convinced Defendants to quickly engage in ADR.  Plaintiffs' Counsel also engaged in extensive settlement negotiations, informed by experts in DEI issues in the tech industry. Plaintiffs' Counsel then brought this expertise into working group meetings with Special Committee's counsel to design state of the art reforms intended to improve Pinterest's corporate culture.  As part of the settlement negotiations, the parties exchanged dozens of letters and had dozens of (formal and informal) meet-and-confer calls regarding the relevant governance issues.

Additionally, Plaintiffs' Counsel engaged in vigorous, arm's-length settlement negotiations, including two separate mediations sessions and additional calls with Judge Spero.  ¶ 34, 43, 44, 95.  The mediation sessions involved extensive presentations by Plaintiffs and Defendants analyzing the legal and factual nuances of the case in depth.  Plaintiffs' Counsel also

attended scores of lengthy meetings with counsel for Pinterest and counsel for the Special Committee to negotiate the corporate governance portion of the Settlement.

As set forth above, Delaware courts frequently award 25% in legal fees in a successful contingent fee case. In *In re Emerson Radio S'holder Derivative Litig.*, No. C.A. 3392, 2011 WL 1135006, at *3 (Del. Ch. Mar. 28, 2011), the Court noted that the median attorneys' fee award in Delaware is 25%, citing Richard A. Rosen, David C. McBride & Danielle Gibbs, Settlement Agreements in Commercial Disputes: Negotiating, Drafting and Enforcement § 27. 10, at 27–100 (2010)).

Plaintiffs' Counsel's extensive efforts and skill leading to the Settlement strongly support the requested percentage fee.

The quality and vigor of opposing counsel are also important in evaluating the caliber of Plaintiffs' Counsel's work. *See, e.g., DeStefano v. Zynga, Inc.*, No. 12-cv-04007, 2016 WL 537946, at *17 (N.D. Cal. Feb. 11, 2016) (noting that "[t]he quality of opposing counsel is also relevant to the quality and skill that class counsel provided"); *Theriault*, 51 A.3d at 1256 (noting Plaintiffs faced off "against major league, first-rate legal talent"). Pinterest and Defendants are each represented by highly experienced and prestigious counsel, who vigorously represented their clients. ¶_96. Pinterest was represented by Freshfields Bruckhaus Deringer LLP, and the Special Committee was represented by WilmerHale. The fact that Plaintiffs' Counsel achieved this excellent Settlement in the face of this formidable legal opposition further evidences the quality of their work.

### 5.   The Reaction of the Stockholders to Date Supports the Fee Request

Although it is not a *Sugarland* factor, the stockholders' reaction to a proposed settlement and fee request is a relevant factor in approving fees. *See Knight v. Red Door Salons, Inc.*, No. 08-01520, 2009 WL 248367, at *7 (N.D. Cal. Feb. 2, 2009); *Omnivision*, 559 F. Supp. 2d at 1048. Here, the Notice of Pendency and Proposed Settlement of Stockholder Derivative Actions (the "Notice") was provided to stockholders. In addition, the Notice was posted on all Plaintiffs' Counsel as well as Pinterest's website. The Notice informed Pinterest stockholders that Plaintiffs' Counsel would seek fees and expenses of not more than $5,373,079. The Notice further informed

Pinterest stockholders of their right to object to the request for attorneys' fees and expenses. While the deadline for filing any objections is not until May 2, 2022, to date, no stockholder has filed or served upon Plaintiffs' Counsel an objection to the fees and expenses requested. ¶ 80.

**6.     The Fee Request is Supported by Plaintiffs**

Each of the Plaintiffs supports the Settlement, and the fee and expense request.   Moreover, the Interim Lead Plaintiff has filed a declaration in support of the Settlement and the fee and expense request.

While this is a derivative action and not a securities class action, it must be noted that Interim Lead Plaintiff ERSRI is an institutional investor, precisely the type of financially interested plaintiff that Congress sought to encourage to play an active role in shareholder litigation, and one familiar with its fiduciary obligations under the Private Securities Litigation Reform Act. H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 731 (1995).  Here, as attested in the accompanying declaration, ERSRI, in its role as a fiduciary, closely supervised, monitored, and actively participated in the prosecution and settlement of the Action. *See* Reiser-Renne Decl., Ex. 2, Amy L. Crane Decl. ¶¶ 7-9.  Based on its direct observation of the high quality of work performed by Plaintiffs' Counsel throughout this litigation, Interim Lead Plaintiff ERSRI believes that the requested fee is reasonable in light of the substantial recovery in the Action, the work counsel performed, and the risks of the litigation. *Id*.  Accordingly, Plaintiffs' endorsement of the fee request supports its approval. *See, e.g., In re Veeco Instruments Inc. Sec. Litig*., No. 05-md-01695, 2007 WL 4115808, at *8 (S.D.N.Y. Nov. 7, 2007) ("public policy considerations support the award in this case because the Lead Plaintiff . . . — a large public pension fund — conscientiously supervised the work of lead counsel and has approved the fee request"); *In re Lucent Tech., Inc. Sec. Litig*., 327 F. Supp. 2d 426, 442 (D.N.J. 2004) ("Lead Plaintiffs, both of whom are institutional investors with great financial stakes in the outcome of the litigation, have reviewed and approved Lead Counsel's fees and expenses request.").

**C.     Plaintiffs' Counsel's Expenses are Reasonable and Should be Approved**

Plaintiffs' Counsel also requests that the Court grant their application for reimbursement of litigation expenses incurred in prosecuting and resolving this litigation. ¶¶ 99. Expenses are

reimbursable where they are of the type typically billed by attorneys to paying clients in the marketplace. *See, e.g., Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (plaintiff may recover "those out-of-pocket expenses that 'would normally be charged to a fee paying client'"); *Omnivision*, 559 F. Supp. 2d at 1048 ("Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters.").

From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover any of their expenses and would not recover anything unless and until the Action was successfully resolved. Plaintiffs' Counsel also understood that, even assuming the case was ultimately successful, an award of expenses would not compensate for the lost use of the funds advanced to prosecute this Action. Thus, Plaintiffs' Counsel were motivated to take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action. ¶ 100.

As discussed in detail in the Reiser-Renne Declaration, Plaintiffs' Counsel incurred $47,047.58 in litigation expenses in litigating the Action. ¶ 99. The litigation expenses were reasonable and necessary for the prosecution and resolution of the litigation and are of the type routinely charged to hourly paying clients. These include mediator fees, expert fees, online research, service of process expenses, court fees, copying costs, and postage expenses. A complete breakdown by category of the expenses is presented in Reiser-Renne Declaration. These expense items are incurred separately by Plaintiffs' Counsel and are not duplicated in the firms' rates.

### III.   CONCLUSION

For all the foregoing reasons, the Court should approve the fee and expense application (i) awarding Plaintiffs' Counsel 10.75% of the Settlement Fund ($5,373,079) in fees, and (ii) awarding $47,047.58 for reimbursement of Plaintiffs' Counsel's litigation expenses.

Dated: April 21, 2022                    Respectfully submitted,

By:
                  */s/ Julie Goldsmith Reiser*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
JULIE GOLDSMITH REISER (*pro hac vice*)
jreiser@cohenmilstein.com
MOLLY BOWEN (*pro hac vice*)

mbowen@cohenmilstein.com
LYZETTE WALLACE (*pro hac vice*)
lwallace@cohenmilstein.com
1100 New York Ave. NW, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

LAURA POSNER (*pro hac vice*)
lposner@cohenmilstein.com
88 Pine St., 14th Floor
New York, NY 10005
Telephone: (212) 220-2925

*Counsel for Interim Lead Plaintiff the Employees'
Retirement System of Rhode Island and Interim Lead
Counsel*

**RENNE PUBLIC LAW GROUP**
LOUISE RENNE (SBN #36508)
lrenne@publiclawgroup.com
RUTH M. BOND (SBN #214582)
rbond@publiclawgroup.com
STEVE CIKES (SBN #235413)
scikes@publiclawgroup.com
ANASTASIA BONDARCHUK (SBN #309091)
abondarchuk@publiclawgroup.com
350 Sansome St., Suite 300
San Francisco, CA 94104
Telephone: (415) 848-7200
Facsimile: (415) 848-7230

*Counsel for Interim Lead Plaintiff the Employees'
Retirement System of Rhode Island and Interim
Liaison Counsel*

**BOTTINI & BOTTINI, INC**.
FRANCIS A. BOTTINI, JR. (SBN 175783)
fbottini@bottinilaw.com
ALBERT Y. CHANG (SBN 296065)
achang@bottinilaw.com
ANNE BESTE (SBN 326881)
abeste@bottinilaw.com
YURY A. KOLESNIKOV (SBN 271173)
ykolesnikov@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

*Counsel for Plaintiff Sal Toronto and Interim
Executive Committee Counsel*

**WEISSLAW LLP**
JOEL E. ELKINS (SBN 256020)
jelkins@weisslawllp.com

9100 Wilshire Boulevard, #725 E
Beverly Hills, CA 90210
Telephone: (310) 208-2800
Facsimile: (310) 209-2348

JOSEPH H. WEISS (*pro hac vice*)
jweiss@weisslawllp.com
DAVID C. KATZ (*pro hac vice*)
dkatz@weisslawllp.com
JOSHUA M. RUBIN (*pro hac vice*)
jrubin@weisslawllp.com
1500 Broadway, 16th Floor
New York, NY 10036
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

*Counsel for Plaintiff Stephen Bushansky and Interim Executive Committee Counsel*

Motion for Attorneys' Fees & Reimbursement of Litigation Expenses